**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Case No. 1:11-cv-04212 (CM)<br><br>Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA Liquidation<br><br>(Substantively Consolidated)<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBS AG, UBS (LUXEMBOURG) SA, UBS FUND SERVICES (LUXEMBOURG) SA, UBS THIRD PARTY MANAGEMENT COMPANY SA, ACCESS INTERNATIONAL ADVISORS LLC, ACCESS INTERNATIONAL ADVISORS EUROPE LIMITED, ACCESS INTERNATIONAL ADVISORS LTD., ACCESS PARTNERS (SUISSE) SA, ACCESS MANAGEMENT LUXEMBOURG | |

SA (f/k/a ACCESS INTERNATIONAL ADVISORS
(LUXEMBOURG) SA) as represented by its
Liquidator MAITRE FERNAND ENTRINGER,
ACCESS PARTNERS SA as represented by its
Liquidator MAITRE FERNAND ENTRINGER,
PATRICK LITTAYE, CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) in her capacity as Executrix under
the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), CLAUDINE MAGON DE LA
VILLEHUCHET (a/k/a CLAUDINE DE LA
VILLEHUCHET) individually as the sole beneficiary
under the Will of THIERRY MAGON DE LA
VILLEHUCHET (a/k/a RENE THIERRY DE LA
VILLEHUCHET), PIERRE DELANDMETER,
THEODORE DUMBAULD, LUXALPHA SICAV
as represented by its Liquidators MAITRE ALAIN
RUKAVINA and PAUL LAPLUME, MAITRE
ALAIN RUKAVINA AND PAUL LAPLUME, in
their capacities as liquidators and representatives of
LUXALPHA SICAV, ROGER HARTMANN,
RALF SCHROETER, RENE EGGER, ALAIN
HONDEQUIN, HERMANN KRANZ, BERND
(a/k/a, BERNARD) STIEHL, GROUPEMENT
FINANCIER LTD.,

Defendants.

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

Third-Party Plaintiff,

v.

UBS AG, UBS (LUXEMBOURG) SA, UBS FUND
SERVICES (LUXEMBOURG) SA, UBS THIRD
PARTY MANAGEMENT COMPANY SA,
ACCESS INTERNATIONAL ADVISORS LLC,
ACCESS INTERNATIONAL ADVISORS EUROPE
LIMITED, ACCESS INTERNATIONAL
ADVISORS LTD., ACCESS PARTNERS (SUISSE)
SA, ACCESS MANAGEMENT LUXEMBOURG
SA (f/k/a ACCESS INTERNATIONAL ADVISORS
(LUXEMBOURG) SA) as represented by its
Liquidator MAITRE FERNAND ENTRINGER,
ACCESS PARTNERS SA as represented by its
Liquidator MAITRE FERNAND ENTRINGER,

PATRICK LITTAYE, CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) in her capacity as Executrix under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), CLAUDINE MAGON DE LA VILLEHUCHET (a/k/a CLAUDINE DE LA VILLEHUCHET) individually as the sole beneficiary under the Will of THIERRY MAGON DE LA VILLEHUCHET (a/k/a RENE THIERRY DE LA VILLEHUCHET), PIERRE DELANDMETER, THEODORE DUMBAULD, LUXALPHA SICAV as represented by its Liquidators MAITRE ALAIN RUKAVINA and PAUL LAPLUME, MAITRE ALAIN RUKAVINA AND PAUL LAPLUME, in their capacities as liquidators and representatives of LUXALPHA SICAV, ROGER HARTMANN, RALF SCHROETER, RENE EGGER, ALAIN HONDEQUIN, HERMANN KRANZ, BERND (a/k/a, BERNARD) STIEHL, GROUPEMENT FINANCIER LTD.,

                         Third-Party Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................ 1

JURISDICTION AND VENUE ......................................................................... 4

THE PARTIES.................................................................................................... 5

    THE TRUSTEE'S POWER AND STANDING................................................ 5

    THE DEFENDANTS......................................................................................... 7

        The UBS Defendants ................................................................................. 8

        The Access Defendants.............................................................................. 9

        The Feeder Fund Defendants ................................................................. 13

            Luxalpha ............................................................................................ 13

            Luxalpha Director Defendants ........................................................ 14

            Groupement Financier ...................................................................... 15

            Groupement Financier Director Defendants............................. 15

    MADOFF'S INVESTMENT ADVISORY, MARKET MAKING, AND
    PROPRIETARY TRADING BUSINESSES ............................................... 15

THE SIPA LIQUIDATION.............................................................................. 22

THE DEFENDANTS AND THEIR CONNECTIONS TO MADOFF...................... 24

    THE FOUNDING OF ACCESS INTERNATIONAL ADVISORS ............... 24

    ACCESS'S CONNECTION TO BLMIS ...................................................... 26

    THE UBS DEFENDANTS' MANY CONNECTIONS TO MADOFF AND
    BLMIS ............................................................................................................ 28

    THE ACCESS DEFENDANTS' AND THE UBS DEFENDANTS'
    CONNECTIONS TO EACH OTHER .......................................................... 29

THE DEFENDANTS' ROLES IN ENABLING AND PERPETUATING THE FRAUD ........ 32

    THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING
    MADOFF AND BLMIS ................................................................................ 32

    UBS KNOWINGLY PROVIDED A FAÇADE OF LEGITIMACY FOR
    MADOFF'S FRAUD ..................................................................................... 40

        UBS AG ................................................................................................ 40

        UBS SA ................................................................................................. 42

        UBSFSL ................................................................................................ 43

        UBSTPM................................................................................................ 44

        UBS's Luxalpha Board Members ......................................................... 44

# TABLE OF CONTENTS
(continued)

Page

THE UBS DEFENDANTS ENABLED MADOFF BY PROVIDING THE
APPEARANCE OF LEGITIMACY AND SECURITY FOR LUXALPHA AND
GROUPEMENT FINANCIER ...................................................................................... 44

    The UBS Defendants Disclaimed All Responsibility and Protected
    Themselves Through a Series of Secret and Undisclosed Indemnity
    Agreements ...................................................................................................... 45

    The UBS Defendants Delegated Their Luxalpha Management and
    Custodial Duties.............................................................................................. 47

    UBS's Operation of Luxalpha Invited a Fraud ................................................ 52

    UBS's Role as a "Front" and Mere "Window Dressing" for Luxalpha Was
    Well Known and Understood by the Fund's Insiders......................................... 54

    The UBS Defendants Were Paid Over $80 Million in Fees for Their
    "Work" on Luxalpha....................................................................................... 56

    UBS Defendants' Operation of Groupement Financier Invited a Fraud ............ 57

THE ACCESS DEFENDANTS FACILITATED THE SCHEME THROUGH
MISLEADING MARKETING AND SALES ................................................................ 58

    The Marketing of the Feeder Fund Defendants ................................................ 58

    Access's Due Diligence Procedures Did Not Apply to Madoff ......................... 59

WHEN FACED WITH PLAIN EVIDENCE OF A FRAUD, THE ACCESS
DEFENDANTS CHOSE TO SUPPRESS THE INFORMATION ................................. 61

    Questions Were Raised Concerning the Reported Volume of Madoff's
    Options Trades ................................................................................................ 62

    Access Brought in Chris Cutler to Do Due Diligence on BLMIS ...................... 63

    Access's Inner Circle Concealed Cutler's Findings .......................................... 64

THE ACCESS DEFENDANTS IGNORED ADDITIONAL RED FLAGS ................... 68

    BLMIS's Auditor Friehling & Horowitz .......................................................... 69

    Access Mgmt Lux Backdated Investment Recommendations and Madoff
    and/or BLMIS Only Reported Trades Through Delayed Paper
    Confirmations ................................................................................................. 70

    Madoff's Purported Market-Timing Ability ..................................................... 71

    Madoff's Insistence on Secrecy ....................................................................... 72

    BLMIS's Unusual Performance........................................................................ 72

    Unidentified Counterparties............................................................................. 73

    Lack of an Independent Custodian ................................................................... 74

**TABLE OF CONTENTS**
(continued)

**Page**

THE AFTERMATH ............................................................................................ 74

THE TRANSFERS ........................................................................................... 77

    TRANSFERS FROM BLMIS TO THE FEEDER FUND DEFENDANTS ................. 77

    TRANSFERS FROM THE FEEDER FUND DEFENDANTS TO THE
    LUXALPHA AND GROUPEMENT FINANCIER DIRECTOR DEFENDANTS,
    ACCESS DEFENDANTS, AND UBS DEFENDANTS ............................................... 79

CUSTOMER CLAIMS ....................................................................................... 80

    COUNT ONE: PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE) 11
    U.S.C. §§ 547(b), 550(a), AND 551 *Against The Feeder Fund Defendants* ................. 81

    COUNT TWO: PREFERENTIAL TRANSFERS (SUBSEQUENT
    TRANSFEREE) 11 U.S.C. §§ 547(b), 550(a), AND 551 *Against The Feeder
    Fund Director Defendants, Access Defendants, And UBS Defendants* .......................... 83

    COUNT THREE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11
    U.S.C. §§ 548(a)(1)(A), 550(a), AND 551 *Against The Feeder Fund Defendants* ......... 84

    COUNT FOUR: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) 11
    U.S.C. §§ 548(a)(1)(B), 550(a), AND 551 *Against The Feeder Fund Defendants* ......... 85

    COUNT FIVE: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW
    YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 *Against The Feeder Fund Defendants* ......... 86

    COUNT SIX: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE) NEW
    YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND
    11 U.S.C. §§ 544, 550(a), AND 551 *Against The Feeder Fund Defendants* ................. 87

    COUNT SEVEN: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
    NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 *Against The Feeder Fund Defendants* ......... 88

    COUNT EIGHT: FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
    NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279,
    AND 11 U.S.C. §§ 544, 550(a), AND 551 *Against The Feeder Fund Defendants* ......... 89

    COUNT NINE: RECOVERY OF SUBSEQUENT TRANSFERS:  NEW YORK
    DEBTOR AND CREDITOR LAW §§ 273 - 279 AND 11 U.S.C. §§ 544, 547,
    548, 550(a) AND 551 *Against The Feeder Fund Director Defendants, Access
    Defendants, And UBS Defendants* ................................................................... 90

    COUNT TEN: DISALLOWANCE OF CUSTOMER CLAIMS *Against Luxalpha
    And UBS SA* ............................................................................................ 91

    COUNT ELEVEN: EQUITABLE SUBORDINATION OF CUSTOMER
    CLAIMS *Against Luxalpha And UBS SA* ........................................................ 91

# TABLE OF CONTENTS
(continued)

**Page**

COUNT TWELVE: AIDING AND ABETTING FRAUD *Against The UBS Defendants* ......................................................................................... 92

COUNT THIRTEEN: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY *Against The UBS Defendants* ............................................................... 94

COUNT FOURTEEN: AIDING AND ABETTING CONVERSION *Against The UBS Defendants* ......................................................................................... 97

COUNT FIFTEEN: KNOWING PARTICIPATION IN A BREACH OF TRUST *Against The UBS Defendants* ........................................................................ 100

COUNT SIXTEEN: CONVERSION *Against The UBS Defendants* ........................... 103

COUNT SEVENTEEN: UNJUST ENRICHMENT *Against The UBS Defendants* ...... 103

COUNT EIGHTEEN: MONEY HAD AND RECEIVED *Against The UBS Defendants* ....................................................................................................... 105

COUNT NINETEEN: AIDING AND ABETTING FRAUD *Against The Access Defendants* ....................................................................................................... 105

COUNT TWENTY: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY *Against The Access Defendants* ........................................................... 107

COUNT TWENTY-ONE: AIDING AND ABETTING CONVERSION *Against The Access Defendants* .......................................................................... 109

COUNT TWENTY-TWO: KNOWING PARTICIPATION IN A BREACH OF TRUST *Against The Access Defendants* ........................................................ 112

COUNT TWENTY-THREE: CONVERSION *Against The Access Defendants* .......... 114

COUNT TWENTY-FOUR: UNJUST ENRICHMENT *Against The Access Defendants* ....................................................................................................... 115

COUNT TWENTY-FIVE: MONEY HAD AND RECEIVED *Against The Access Defendants* ....................................................................................................... 116

COUNT TWENTY-SIX: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY *Against The Luxalpha Director Defendants* .............................. 116

COUNT TWENTY-SEVEN: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY *Against The Groupement Financier Director Defendants* .......... 118

COUNT TWENTY-EIGHT: CONTRIBUTION *Against All Defendants* .................... 119

Irving H. Picard, as trustee (the "Trustee") for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act ("SIPA"), §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff ("Madoff"), individually, by and through his undersigned counsel, as and for his Amended Complaint, alleges as follows:

## NATURE OF THE ACTION

1.      Madoff did not act alone in perpetrating the largest financial fraud in history. UBS AG and its affiliated entities (collectively, the "UBS Defendants") enabled Madoff's Ponzi scheme through numerous international feeder funds, including Luxalpha SICAV ("Luxalpha") and Groupement Financier Ltd. ("Groupement Financier," and together with Luxalpha, the "Feeder Fund Defendants").  Luxalpha and Groupement Financier together withdrew approximately $796 million in the ninety days before December 11, 2008 (the "Filing Date"), and roughly $1.12 billion in the preceding six years.  The UBS Defendants appear to have made at least $80 million in fees from the Ponzi scheme, as they facilitated the scheme in the face of clear indicia of fraud that cast doubt on the legitimacy of Madoff and BLMIS.  Defendant Access International Advisors LLC, its several affiliates and the associated individuals named herein (collectively, the "Access Defendants") worked together with the UBS Defendants to extend the Ponzi scheme to European investors, earning millions of dollars in fees for their role in the Ponzi scheme.  The UBS Defendants and the Access Defendants are liable for at least $2 billion for their roles in masking BLMIS's fraud and perpetuating the Ponzi scheme, with an exact amount to be determined at trial.

2.      The UBS Defendants were well aware of indicia of fraud surrounding Madoff and BLMIS.  For instance, beginning at least in 2002, the UBS Defendants questioned the consistency of Madoff's returns, which UBS analysts could not replicate using Madoff's

purported "Split Strike Conversion" strategy.  The UBS Defendants further saw other red flags,

such as Madoff's lack of transparency.  In addition, the UBS Defendants could not figure out

who Madoff's counterparties were.  The Private Wealth Management Group of the UBS

Defendants reportedly put BLMIS on a "non-approved" list and BLMIS-related funds were not

recommended to Private Wealth clients.  As one UBS analyst pointed out in 2007:  "[s]ome folks

think [M]adoff could be one of the most successful schemes ever."

3.     Thus armed with the knowledge that BLMIS was likely a fraud, the UBS

Defendants nevertheless chose to enable Madoff's fraud for their own gain.  The UBS

Defendants outwardly assumed a number of key roles for the Feeder Fund Defendants only to

delegate their roles to Madoff and/or BLMIS and then disavow any potential liability through

undisclosed indemnity agreements and insurance policies.  For example, UBS AG sponsored the

formation of Luxalpha, lending its name as sponsor of that fund to lull the outside world into

believing that Luxalpha was legitimate, while at the same time contracting with the Access

Defendants to absolve UBS AG of any liability in its role as sponsor.  UBS (Luxembourg) S.A.,

a wholly-owned subsidiary of UBS AG, purported to serve as custodian for the assets of

Luxalpha and Groupement Financier, but delegated its custodial duties to Madoff and/or BLMIS,

which was also the investment adviser with trading authority for the Feeder Fund Defendants.

UBS Fund Services (Luxembourg) S.A., another wholly-owned subsidiary of UBS AG, served

as administrator for both Feeder Fund Defendants.  It calculated the "net asset value" ("NAV")

of these funds based solely on numbers and information provided by Madoff and/or BLMIS,

with no independent verification.

4.     UBS concealed Madoff's involvement with Luxalpha from the Luxembourg

regulator, the Commission de Surveillance du Secteur Financier (the "CSSF").  UBS knowingly

omitted any reference to Madoff or BLMIS when identifying Luxalpha's custodians and managers to the CSSF.  UBS had to have known that Madoff could not pass the scrutiny of the CSSF given the likelihood that he was a fraud.

5.    There were no checks and balances on Madoff and/or BLMIS, and the UBS Defendants knew it because the system – which invited fraud – was knowingly put in place and carried out by the UBS Defendants.  Madoff's scheme could not have been accomplished unless the UBS Defendants had agreed to look the other way and to pretend that they were truly ensuring the existence of assets and trades when in fact they were not and never did.  The UBS Defendants disregarded the duties they publicly assumed and improperly delegated their primary functions to Madoff himself.  The "fees" they received in their various roles were nothing more than "fees" for looking the other way, and lending their prestigious name to legitimize and attract money to Madoff's fraud.

6.    Meanwhile, the Access Defendants marketed the Feeder Fund Defendants by touting a rigorous due diligence process and a series of antifraud measures that in reality never applied to the Feeder Fund Defendants.  Just as the UBS Defendants allowed for special, lax treatment of the Feeder Fund Defendants, so, too, did the Access Defendants.  Luxalpha and Groupement Financier were treated differently from other funds and were allowed to operate as an exception to the Access Defendants' normal policies and procedures regarding the due diligence of funds and their managers.  Madoff was not subject to routine background checks, did not have to allow the Access Defendants to regularly visit his office or meet with his staff, and was allowed to report his purported trades on a delayed basis using only hard copy confirmations that provided ample opportunity for him to commit and perpetuate his fraud.

7.     The Access Defendants and, thereby, Luxalpha's and Groupement Financier's Boards of Directors – which consisted of the principals of the Access entities and of UBS (Luxembourg) SA executives – knew that the volume of trading being reported by Madoff was impossible, but decided not to make that information public.  The Access Defendants also knew of other red flags surrounding Madoff and/or BLMIS.  For example, they knew that BLMIS had a small, unknown auditor.  Furthermore, they were aware of Madoff's implausible market-timing ability and performance, and the Access Defendants were never able to identify any of Madoff's purported counterparties.  Together with the UBS Defendants, the Access Defendants enabled the Ponzi scheme and were complicit in it, to their profit.

8.     The Trustee seeks the recovery of all Customer Property[1] belonging to the BLMIS estate, in the form of redemptions, fees, compensation and assets, as well as all damages, including but not limited to consequential, compensatory and punitive damages, caused by the Defendants' misconduct, and the disgorgement of all funds by which the Defendants were unjustly enriched at the expense of BLMIS's customers.

## JURISDICTION AND VENUE

9.     The Trustee brings this adversary proceeding pursuant to his statutory authority under SIPA §§ 78fff(b) and 78fff-2(c)(3), §§ 105(a), 502(d), 510, 541, 544, 547, 548(a), 550(a), and 551 of 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt. & Cred. § 270, *et seq.* (McKinney 2001)), and other applicable law, for avoidance and recovery of preferential transfers and fraudulent conveyances, knowing participation in breach of trust, unjust enrichment, conversion, money had and received, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion,

---

[1] SIPA § 78lll(4) defines "Customer Property" as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted."

contribution, disallowance of the customer claims filed by certain Defendants, and equitable subordination.  The Trustee also seeks, among other things, to set aside all avoidable transfers, collect damages caused by the Defendants, preserve the stolen Customer Property for the benefit of BLMIS customers, and recover *all* stolen Customer Property from the Defendants, wherever it is located and in whatever form it may now or in the future exist.

10.     This case began as an adversary proceeding brought in the bankruptcy court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending.  The Securities Investor Protection Corporation ("SIPC") originally brought the SIPA Proceeding in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding").  This Court has jurisdiction over this action under 28 U.S.C. §§ 1334(b) and 1334(e)(1), and SIPA §§ 78eee(b)(2)(A), (b)(4).

11.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

12.     Venue in this district is proper under 28 U.S.C. § 1409.

## THE PARTIES

### THE TRUSTEE'S POWER AND STANDING

13.     Plaintiff is the Trustee appointed, by order dated December 15, 2008, for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3).  Pursuant to SIPA § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code.  Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code are applicable to this case to the extent consistent with SIPA § 78fff(b).

14.     In addition to the powers of a bankruptcy trustee, the Trustee has broader powers granted by SIPA.

15.     The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including §§ 323(b), 541, 544 and 704(a)(1), because, among other reasons:

    a.      BLMIS incurred losses as a result of the conduct set forth herein;

    b.      BLMIS customers and/or the Customer Property estate were injured as a result of the conduct detailed herein;

    c.      SIPC cannot by statute advance sufficient funds to the Trustee to fully reimburse all BLMIS customers for all of their losses;

    d.      the Trustee will not be able to fully satisfy all claims;

    e.      the Defendants, as captioned herein, received Customer Property;

    f.      the Trustee, as representative of, and as bailee of, the Customer Property estate, can sue as a real party in interest to pursue Customer Property for equitable distribution;

    g.      to the extent the Trustee has received express assignments of certain BLMIS customer claims, which they could have asserted, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to seek monetary damages;

    h.      SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding.  SIPC has expressly assigned to the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds;

i.      the Trustee has the power and authority to bring claims and to avoid and recover transfers pursuant to §§ 541, 544, 547, 548, 550(a), and 551 of the Bankruptcy Code and SIPA §§ 78fff-1(a) and 78fff-2(c)(3); and

j.      the Trustee has the rights and powers of a creditor under § 544 of the Bankruptcy Code.

16.    The Trustee also brings a contribution claim as a successor-in-interest to BLMIS and a third-party plaintiff in the SIPA Proceeding.  BLMIS customers have filed thousands of claims to date, and pursuant to Rule 14 of the Federal Rules of Civil Procedure and Rule 7014 of the Federal Rules of Bankruptcy Procedure, the Trustee impleads all of the Defendants as captioned herein as third-party defendants seeking contribution from them to the extent they contributed to damages suffered by BLMIS customers.

**THE DEFENDANTS**

17.    This Court has personal jurisdiction over all of the Defendants captioned herein pursuant to N.Y. CPLR 301 and 302, and Bankruptcy Rule 7004.  All Defendants have maintained minimum contacts with New York in connection with the claims alleged herein.  The Defendants have or had offices in New York, or are doing or did business in New York, and/or transact or transacted business in New York.  Defendants Luxalpha and Groupement Financier had accounts with BLMIS in New York.  The UBS Defendants, the Access Defendants, the Feeder Fund Defendants and the Feeder Fund Director Defendants (defined below), delivered agreements or caused agreements to be delivered in New York relating to BLMIS.  In addition, certain of the UBS Defendants and Access Defendants communicated regularly with persons in New York regarding the Feeder Fund Defendants and/or BLMIS, and also sent and/or received funds to and/or from BLMIS in New York, utilizing New York banks.  Furthermore, the Defendants have committed tortious acts both within and without New York, causing injury in

New York, and expected or should reasonably have expected these tortious acts to have consequences in New York, and derive substantial revenue from interstate or international commerce.  In addition, Luxalpha filed Customer Claims in the SIPA Proceeding seeking to recover funds it allegedly lost on its investments in BLMIS, and has thus submitted to the jurisdiction of this Court.

### The UBS Defendants

18.     Defendant UBS AG is a public company incorporated under the laws of Switzerland, having its registered and principal offices at Bahnhofstrasse 45, CH-8001 Zurich, and Aeschenvorstadt 1, CH-4051 Basel, Switzerland.  UBS AG is present in New York, with offices located at 299 Park Avenue, New York, NY 10171 and 101 Park Avenue, New York, NY 10178.  UBS AG, together with UBS (Luxembourg) SA, sponsored the formation of Luxalpha.

19.     Defendant UBS (Luxembourg) S.A. ("UBS SA"), a wholly-owned subsidiary of UBS AG, is a *société anonyme* (public limited company), organized under the laws of Luxembourg and has its registered office at 33a, Avenue John F. Kennedy, BP 2, L-1855 Luxembourg.  UBS SA sponsored the formation of Luxalpha jointly with UBS AG.  In addition, UBS SA formally served as the custodian of Luxalpha's assets as invested through BLMIS. However, unbeknownst to its investors and the regulators, UBS SA abdicated all of its custodial obligations by entering into a sub-custodian agreement with New York-based BLMIS upon the opening of Luxalpha's account with BLMIS.  UBS SA also formally served as Luxalpha's portfolio manager from February 2004 through August 2006.  In reality, UBS SA delegated this function to Madoff as well and authorized BLMIS to "follow [Madoff's] instructions . . . in every respect concerning" the BLMIS account held by UBS SA on behalf of Luxalpha. Additionally, UBS SA entered into a Portfolio Advisory Agreement with New York-based Defendant Access International Advisors LLC ("AIA LLC"), pursuant to which AIA LLC would

advise UBS SA with respect to investing Luxalpha's assets.  Finally, UBS SA served as the

prime bank for Groupement Financier.

20.     Defendant UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), a wholly-owned

subsidiary of UBS AG, is a *société anonyme* (public limited company), organized under the laws

of Luxembourg and has its registered office at 33a, Avenue John F. Kennedy, L-1855

Luxembourg.  UBSFSL served as the administrator for both Luxalpha and Groupement

Financier, charged, among other things, with the calculation of the NAV.

21.     Defendant UBS Third Party Management Company S.A. ("UBSTPM"), which is,

upon information and belief, a wholly-owned subsidiary of UBS AG, is a *société anonyme*

(public limited company) organized under the laws of Luxembourg, with its registered office at

33a, Avenue John F. Kennedy, L-1855 Luxembourg.  The Chairman of UBSTPM's board of

directors was a managing director of UBS AG, and the remainder of its board was comprised of

UBS AG and UBSFSL directors.  In addition, the day-to-day managers of UBSTPM were all

directors of UBSFSL.  UBSTPM formally served as Luxalpha's portfolio manager beginning in

August 2006, but AIA LLC retained its role as investment advisor until UBSTPM entered into an

Investment Advisory Agreement with Access Partners S.A. (Luxembourg).  Like UBS SA,

UBSTPM left the management of Luxalpha's portfolio to BLMIS.

***The Access Defendants***

22.     Defendant AIA LLC is a Delaware limited liability company which had its

principal place of business at 509 Madison Avenue, 22nd Floor, New York, New York 10022

during the relevant period.  AIA LLC served as Luxalpha's portfolio advisor from August 1,

2004 to November 17, 2008, charged with primary responsibility for marketing and monitoring

Luxalpha's investments through BLMIS.  In this capacity, AIA LLC also advised UBS SA in

connection with UBS SA's role as portfolio manager of Luxalpha from August 1, 2004 to August 1, 2006.

23.     Defendant Access International Advisors Europe Limited ("AIA Europe Ltd.") is a limited company formed under the laws of England.  AIA Europe Ltd. was dissolved on November 24, 2009.  Its last registered address was Suite 17, City Business Centre, Lower Road, London SE16 2XB.  AIA Europe Ltd. served as the administrative agent for Groupement Financier and provided "back office," administrative support for Luxalpha.  AIA Europe Ltd. was also generally regarded as the "back office" for the entire Access group.

24.     Defendant Access International Advisors Ltd. ("AIA Ltd.") is a limited liability company incorporated in the Bahamas with its registered office at c/o MMG Bahamas Ltd., P.O. Box CB – 13937, Suite 102, Saffrey Square, Bay Street & Bank Lane, Nassau, Bahamas. According to various operating memoranda, AIA Ltd. was the investment manager of Groupement Financier until July 2007.  At various times, AIA Ltd. was also identified as Groupement Financier's operator, sponsor, and investment advisor.  Although it was formed in 1998, as of 2004, AIA Ltd. did not have a physical presence in any jurisdiction and had "limited physical evidence of being an actual company."  It was regarded as the "money box" for the Access group, and its primary purpose was "the receipt of fees on behalf of the group."  As of 2007, AIA Ltd. does not appear to have been licensed to act as an investment manager and it did not, in fact, act as investment manager to Groupement Financier.

25.     Defendant Access Partners (Suisse) S.A. ("AP (Suisse)") is a *société anonyme* (public limited company) registered under the laws of Switzerland with its registered address at Baarestrasse 112, 6302 Zug, Switzerland.  AP (Suisse) was designated as Groupement

Financier's investment manager beginning in July 2007.  However, as of September 2008, AP

(Suisse) was not operational and all investment manager fees were invoiced to AIA Ltd.

26.     Defendant Access Management Luxembourg S.A. ("Access Mgmt Lux") (f/k/a

Access International Advisors (Luxembourg) S.A. ("AIA (Lux)")) is a *société anonyme* (public

limited company) incorporated and organized under the laws of Luxembourg, registered at the

Luxembourg Register of Commerce and Companies under n° B 94564, having its registered

office at 34A, rue Philippe II, L-2340 Luxembourg.  The company is represented by its

liquidator, Maitre Fernand Entringer, having his offices at 34A, Rue Philippe II, L-2340,

Luxembourg.  Access Mgmt Lux formally served as portfolio manager for Luxalpha from

November 17, 2008 through its liquidation, but entered into an Investment Advisory Agreement

with Access Partners S.A. (Luxembourg), and ultimately left the management of Luxalpha's

portfolio to BLMIS.  As AIA (Lux), it also served as Luxalpha's portfolio advisor from February

4, 2004 until August 1, 2004, where it advised UBS SA in connection with UBS SA's role as

portfolio manager of Luxalpha.

27.     Defendant Access Partners S.A. (Luxembourg) ("AP (Lux)") is a *société anonyme*

(public limited company) incorporated and organized under the laws of Luxembourg, registered

at the Luxembourg Register of Commerce and Companies under n° B124 678, having its

registered office at 34A, rue Philippe II, L-2340 Luxembourg.  The company is represented by

its liquidator, Maitre Fernand Entringer, having his offices at 34A, Rue Philippe II, L-2340,

Luxembourg.  AP (Lux) formally served as Luxalpha's investment advisor from February 13,

2007 through its liquidation, where it advised UBSTPM, and later Access Mgmt Lux, in

connection with their roles as managers for Luxalpha.  AP (Lux) was also designated as

Groupement Financier's investment adviser.

28.     Defendant Patrick Littaye ("Littaye") co-founded AIA LLC in 1995, and served as its Partner, Chairman and Chief Executive Officer.  He served as a Director of Luxalpha and as a Director of Groupement Financier.  In addition, Littaye was a Director, Chairman and Managing Director of AIA (Lux).  Littaye is a citizen of a foreign state.

29.     Claudine Magon de la Villehuchet a/k/a Claudine de la Villehuchet, is named herein in her capacity as Executrix under the Will of Thierry Magon de la Villehuchet a/k/a René Thierry de la Villehuchet, dated November 6, 2000.  Thierry Magon de la Villehuchet ("Villehuchet") co-founded AIA LLC in 1995, and served as its Partner, Chairman, and Chief Executive Officer up until his death on December 22, 2008.  He also served as a Director of Groupement Financier.  In addition, Villehuchet was a Director of AIA (Lux).  Upon information and belief, Ms. Villehuchet is a resident of New York.

30.     Claudine Magon de la Villehuchet a/k/a Claudine de la Villehuchet, is also named herein individually, as the sole beneficiary under Article Second of the Will of Thierry Magon de la Villehuchet a/k/a René Thierry de la Villehuchet, dated November 6, 2000.  Upon information and belief, Ms. Villehuchet is a resident of New York.

31.     Defendant Pierre Delandmeter ("Delandmeter") was a board member of Access Mgmt Lux, the entity designated as Luxalpha's portfolio manager beginning in November 2008.  He served as both a Director and Legal Advisor of Luxalpha.  In addition, Delandmeter served as a Director and Managing Director of AIA (Lux).  Delandmeter is a citizen of a foreign state.

32.     Defendant Theodore Dumbauld ("Dumbauld") was a Partner at AIA LLC beginning in 2002.  He also served as Chief Investment Officer of AIA LLC until his departure in 2006.  Dumbauld is a resident of the State of Connecticut.

***The Feeder Fund Defendants***

      ***Luxalpha***

33.     Defendant Luxalpha is a Luxembourg-based, open-ended investment fund with its registered office at 33A, Avenue J.F. Kennedy, L-1855 Luxembourg, formed by UBS AG and UBS SA.  Luxalpha is listed in the Trade and Companies Register under number B.98874.  Luxalpha was placed in liquidation by the District Court of Luxembourg on April 2, 2009 and is represented by its court-appointed liquidators, Maitre Alain Rukavina, barrister (avocat á la Cour) and Paul Laplume, company auditor (the "Luxembourg Liquidators").  Me. Rukavina resides at 10A, Boulevard de la Foire, L-1528 Luxembourg.  Mr. Laplume resides at 42, Rue des Cerises, L-6113 Junglinster.

34.     Me. Rukavina and Mr. Laplume are also defendants in their capacity as court-appointed liquidators and representatives of the open-ended investment company Luxalpha SICAV in judicial liquidation, and of the investors and creditors of the open-ended investment company Luxalpha SICAV in judicial liquidation, according to the provisions of the judgment of the District Court of Luxembourg of April 2nd, 2009.  Me. Rukavina and Mr. Laplume are both residents of Luxembourg.  Defendant Luxalpha includes Me. Rukavina and Mr. Laplume.

35.     Luxalpha opened its account (Account No. 1FR108) with BLMIS on March 22, 2004, and this account was still open when Madoff was arrested on December 11, 2008.  This account was opened by and held in the name of "UBS (Luxembourg) S.A. for the benefit of Luxalpha."  Three claims were filed with the Trustee in this SIPA proceeding.  Two of the claims, Claim Nos. 004419 and 005725, were filed by Luxalpha on March 2, 2009 and March 3, 2009 respectively.  These two claims, which are duplicative of each other, were signed by two of Luxalpha's directors, Ralf Schroeter and Alan Hondequin, and both claim the same amount of

13

$1,537,099,731.  The third claim, Claim No. 005025, was filed by UBS SA on behalf of Luxalpha on March 2, 2009, and also claims the amount of $1,537,099,731.

### Luxalpha Director Defendants

36.     Defendant Roger Hartmann ("Hartmann") served as chairman of the Board of Directors of Luxalpha from February 2004 to January 1, 2008.  He was the Chief Executive Officer of UBS SA until November 30, 2007.  Hartmann is a citizen of a foreign state.

37.     Defendant Ralf Schroeter ("Schroeter") served as chairman of the Board of Directors of Luxalpha from January 1, 2008 through the fund's liquidation.  He currently serves as "Managing Director:  Chief Operating Officer" of UBS SA.  Schroeter is a citizen of a foreign state.

38.     Defendant Rene Egger ("Egger") served as a Director of Luxalpha from December 15, 2005 through its liquidation.  He served as "Managing Director:  Head of Products and Services" at UBS SA until June 2009.  Egger is a citizen of a foreign state.

39.     Defendant Alain Hondequin ("Hondequin") served as a Director of Luxalpha from February 2004 through its liquidation.  He formerly served as "Executive Director:  Head of Legal and Compliance" at UBS SA.  Hondequin is a citizen of a foreign state.

40.     Defendant Hermann Kranz ("Kranz") served as a Director of Luxalpha from February 2004 through its liquidation.  He currently serves as "Managing Director:  Chief Administrative Officer" of UBS SA.  Kranz is a citizen of a foreign state.

41.     Defendant Bernd (a/k/a, Bernard) Stiehl ("Stiehl") served as a Director of Luxalpha from February 2004 to December 15, 2005.  He was formerly an Executive Director at UBS SA.  Stiehl is a citizen of a foreign state.

42.     Defendant Littaye also served as a Director of Luxalpha from February 1, 2006 through its liquidation.

14

43.     Defendant Delandmeter also served as both a Director of Luxalpha and as its legal advisor from February 2004 through its liquidation.

44.     Defendants Hartmann, Schroeter, Egger, Hondequin, Kranz, Stiehl, Littaye, and Delandmeter are referred to collectively as the "Luxalpha Director Defendants."

### Groupement Financier

45.     Defendant Groupement Financier is an investment fund organized under the laws of the British Virgin Islands ("BVI").  Groupement Financier's registered agent is Maples & Calder and its registered office is at Sea Meadow House, P.O. Box 173, Road Town, Tortola VG 1110, BVI.  Groupement Financier opened its account (Account No. 1FR096) with BLMIS on April 8, 2003 and this account was still open when Madoff was arrested on December 11, 2008.

### Groupement Financier Director Defendants

46.     Access Defendants Littaye and Villehuchet were the Directors of Groupement Financier, and are referred to collectively as the "Groupement Financier Director Defendants."

47.     The Luxalpha Director Defendants and the Groupement Financier Director Defendants are collectively referred to herein as the "Feeder Fund Director Defendants."

### MADOFF'S INVESTMENT ADVISORY, MARKET MAKING, AND PROPRIETARY TRADING BUSINESSES

48.     BLMIS was a New York limited liability company that was wholly owned by Madoff.  Founded in 1959, BLMIS operated its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees.  BLMIS was registered with the Securities Exchange Commission ("SEC") as a securities broker-dealer under § 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b).  By that registration,

BLMIS is a member of SIPC.  BLMIS had three business units:  market making, proprietary

trading, and investment advisory (the "IA Business").

49.     BLMIS had an active market making unit.  A market maker is a brokerage firm

that regularly offers to trade securities with other brokerage firms at posted prices.  The universe

of securities in which BLMIS made a market was comprised of approximately 80% securities

with primary listings on the NYSE, and of approximately 20% securities listed solely on

NASDAQ.

50.     BLMIS also engaged in proprietary trading, which means that BLMIS traded on

its own behalf rather than on behalf of its customers.  It is very common for a market maker to

also engage in proprietary trading.

51.     Madoff operated his fraudulent IA Business from the same BLMIS offices that it

operated its legitimate businesses.  Outwardly, BLMIS functioned as both an investment adviser

to its customers and a custodian of their securities.  Its annual audits were purportedly performed

by Friehling & Horowitz, CPAs, P.C. ("Friehling"), an accounting firm of three employees, one

of whom was semi-retired, with offices located in a strip mall in Rockland County, New York.

The precise date on which BLMIS began offering investment advisory services has not been

established, but it appears that BLMIS was offering such services as far back as the 1960s.  The

Trustee's investigation to date establishes that, to the extent records are available, BLMIS never

acted as a true investment adviser in the interest of its customers.

52.     Madoff solicited billions of dollars from investors for his fraudulent IA Business.

Outwardly, Madoff ascribed the success he purported to achieve in his IA Business to the Split

Strike Conversion Strategy (the "SSC Strategy").  Madoff represented that his strategy was to

invest customer funds in a subset or "basket" of the common stocks that comprised the Standard

& Poor's 100 Index ("S&P 100").  Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted that he would carefully time purchases and sales to maximize value, and correspondingly, BLMIS customers' funds would, intermittently, be out of the equity markets.  Several times a year, customer funds would purportedly move "into the market," which consisted of allegedly purchasing a basket of stocks and corresponding options hedges.  Then customer funds were moved completely "out of the market" to purported investments in United States Treasury Bills ("T-bills") and Fidelity money market funds until the next presumed trading opportunity arose.  At the end of most quarters, the baskets were sold and the proceeds invested in T-bills or other money market funds.

53.      As part of the SSC Strategy, Madoff also concocted a fictitious hedging strategy for the baskets of stock.  He purported to purchase and sell S&P 100 option contracts correlated to the stocks in the basket, thereby limiting both the downside risk associated with possible adverse price changes in the basket of stocks and limiting profits associated with increases in underlying stock prices.  These options contracts functioned as a "collar," limiting both the potential gains and the potential losses.  Madoff purported to use proceeds from the sale of S&P 100 call options to finance the cost of purchasing S&P 100 put options.

54.      The final customer statements issued by BLMIS as of November 30, 2008, falsely recorded nearly $65 billion of net investments and related fictitious gains from those investments with BLMIS as of December 11, 2008 (the "Filing Date").

55.      Madoff himself admitted in his Plea Allocution that, "I never made the investments I promised clients, who believed they were invested with me in the split strike conversion strategy."  Instead, investors' funds were principally deposited into BLMIS's account at JPMorgan Chase & Co., Account No. xxxxxxxxxxx1703 (the "703 Account").

56.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in—or had been traded through—their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication.  The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.  At his plea hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts.  Indeed, based on the Trustee's investigation to date, and with the exception of isolated individual trades for certain clients other than the Defendants, there is no record of BLMIS's having cleared any purchase or sale of securities for customers of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.  Madoff's SSC Strategy was entirely fictitious.

57.     At times, prior to his arrest, Madoff generally assured customers and regulators that he purchased and sold the put and call options over-the-counter ("OTC") rather than through an exchange.  Based on the Trustee's investigation to date, there is no evidence that the BLMIS IA Business ever entered into any OTC options trades on behalf of BLMIS account holders.  The Options Clearing Corporation, which clears all option contracts based upon stocks of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any IA Business customers.

58.     To bolster that lie, Madoff periodically wired hundreds of millions of dollars from the 703 Account to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London based entity wholly owned by Madoff.  MSIL wired hundreds of millions of dollars back into the

bank accounts of BLMIS's proprietary trading and market making businesses in an attempt to create a record of revenues.

59.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS from discovering the fraud.  The money received from investors was overwhelmingly used to make the distributions to—or payments on behalf of— other investors.  That is, BLMIS used its IA Business customers' deposits to pay redemptions by other customers and to make other transfers, which are, of course, avoidable by the Trustee. Many of these transfers were to enrich Madoff, his associates, and his family.  The money sent to BLMIS for investment, in short, was simply used to keep the operation going and to enrich Madoff, his associates and others until such time as the requests for redemptions in December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

60.     During the scheme, certain investors requested and received distributions of the "profits" listed for their accounts which were nothing more than fictitious profits.  Other investors, from time to time, redeemed or closed their accounts, or removed portions of the purportedly available funds, and were paid consistent with the statements they had been receiving.  Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

61.     The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments.  BLMIS

was only able to survive for as long as it did by using the stolen principal invested by some customers to pay other customers.

62.     It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so could promptly have resulted in demand, investigation, the filing of a claim and disclosure of the fraud.  The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors, and to lure other investors into the Ponzi scheme.  Each payment constituted an intentional misrepresentation of fact regarding the underlying account and was an integral and essential part of the fraud.

63.     In an effort to hinder, delay or defraud authorities from detecting the fraud, Madoff did not register BLMIS as an Investment Adviser pursuant to 15 U.S.C. § 80b-3 until August 2006.  This allowed Madoff to avoid scrutiny from the SEC that may have uncovered his true dealings, exposing the billions of dollars that flowed into BLMIS that Madoff used for the benefit of himself, his family, and his associates.

64.     In or about January 2008, BLMIS filed with the SEC an Amended Uniform Application for Investment Adviser Registration.  The application represented, among other things, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In actuality, in January 2008, BLMIS had 4,900 active customer accounts and purported assets under management of $68 billion.

65.     Based upon the Trustee's ongoing investigation, it appears there were more than 8,000 customer accounts at BLMIS over the life of the scheme.  In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. In total, these statements showed that BLMIS customers had approximately $65 billion invested

through BLMIS.  In reality, BLMIS had assets on hand worth a fraction of that amount.

Customer accounts had not accrued any real profits because no investments were ever made.  By

the time the Ponzi scheme came to light on December 11, 2008, investors had lost approximately

$19 billion in principal.

66.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars

greater than its assets.  BLMIS was insolvent in that:  (i) its assets were worth less than the value

of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the

transfers, BLMIS was left with insufficient capital.

67.     At all relevant times, and as more fully described herein, BLMIS was insolvent

and Madoff, in carrying out his unlawful acts, directly and by wrongful domination and control

of BLMIS:

> Violated his fiduciary duties to the entire community of interests in BLMIS,
> including its good faith customers, creditors and other lawful stakeholders and
> claimants;
>
> Totally abandoned, furnished no benefit to, and materially injured and defrauded
> BLMIS and its community of interests; and
>
> Acted wholly outside the scope of his agency, employment, authority, capacity
> and power, and entirely for his own and for third parties' personal benefit and
> purposes.

68.     In addition, the UBS and Access Defendants knew or had notice of circumstances

indicating that Madoff's unlawful acts, and the acts of BLMIS caused by his wrongful

domination and control, in furtherance of the Ponzi scheme were not apparently for the carrying

on of any business of BLMIS in the usual way and were in contravention of their authority,

capacity and power.

## THE SIPA LIQUIDATION

69.     On December 11, 2008, Madoff was arrested by federal agents for violations of the criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail and wire fraud, and was criminally charged with operating a multi-billion dollar securities fraud scheme in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5, in the United States District Court for the Southern District of New York ("District Court"), captioned *United States v. Madoff*, Case No. 08-MJ-2735.  Contemporaneously, the SEC filed the District Court proceeding against Madoff, which remains pending.  The SEC complaint alleges that Madoff and BLMIS engaged in fraud through the BLMIS IA Business.

70.     On December 12, 2008, The Honorable Louis L. Stanton of the United States District Court for the Southern District of New York entered an order appointing Lee S. Richards, Esq. as receiver for the assets of BLMIS (the "Receiver").

71.     On December 15, 2008, pursuant to SIPA § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.  On that same date, pursuant to SIPA § 78eee(a)(4)(A), the SEC consented to a combination of its own action with SIPC's application.

72.     Also on December 15, 2008, Judge Stanton granted SIPC's application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

      a.     appointed the Trustee for the liquidation of the business of BLMIS pursuant to SIPA § 78eee(b)(3);

      b.     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to SIPA § 78eee(b)(3);

     c.      removed the case to the United States Bankruptcy Court for the Southern

             District of New York ("Bankruptcy Court") pursuant to SIPA

             § 78eee(b)(4); and

     d.      removed the Receiver for BLMIS.

73.      By orders dated December 23, 2008 and February 4, 2009, respectively, the

Bankruptcy Court approved the Trustee's bond and found the Trustee was a disinterested person.

Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.  By

virtue of his appointment under SIPA, the Trustee has the responsibility to recover and pay out

Customer Property to BLMIS customers, assess claims, and liquidate any other assets of BLMIS

for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling

BLMIS's assets, but such assets will not be sufficient to fully reimburse BLMIS customers for

the billions of dollars they invested through BLMIS.  Consequently, the Trustee must use his

broad authority as expressed and intended by both SIPA and the Bankruptcy Code to pursue

recovery for BLMIS accountholders.

74.      At a plea hearing on March 12, 2009, in the case captioned *United States v.*

*Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an eleven-count criminal information

filed against him by the United States Attorneys' Office for the Southern District of New York.

At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment

advisory side of [BLMIS]."  Additionally, Madoff admitted that "[a]s I engaged in my fraud, I

knew what I was doing [was] wrong, indeed criminal."  Madoff was sentenced on June 29, 2009

to 150 years in prison.

75.      On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to

participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August 11,

2009, in the case entitled *United States v. DiPascali*, Case No. 09-CR-764(RJS), DiPascali pled

guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the

Ponzi scheme had begun at BLMIS since at least the 1980's.  (Plea Allocution of Frank

DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009)

(Dkt. No. 11).)

<u>**THE DEFENDANTS AND THEIR CONNECTIONS TO MADOFF**</u>

**THE FOUNDING OF ACCESS INTERNATIONAL ADVISORS**

76.     Access International Advisors was founded in 1995 by Defendants Littaye and

Villehuchet.  As was widely reported at the time, Defendant Villehuchet committed suicide on

December 22, 2008, shortly after the Madoff fraud was revealed.  Thus, his estate is named as a

Defendant herein.

77.     Although formally distinct and separately organized in their various jurisdictions,

AIA LLC, AIA Europe Ltd., AIA Ltd., AP (Suisse), Access Mgmt Lux, and AP (Lux)

(collectively, "Access") were, in reality, a single business enterprise or, alter-egos of each other,

which was, at all times relevant herein, coordinated, dominated and controlled by Littaye and

Villehuchet.  Littaye and Villehuchet marketed and used their network of Access entities as a

collective whole to service their many BLMIS portals, which included Luxalpha and

Groupement Financier, among other BLMIS-feeder funds.

78.     Originally a distributor of other entities' hedge fund products, Access later

evolved into a manager and portfolio advisor for its own hedge funds and investment products,

with offices in New York, the Bahamas, London, and throughout Europe.  Access served as the

center of a network of funds that provided the point of entry to Madoff for billions of dollars

from European investors.

79.     AIA Ltd., AP (Suisse), Access Mgmt Lux and AP (Lux) appear to have been created merely to facilitate, among other things, money transfers and fund formation, as well as ostensibly to perform management and administration for the funds in the Bahamas, Luxembourg and Switzerland.  Access had approximately twenty employees and, according to Access, these employees were located in New York, London and Paris.  None was in the Bahamas, Luxembourg or Switzerland.  Management, marketing and operational decisions were coordinated through Access's New York office, while back-office and administrative functions were carried out by AIA Ltd. in London.

80.     Prior to being a Founding Partner, Chairman and Chief Executive Officer of AIA LLC, Defendant Littaye worked in a number of positions in the securities industry.  From 1968 until 1971, Littaye was an Assistant Vice-President at Banque Paribas in the Corporate Finance Department.  From 1971 until 1977, Littaye was responsible for the Capital Market Products division at Credit Agricole Segespar.  From 1977 until 1985, Littaye was Senior Vice President at Banque NSM (ABN Group) responsible for corporate finance for fixed income issues, including "high tech" swaps for bond issues in foreign currencies.  From 1985 until 1992, Littaye was Managing Director for brokerage activities at Banque Pallas France.  From 1993 through 1994, Littaye was Chief Operating Officer at Credit Lyonnais Securities (USA) responsible for syndication, brokerage activities, back-office/operations and systems.

81.     Villehuchet also worked in several positions in the securities business prior to being a Founding Partner, Chairman and Chief Executive Officer of AIA LLC.  From 1970 until 1983, Villehuchet worked in the Capital Markets division of Banque Paribas in Paris.  From 1983 until 1987, Villehuchet founded and was President of Interfinance, an international

brokerage firm.  From 1987 through 1994, Villehuchet founded and became Chairman and CEO of Credit Lyonnais Securities (USA) in New York.

82.     After initially serving as a marketer and distributor of hedge funds managed by other companies, Access, under the leadership of Littaye and Villehuchet, became what is described in its own marketing materials as a manager of "a platform of US hedge funds specializing in absolute return investment strategies by providing a centralized approach to due diligence, operations, distribution, compliance and most importantly, risk management."

83.     Access owned and operated a series of what it termed "single manager hedge fund products, each with its own investment mandate."  Access's marketing materials also stated that while Access served as the portfolio manager and risk manager for all of its funds, "Access hires a Trading Advisor to provide specialized investment advice to each fund," and that all such Trading Advisors were located in the U.S. and invested predominantly in U.S. assets.

84.     Access promoted itself as a link between its predominantly European clients – consisting of high net worth individuals, family offices, fund of funds, private banks and asset management companies – and "seasoned US managers with proven track records."

### ACCESS'S CONNECTION TO BLMIS

85.     Littaye and Madoff had a relationship going back to 1985.  It was this relationship that led to the creation of the Feeder Fund Defendants – Luxalpha and Groupement Financier – both of which maintained accounts at BLMIS through Access, and which together served to feed over two billion dollars into BLMIS.

86.     Littaye's relationship with Madoff gave rise to additional feeder funds and individual accounts as well.  Feeder funds Trotanoy Investment Company Ltd. and Citrus Investment Holdings Ltd. were set up through the Access entities and together funneled over $200 million into BLMIS.  Littaye was also responsible for the creation of at least eight other

individual managed accounts at BLMIS which, combined, contributed tens of millions more to Madoff's scheme. For these accounts, which the Trustee is pursuing through separate actions or investigations, Littaye is identified in BLMIS documents as the introducing party.

87.     Littaye's relationship with Madoff was strictly preserved and well-guarded. No other person at Access had or was permitted to have any real contact with BLMIS. With the exception of some meetings attended by Villehuchet and perhaps a few choice investors on rare occasions, only Littaye was permitted to deal directly with Madoff.

88.     The relationship with Madoff was considered at Access to be the basis for the company's cash flow. The ability to provide European investors the opportunity to invest with Madoff was Access's most significant marketing and fund raising tool. While Access offered some non-Madoff funds to its investors, the vast majority of Access's assets under management (which at their peak exceeded $3 billion), were handed over to Madoff. By way of example, in 2004, Access raised assets for investment in eleven different families of funds, yet 50% of those assets were for investments at BLMIS. As of 2005, 52% of assets placed through Access were invested at BLMIS, accounting for 61% of Access's total net revenue. Access's relationship with Madoff was vital to its very existence.

89.     Littaye regularly visited with Madoff at Madoff's office in New York. These meetings were on a quarterly basis. During these meetings, Littaye raised questions that Access or its clients had with respect to the BLMIS-related funds. He would then relay Madoff's answers to Access's New York employees. Littaye also would meet with Madoff in the south of France when Madoff would vacation there. During these visits in France, Madoff and Littaye would play tennis together, which provided further opportunities for Littaye and Madoff to discuss business and Access's investments with BLMIS.

90.     Access had a staff of approximately 20-30 employees spread among its New York, London and Paris offices responsible for the sales, operation, due diligence and monitoring for its multiple fund offerings.  However, any issues, questions or concerns regarding the several Access funds that maintained accounts at BLMIS were addressed by and had to be run through Littaye, and Littaye alone.

## THE UBS DEFENDANTS' MANY CONNECTIONS TO MADOFF AND BLMIS

91.     Partnering with the Access Defendants, the UBS Defendants provided crucial infrastructure for several BLMIS feeder funds.  For the Luxalpha and Groupement Financier funds, the UBS Defendants served multiple roles, including sponsor, manager, administrator and custodian or prime banker.  In addition, UBS SA opened Luxalpha's account with BLMIS and, to that end, executed a Customer Agreement and numerous other ancillary agreements with BLMIS.  The Customer Agreement was deemed to have been made in New York.  UBS SA also entered into a separate agreement with BLMIS, designating BLMIS as the sub-custodian of Luxalpha's assets.

92.     UBS entities also sponsored, managed, administered or served as custodian for several other BLMIS-feeder funds that the Trustee is investigating or pursuing through separate actions.  For example, UBS SA served as the custodian for Plaza Investments International Limited, which directed investments of approximately $534 million into BLMIS.  At various times, UBS SA also served as administrator and custodian for Thybo Asset Management Limited, Thybo Global Fund Limited, Thybo Return Fund Limited and Thybo Stable Fund Limited, which collectively directed investments of approximately $207 million into BLMIS.  UBS AG and UBS SA served as sponsors of Luxembourg Investment Fund ("LIF").  UBS SA also served as LIF's custodian, main paying agent and, for a time, as its portfolio manager.  UBSTPM ultimately replaced UBS SA as portfolio manager of LIF, and UBSFSL served as

administrator of LIF.  LIF directed investments of approximately $759 million into BLMIS.  The Trustee is pursuing these accounts and entities through separate investigations or actions.  The UBS Defendants' deep involvement with Madoff and the BLMIS-feeder funds was far-reaching, extended well beyond Luxalpha and Groupement Financier, and involved billions of dollars being funneled into BLMIS.

93.     The UBS Defendants served as support for these massive BLMIS-feeder funds despite having concluded that BLMIS was not a suitable investment for marketing to their own clients.

94.     The UBS entities identified as Defendants herein present themselves to the public as a unified global entity that operates as "a coherent and effective whole."  The UBS Defendants share a centralized structure for their core enterprise functions including finance, risk, legal, compliance and shared services including, among other things, human resources, information technology, communication and branding, and corporate development.  Upon information and belief, this organizational structure is designed to ensure the centralized control over UBS-group companies by UBS AG of global business strategy and reporting obligations.  UBS AG subsidiaries market themselves as part of a "worldwide financial network," which provides "an international network of experts and can propose truly global investment solutions" that benefit from "the experience, know-how and substantial resources provided by the UBS Group as a whole."

## THE ACCESS DEFENDANTS' AND THE UBS DEFENDANTS' CONNECTIONS TO EACH OTHER

95.     The Access Defendants and the UBS Defendants were intertwined with respect to BLMIS feeder funds, and worked closely together for purposes of creating and growing Luxalpha's and Groupement Financier's investments in BLMIS.

96.     The Luxalpha board was comprised of individuals from UBS SA and the Access Defendants.

97.     UBS SA, UBSFSL and UBSTPM worked closely with several of the Access Defendants – including AIA LLC, AIA Europe Ltd., and, ostensibly, AIA Ltd. and Access Mgmt Lux – in the purported management, supervision and administration of Luxalpha and Groupement Financier.  In 2004, UBS SA, "desir[ing] to avail itself of the experience, advice, and assistance" of New York-based AIA LLC, entered into a Portfolio Advisory Agreement with AIA LLC.  Pursuant to this agreement, AIA LLC was to advise UBS SA with respect to the manner in which Luxalpha's assets would be invested, keep Luxalpha's investments "under surveillance and review," submit periodic reports to UBS SA, and advise UBS SA with respect to actions that would be advantageous to Luxalpha.  Although this agreement was terminated in 2006 when UBS SA transferred its obligations as portfolio manager to UBSTPM, UBSTPM subsequently entered into a similar Investment Advisory Agreement with Access (specifically, with AP (Lux)).

98.     Viviane DeAngelis, a Managing Director of UBS SA, and Littaye had an ongoing, collaborative relationship.  Together, they worked to protect Luxalpha from any inquiry that threatened to disrupt the fund and the fees they earned off of it.  As an example, in July of 2006, Littaye entered into Access's internal database the following note regarding conversations among himself, UBS SA's DeAngelis and an individual named Lila Seirafi.  The internal database was commonly used by individuals at Access to share details of meetings or conversations.  Littaye's note reads:

> LS HAD CALLED ME TO ASK IF THEY COULD
> STRUCTURE A NOTE WITH LEVERAGE ON LUX. FOR ONE
> OF THEIR CLIENTS.  THINKING THEY CAME TO US

> THROUGH UBS LUXEMBOURG, I SENT QUITE A DOC TO
> HER, THOUGH NOT MENTIONING BMI.
>
> **V DE ANGELIS STOPPED ME, EXPLAINING THAT THIS
> COULD CAUSE THE END OF OUR FUND, BECAUSE, IF
> THE ANALYSTS OF ZURICH FIND OUT BMI IS BEHIND
> THE STORY, WE WOULD BE KILLED.**
>
> SO I CALLED L. SEIRAFI, TELLING HER WE COULD NOT
> GO ANY FURTHER BECAUSE THIS IS REALLY A FAMILY
> FUND AND WE CANNOT LET THE PRODUCT SPREAD
> OUT.  I TOLD HER THAT, WHEN WE HAVE THE IXIS
> PROPOSAL, I WOULD CALL HER AGAIN.  THEN I TALKED
> TO VDA AGAIN.  SHE TOLD ME TO DROP ANY
> RELATIONSHIP.

(Emphasis added.)

99.     Later, in September of 2006, Littaye entered a note into the internal Access

database which reads in part:

> M. Neiman had a bid last July from Ixis concerning a leveraged
> position in Luxalpha (Leverage 3).  One way of the other [*sic*], he
> contacted UBS structured product department – Geneva to get a
> second bid.  This department was very excited.
>
> **Now V. d Angelis had told her hierarchy that Luxalpha was a
> sicav dedicated to a family.  She entered in a fundamental risk
> on her own position, because of this movement, which shows
> that the sicav is evidently not a dedicated sicav (huge internal
> compliance risk).**

(Emphasis added.)

100.    Subsequently, in June of 2007, Littaye entered the following note into Access's

internal database:

> V DE ANGELIS IS RESPONSIBLE OF [*sic*] THE UBS
> DEPARTMENT[]ADMINISTRATING THE FUNDS
> DEDICATED TO A FAMILY OR SOME GROUP**.  UBS
> INTERNAL AUDIT ON THESE FUNDS WAS COMPLETED
> 6 WEEKS AGO.  WE FEARED FOR LUXALPHA
> SURVIVAL DUE TO THE MULTIPLICITY OF
> SUBSCRIBERS. []IT SEEMS TODAY THAT NO HARM
> WILL BE DONE.**  AN A[U]DIT ON THE DEPT ITSELF

> STARTS IN ONE WEEK.  VDA IS HIGHLY CONFIDENT.  IT
> SEEMS WE SHOULD BE TOTALLY COMFORTED AT THE
> END OF JULY.

(Emphasis added.)

101.   Taken together, these internal notes, which offer only a glimpse of the relationship between Littaye and Viviane DeAngelis, show that Access and UBS SA were concerned that investments into Luxalpha would be stopped because of BLMIS's involvement. These internal notes also demonstrate that in some respects, Littaye was taking direction from UBS SA's Viviane DeAngelis with regard to who could be permitted to establish a relationship with Luxalpha.

102.   These notes also suggest that UBS AG failed to adequately supervise or monitor Luxalpha and UBS SA's involvement with the fund, and was willing to turn a blind eye to inconsistent information about the fund, even though UBS AG was at all times willing to lend its name to the fund and serve as its sponsor (a/k/a its "promoter").

## THE DEFENDANTS' ROLES IN ENABLING AND PERPETUATING THE FRAUD

## THE UBS DEFENDANTS SAW THE INDICIA OF FRAUD SURROUNDING MADOFF AND BLMIS

103.   Upon information and belief, because of concerns about Madoff's purported strategy and because he would not meet with their due diligence teams, the UBS Defendants refused to recommend or market BLMIS to their private bank clients, though they willingly supported and facilitated BLMIS for at least $80 million in fees, and likely much more.

104.   Upon information and belief, neither BLMIS nor any BLMIS-feeder fund was ever placed on the list of Global Wealth Management & Business Banking recommendations for direct investment maintained by the UBS Defendants for their clients.

105.   Following the revelation of the Madoff fraud, UBS AG, the parent entity of the UBS Defendants, stated publicly that it had no material exposure to BLMIS.

106.   Upon information and belief, the UBS Defendants' lack of exposure to BLMIS and the decision to not market BLMIS-feeder funds to their own private bank clients were the result of due diligence analyses performed by the UBS Defendants on Madoff and BLMIS.

107.   In November 2000, UBS AG acquired Fondvest AG ("Fondvest"), a Zurich-based company specializing in analyzing funds for institutional investors, as well as its subsidiary, Fondcenter, a fund distribution unit.  Fondvest served as the research unit for the UBS Defendants, providing analysis on third party funds for the UBS business units.  Upon information and belief, Fondvest analyzed BLMIS-related funds and repeatedly declined to endorse them for distribution to UBS clients because of the lack of transparency regarding their ability to generate such high, stable returns.

108.   Upon information and belief, the Fondcenter subsidiary was asked in or around 2001 to grant approved status to Fairfield Sentry Fund, another BLMIS-feeder fund.  Upon information and belief, Fondcenter refused because of Fairfield Sentry Fund's involvement with Madoff and because the research that Fondcenter had access to raised concerns about Madoff.

109.   Following this initial refusal, upon information and belief, UBS Private Banking in New York tried several more times to convince Fondcenter to approve Fairfield Sentry Fund for marketing to UBS Private Bank customers, and each time, Fondcenter refused and rejected Fairfield Sentry Fund.  As a result, UBS Private Banking could only accept non-discretionary investments and would place customers in Fairfield Sentry Fund only upon the customers' requests.  Even then, upon information and belief, UBS Private Banking's customers were required to sign a disclaimer saying they made the investment decision without UBS's

recommendation.  Despite the non-approved status of the Fairfield Sentry Fund, upon

information and belief, UBS Private Banking received "trailer fees" (also known as "retrocession

fees") from one of the Fairfield Greenwich Group entities as remuneration for placing investors

in the BLMIS-feeder fund.  At some point, upon information and belief, UBS AG's headquarters

in Switzerland became uncomfortable with that arrangement and instructed UBS Private Bank to

no longer accept the trailer fees from Fairfield Greenwich Group.

110.    Fondvest was discontinued in 2004 and the Investment Solutions unit within UBS

Wealth Management became responsible for providing analysis of third-party funds to the UBS

Defendants.  Investment Solutions continued to refuse to endorse BLMIS-related funds.

According to an April 2009 *Financial Times* article, seemingly disputed by the UBS Defendants,

UBS AG's Wealth Management unit:

> had earlier looked at the Madoff funds platform from a general
> process and firm perspective, but did not receive the required
> levels of comfort and gave the funds a "non approved" status for
> internal records.  This was seen as a clear signal that Madoff funds
> should not be actively held for portfolio construction uses at UBS.

111.    The UBS Defendants decided against investing in a BLMIS feeder fund, despite

its attractive returns, as early as 2002, noting that "[t]he fund seems to do very well, but there are

voices in the industry warning because generating such consistent returns with such a strategy is

more or less impossible."  The feeder fund's promoters claimed that their "great relationship"

with Madoff provided complete transparency, yet they were never able to sufficiently answer the

UBS Defendants' questions about the strategy.  As a result, the UBS Defendants decided not to

invest in the feeder fund, saying "[w]e consider ourselves pretty smart and no one in their firm

has properly explained their strategy to match the return profile to us, so we avoid stuff like

that."

112.    Between September 2007 and December 2008, UBS AG was approached about investing in several BLMIS-related products.  Internal emails from the UBS Defendants show that, in response to these requests, UBS AG performed extensive due diligence on BLMIS.  During this process several red flags were raised regarding BLMIS and the underlying manager, Madoff, including Madoff's lack of transparency and his refusal to meet with UBS AG's analysts.

113.    For example, representatives of an investment firm called Pioneer Alternative Investment Management, Ltd., Dublin or Pioneer Global Asset Management S.p.A. in Milan ("Pioneer") approved UBS AG.  Both these entities are owned by UniCredit S.p.A., which also owns Bank Austria, which is also the subject of separate actions and investigations by the Trustee for its role with certain other BLMIS Feeder Funds.  Pioneer sought to have a Madoff feeder fund called Primeo Select offered and promoted through UBS AG.  Ultimately, UBS AG refused to allow the Primeo Select fund to be offered through UBS AG.  Upon information and belief, this decision appears to have been based on due diligence done by UBS AG in London, as well as a decision from UBS AG's asset management group in Switzerland.  UBS AG believed that it did not have enough information on Madoff, who was the underlying fund manager for Primeo Select, could not get comfortable with Madoff's strategy, and refused to offer any Madoff product because Madoff would not meet with UBS AG's analysts.

114.    To approve investments in BLMIS-related products, UBS AG required its analysts to obtain more information on the underlying fund manager, Madoff.  One of the due diligence requirements was a "face to face meeting with the manager and a site visit to the HQ of the firm where money is managed."  This task was assigned to a UBS AG analyst in London, Mary Kleckner ("Kleckner").  In preparation for such a meeting, Kleckner asked her team for a

list of specific questions or topics that they would like answered.  The team responded with

concerns about the total assets BLMIS was managing and whether there was a point at which

these assets would be large enough to deteriorate the strategy's performance.  Additionally,

Kleckner's team raised questions about the potential misuse of information between BLMIS's

market-making and investment advisory arms.

115.    UBS AG's questions were never answered, as Madoff continuously thwarted

Kleckner's efforts to gain transparency, repeatedly refusing Kleckner's requests to meet with

him.  In a September 17, 2008 email, Kleckner was informed:

> Madoff has turned down our request for a meeting.  His simple
> explanation was that if he meets with one client he would be
> obligated, perhaps even from a regulatory standpoint now that he is
> an RIA, to meet with all of them, and he would literally be forced
> to build an infrastructure to support meetings and devote a huge
> amount of time to it.

116.    Kleckner also reached out to others for their opinions on Madoff.  On October 31,

2007, in response to her question, "What are your feelings on Madoff," Kleckner received the

following response:

> I think [M]adoff is one of the most controversial funds out there.
> The historic returns and low vol[ume] make the [M]adoff feeders
> look very attractive for leveraged structured products and FAs love
> it.  In addition, [M]adoff is very involved with the [NASD] and on
> a number of committees there.  We get asked about sp's on these
> funds all the time, but there are a lot of folks who are concerned
> about the fund.  Everything is probably fine, but there are a number
> of things that are odd or different than the norm.  Like no prime
> broker, all trades done through [M]adoff securities through an
> ordinary brokerage account.  It's also unclear which dealers are
> executing the [OTC] collars for him?  They are pretty big, but no
> one seems to know who is trading them. The compensation for him
> is just through commission, no mgmt or incentive fee.  There are a
> couple of other flags as well but [redacted] have both written a lot
> of structured products on [M]adoff . . . .  I've never met him, but
> we did have a call with one of his risk folks some time ago.  Could
> be ok, but there is more risk due to the lack of transparency on this
> one than in many other funds.  **Some folks think [M]adoff could**

**be one of the most successful schemes ever, I think it would be
hard to do anything on them without more transparency than
they have historically been willing to provide.**

(Emphasis added.)

117.    After performing extensive due diligence, UBS AG decided that it did not have
enough information on Madoff to be able to get comfortable with his strategy.  UBS AG was
unable to assuage its concerns as no further transparency was forthcoming, since Madoff refused
to meet with any of UBS AG's analysts.   UBS AG ultimately concluded that "Madoff is not a
manager that we are willing to structure products on. . . . "

118.    UBS AG also issued a series of notes linked to Momentum AllWeather Strategies
II, which in turn was invested in a Madoff feeder fund, Kingate Global Fund, Ltd. (8.24%
reported as of December 2008).  Upon information and belief, UBS, as issuer of these notes,
would have performed due diligence on Madoff and BLMIS in the normal course of business.

119.    Despite not permitting the investment of a significant amount, if any, of its own
money in BLMIS and refusing to recommend any BLMIS-feeder fund to their clients, the UBS
Defendants decided as early as January 2004 to create and structure the BLMIS-feeder funds
Luxalpha and Groupement Financier.

120.    The UBS Defendants consciously disregarded the numerous red flags raised by
various UBS employees and internal opposition regarding whether the UBS Defendants should
be involved with a BLMIS structure in any capacity.  As Bernd Stiehl, one of the directors of
Luxalpha and a managing director of UBS SA, stated in response to an e-mail from UBS AG
which explicitly raised concerns about getting involved with BLMIS, "Business is business.  We
cannot permit ourselves to lose 300 million."  Upon information and belief, Mr. Stiehl was
referring to anticipated assets under management.

121.    The UBS Defendants were willing to make an exception to their normal policies and procedures by allowing Madoff to serve as Luxalpha's custodian, which enabled them to reap millions of dollars in anticipated fees from the fund.

122.    While performing due diligence, UBS SA reached out to other UBS entities for information on BLMIS, and received significant negative feedback.  For example, Mike Welch ("Welch") of UBS O'Connor LLC, a subsidiary of UBS AG, cautioned against becoming involved with Madoff due to the lack of transparency surrounding BLMIS.  In a March 5, 2004 e-mail regarding BLMIS, a portion of which was entitled "Thoughts and Rationale for NOT Investing," Welch raised several red flags.  First, he noted that since 1990 there were only a handful of negative months, and that the strategy generated incredibly consistent returns each year.  Second, he stated that "[i]f Madoff were to run the strategy totally independently from his [broker/dealer business], it would be IMPOSSIBLE to generate the returns that he has produced since 1990."  Additionally, Welch noted that Madoff did not charge fees for his hedge fund, which "[m]akes one ask the question of why Madoff would bother to have such a product when the only revenue coming from running outside money is commission dollars."  Welch concluded that "[t]he simple fact that an investor has to start considering how the fund and the [broker/dealer] benefit one another is a non-starter in our mind."

123.    Tim Bell ("Bell"), a UBS AG employee who regularly advised on hedge fund investments, echoed Welch's concerns about BLMIS.  In an e-mail dated March 5, 2004, Bell characterized the question of whether the UBS Defendants "should [] go there" as depending on the answers to the questions, "can we really get transparency and can we really get comfortable?"  In response to UBS SA's inquiries about BLMIS, Bell stated:

> [w]e should have a proper UBS view on what we think of all this
> rather than a purely personal view on my part, but I think you will

> find that the general UBS view would steer on the negative side given the great need for transparency . . . .  My natural leaning would be negative as well, not because of anything against the strategy or Madoff himself, but because of the size, the lack of transparency, [and] the lack of capcity [*sic*] . . . .

124.    UBS SA itself acknowledged the serious risks involved in working with BLMIS. In response to a request in 2003 by UBS SA for feedback regarding Madoff, a UBS AG (Zurich) employee stated that one of UBS AG's biggest concerns was that Madoff was acting as both a broker and a depository at once.  In addition, this same employee stated:

> We normally have to give "NO" as the answer in cases like Madoff.  In doing so, we make reference to the following principles:  no broker as depository, and the broker may under no circumstances also be a depository at the same time!  Such a NO is easy to comprehend for both business policy reasons and risk reasons.

In a December 17, 2003 e-mail forwarding UBS AG's feedback on Madoff, De Angelis of UBS SA concurred with this assessment, stating that "[t]he risk should not be underestimated," however, she also countered that working with BLMIS "would be advantageous on the income side."

125.    In spite of the UBS Defendants' own policy against such a structure, BLMIS was given "'special' handling" and permitted to function as both depository and broker.  Apparently to give themselves comfort, UBS SA and UBS AG attempted to impose certain conditions.  For example, they wanted to require BLMIS to report cash and security movements to UBS SA for the purpose of daily reconciliations.  They also wanted electronic access to their accounts.  None of these requirements was met.

126.    Rather than heeding the glaring red flags and words of warning from their own colleagues, UBS SA merely limited its own exposure to BLMIS via insurance policies and secret indemnity agreements and forged on with the corrupt relationship.  Indeed, upon reading Bell's

negative assessment of BLMIS, De Angelis replied, "[t]hanks, does not contribute to me having a better feeling.  I have inquired about additional insurance."  Less than two weeks later, she and Serge Karp forwarded Luxalpha's executed account opening documents to BLMIS.

127.     Subsequently, in 2006, the UBS Defendants were again alerted to significant concerns about Madoff and his purported trading activity.  Upon information and belief, and as set forth in the SEC Office of Inspector General's report dated August 30, 2009 (the "OIG Report"), the SEC's Enforcement Staff sent a draft document request to UBS's offices in the U.S. on June 16, 2006 in an attempt to verify whether any of UBS's European affiliates served as one of Madoff's purported OTC option counterparties as Madoff had claimed.  The OIG Report details that, instead of providing the SEC with a direct answer, UBS's U.S. offices claimed to be unable to access the relevant data from Europe, and informed the SEC's Enforcement Staff that it would have to seek the relevant information directly from Europe.  However, the UBS Defendants knew in 2006 that they were not and never were one of Madoff's counterparties.  Despite being alerted to yet another significant concern about Madoff's purported trading activity, the UBS Defendants continued to service the Feeder Fund Defendants.

### UBS KNOWINGLY PROVIDED A FAÇADE OF LEGITIMACY FOR MADOFF'S FRAUD

*UBS AG*

128.     UBS AG is the parent entity of the UBS Defendants and a recognized leader in global private wealth management.  UBS AG's role with respect to Luxalpha, one of the largest of the BLMIS feeder funds, was integral to its development and promotion as a specific type of European fund known as a UCITS fund.  A UCITS fund – an acronym for "Undertakings for Collective Investments in Transferable Securities" – is organized under a set of European Union ("EU") directives that aim to allow collective investment schemes to operate freely throughout

the EU on the basis of a single authorization from one member state.  In the case of Luxalpha,

the authorizing member state was Luxembourg, and the approving body was the Commission de

Surveillance du Secteur Financier (the "CSSF").  Luxalpha used its approval in Luxembourg to

"passport" itself and market itself elsewhere in Europe, including France, where many of its

investors were located.

129.    UBS AG served as the sponsor or "promoter" of Luxalpha (titles that UBS AG

used interchangeably).  UBS AG is named as the sponsor in a February 2004 draft prospectus

sent at Luxalpha's inception as part of the approval application to the CSSF, the Luxembourg

regulator.  UBS AG's sponsor role was subsequently confirmed in each of Luxalpha's

subsequent prospectuses issued in August 2004, August 2006, March 2007, and November 2008.

For example, the November 2008 sales prospectus for Luxalpha emphasizes the unique global

nature of UBS by stating that, "[t]he Sponsor of the fund is UBS AG, one of the world's leading

financial institutions which offers a full range of commercial, trading, risk management and

investment services."  UBS AG was also identified as the fund's promoter in an Operating

Memorandum for Luxalpha dated October 16, 2008.

130.    A fund's sponsor or promoter is essentially responsible for the creation of the

fund.  The promoter of a UCITS fund, including Luxalpha, must be a regulated entity with

sufficient financial resources.  A UCITS fund, including Luxalpha, is authorized in Luxembourg

by the CSSF on the basis of the promoter's experience and financial soundness.  The promoter of

a UCITS, including Luxalpha, is required to have a significant capital base because it is expected

to provide compensation for damages sustained by third parties as a result of fault in the

management or administration of the fund.

131.     By serving as the fund's sponsor and advertising that role, UBS AG gave its imprimatur to Luxalpha and led the Luxembourg regulator, as well as the public, to believe that one of the world's largest financial institutions was endorsing and standing behind the fund.  By so doing, UBS AG provided a façade of legitimacy for a fund that UBS AG knew channeled all of its investments into the custody and control of BLMIS, with no checks and balances on BLMIS.

***UBS SA***

132.     UBS SA served in multiple roles for BLMIS feeder funds Luxalpha and Groupement Financier.

133.     UBS SA was identified as a sponsor of Luxalpha in an approval request letter sent to the CSSF at Luxalpha's inception.  The experience and financial soundness of UBS SA was, upon information and belief, instrumental in the approval of Luxalpha by the CSSF, and UBS SA assumed responsibility for providing compensation for damages sustained by third parties as a result of fault in the management or administration of the fund.

134.     UBS SA was also the custodian and distributor of Luxalpha.  As custodian, UBS SA was by law responsible for both the safekeeping of the fund's assets and the supervision of the fund.  Despite earning substantial fees for serving as the fund's custodian, UBS SA delegated its custodial functions to BLMIS in violation of relevant law.

135.     UBS SA also served as the portfolio manager of Luxalpha from February 2004 until August 2006.  As portfolio manager of Luxalpha, UBS SA represented to the CSSF and investors that it had assumed the responsibility for the active management of the fund's assets, as well as the ongoing monitoring and adjusting of the fund's investments, all under the supervision of the fund's board of directors.  Despite earning substantial fees for serving as Luxalpha's portfolio manager, UBS SA delegated all asset management functions to BLMIS.

136.    All money invested in BLMIS through the Luxalpha fund was invested through BLMIS Account No. 1FR108, which was held in the name of UBS SA.  All account opening papers and agreements were completed and executed by UBS SA employees, including Managing Director Viviane DeAngelis and Director Serge Karp, and delivered to BLMIS in New York.  UBS SA employees regularly corresponded with Frank DiPascali of BLMIS for purposes of managing Luxalpha's investments and redemptions.  All redemptions requested by UBS SA for the Luxalpha fund were processed through an account held at UBS AG's U.S.-based Stamford branch.

137.    UBS SA also served as the Prime Bank for Groupement Financier, and as custodian of a related fund, Groupement Financier Levered Ltd., which did not have a direct account at BLMIS, but which offered leveraged returns based on investments in the underlying Groupement Financier fund that was directly invested with BLMIS.  As Prime Bank for Groupement Financier, UBS SA was responsible for the receipt of the fund's subscription monies and the subsequent transfer of those monies to the Bank of Bermuda, which acted as Groupement Financier's beneficiary bank, through HSBC Bank USA in New York, Groupement Financier's correspondent bank.

138.    UBS SA was also responsible for maintaining a mirror book-keeping of all transactions reported by BLMIS in respect of Groupement Financier so as to enable UBSFSL, the fund's administrator, to calculate the fund's net asset value ("NAV").

***UBSFSL***

139.    UBSFSL served as administrator for BLMIS feeder funds Luxalpha and Groupement Financier.  As administrator of Luxalpha and Groupement Financier, UBSFSL was responsible for accounting functions, calculation of the funds' NAV, keeping the register of shareholders, handling subscriptions and redemptions, communication with investors, and

preparation of financial statements for the funds.  It calculated the NAV of the Feeder Fund Defendants with information provided by BLMIS, without any independent verification of the numbers BLMIS provided.

**UBSTPM**

140.    UBSTPM formally served as manager of Luxalpha from August 2006 until November 2008.  As manager of Luxalpha, UBSTPM represented to the CSSF and the public that it had assumed the responsibility for the management and administration of the fund, as well as the monitoring of investment policies and restrictions of the fund.  In reality, all management functions for Luxalpha had already been delegated to BLMIS as a result of the asset management agreement executed between UBS SA and BLMIS.

**UBS's Luxalpha Board Members**

141.    At all times, from its inception through its ultimate liquidation in 2009, the board of Luxalpha was dominated by UBS-based directors.  Luxalpha Director Defendants Hartmann, Schroeter, Stiehl, Egger, Hondequin, and Kranz were all UBS SA employees.  These UBS-based directors were responsible for all aspects of the fund, including its management and the agreements it entered into which ultimately delegated custody and management of the fund's assets to BLMIS.

### THE UBS DEFENDANTS ENABLED MADOFF BY PROVIDING THE APPEARANCE OF LEGITIMACY AND SECURITY FOR LUXALPHA AND GROUPEMENT FINANCIER

142.    Partnering with the Access Defendants, the UBS Defendants enabled and perpetuated the Madoff fraud by effectively selling the UBS brand and reputation to Luxalpha and Groupement Financier in order to provide those funds with the appearance of legitimacy.

143.    While outwardly named in multiple and substantial roles for Luxalpha and Groupement Financier, the UBS Defendants in reality delegated their responsibilities for the

investments, monitoring and management of the funds to Madoff and/or BLMIS in New York. The UBS Defendants all attempted to protect themselves from liability for the delegation of their duties through a series of undisclosed indemnity agreements with the Access Defendants. Although the UBS Defendants disclaimed all responsibility and delegated all their primary functions to Madoff and/or BLMIS, they nevertheless collected more than $80 million in fees from Luxalpha and Groupement Financier – fees apparently given for "looking the other way" and for concealing the fraud.

***The UBS Defendants Disclaimed All Responsibility and Protected Themselves Through a Series of Secret and Undisclosed Indemnity Agreements***

144.    Upon information and belief, several financial institutions declined Access's requests to service Luxalpha.  The UBS Defendants were the only major financial institution that the Access Defendants could find that was willing to serve as sponsor, administrator, manager and custodian of Luxalpha.  The UBS Defendants were willing to do so only after protecting themselves through a series of undisclosed indemnity agreements entered into with the Access entities.

145.    The UBS Defendants publicly lent their name to the fund, but under the undisclosed indemnity agreements were to be absolved of all responsibility for the risks associated with Luxalpha's creation and management.  Upon information and belief, on or about February 5, 2004, AIA (Lux) entered into a series of indemnity agreements with the UBS-based directors of Luxalpha and UBS SA, which purported to indemnify and hold harmless the UBS-based directors and UBS SA for any liabilities resulting from their involvement with Luxalpha.

146.    In particular, the indemnity agreement between AIA (Lux) and UBS SA specifically provides that UBS SA is merely acting as a "figure head" and states as follows:

> **[AIA (Luxembourg) SA] acknowledges and agrees that it has requested [UBS SA] to act as a figure head to third parties in the sponsorship and in the managementship [sic] of the Fund.** As a result of which, [UBS SA], according to Luxembourg laws, may be liable to cover damages resulting from proved irregularities, inadequacies or omissions in the administration or the management of the Fund. [AIA (Luxembourg) SA] acknowledges and agrees that [UBS SA] shall perform such services at the exclusive risks [sic] of [AIA (Luxembourg) SA].

(Emphasis added.)

147.    In an email dated March 11, 2004, Serge Karp of UBS SA, outlined UBS SA's concerns of a "worst case scenario" whereby BLMIS would fail, leaving UBS SA on the hook for investor claims. To meet these concerns, UBS SA demanded that Access provide it with a letter from Luxalpha's investors holding UBS SA harmless for any loss incurred as a result of any failure of the sub-custodian (BLMIS), as well as proof of an insurance policy subscribed and paid for by Access covering the risks of Luxalpha. While it is currently unknown whether UBS SA's specific demands were met, and if so in what fashion, the import of the demands is clear – UBS SA wanted to be sure that, while it was content to sell its name for purposes of promoting Luxalpha and reaping lucrative fees, it would not be liable for its total delegation of Luxalpha's management and operation to Madoff and/or BLMIS or for concealing Madoff's involvement from the Luxembourg regulators.

148.    The UBS Defendants sought to limit their liability in relation to Luxalpha through other indemnity agreements as well. Access Mgmt Lux, which became the manager of Luxalpha as of November 17, 2008, executed an Indemnity Letter that same date in favor of UBS SA (the "November 2008 Indemnity Letter").

149.    The November 2008 Indemnity Letter purported to replace and supersede an indemnity agreement signed between AIA (Lux) and UBS SA on January 5, 2004. Along with agreeing that UBS SA would be indemnified and held harmless, the November 2008 Indemnity

Letter again specifically provided that UBS SA was merely acting as a "figure head" for third parties with regard to sponsorship of Luxalpha.

150.    Access Mgmt Lux also executed indemnity agreements on November 17, 2008 – just a month before Madoff turned himself in – in favor of UBS-based directors Kranz, Egger, Schroeter and Hondequin, as well as Access-based director Delandmeter.

151.    The November 2008 indemnity agreements served to perpetuate the fiction that UBS SA and Luxalpha's UBS-based directors were responsible for Luxalpha, when in reality these Defendants were simply selling the UBS name to Luxalpha in return for tens of millions of dollars in fees.

***The UBS Defendants Delegated Their Luxalpha Management and Custodial Duties***

152.    From its very beginning, and through Luxalpha's eventual demise, the UBS Defendants knowingly and purposefully delegated to Madoff and/or BLMIS all of the management and custodial duties they outwardly assumed for Luxalpha.  Custody of Luxalpha's assets was at all times delegated to BLMIS.  Management of Luxalpha's assets was also delegated entirely to BLMIS, with certain of the Access Defendants serving in purported advisory capacities, although Luxalpha was at all times 100% invested in BLMIS.  Thus, despite numerous representations made in sales prospectuses and representations to the Luxembourg regulator, from the beginning of Luxalpha until its end, the UBS Defendants performed no actual management or custodial functions for Luxalpha, despite collecting fees for those services.

153.    Time and time again – in each of the February 2004, August 2004, August 2006, March 2007, and November 2008 Luxalpha sales prospectuses – it was emphasized that the rights and duties of Luxalpha's custodian had been assumed by UBS SA.  Each prospectus then went on to detail the length and breadth of UBS SA's banking experience, stating:

> UBS (Luxembourg) S.A., [is] a fully fledged bank, founded on
> August 20, 1973, and has its registered office at 36-38, Grand Rue,
> Luxembourg.  In addition to international banking, UBS
> (Luxembourg) S.A. is also active in private banking and offers a
> wide range of customer services, among them investment advisory
> and asset management services, time deposits as well as securities
> and foreign exchange.  Since the 1st July, 1998 its share capital
> amounts to CHF 150 Mio.

This detail on UBS SA was provided with the knowledge of UBS SA and with the intent to

mislead regulators and the public into believing that an experienced and secure bank was

supervising and safekeeping Luxalpha's assets.

154.   What was not disclosed in any prospectus was the fact that UBS SA, in its

capacity as Luxalpha's custodian, had entered into a Sub-Custodian Agreement, dated February

5, 2004, with BLMIS.  The Sub-Custodian Agreement put in place could not have met the

approval of the CSSF because Madoff and/or BLMIS did not meet the criteria for officially

performing the duties of a custodian of a Luxembourg UCITS fund.

155.   On March 18, 2004, in its capacity as Luxalpha's manager, UBS SA also

executed an agreement with BLMIS entitled "Trading Authorization Limited to Purchases and

Sales of Securities and Options" in favor of BLMIS.  Under the terms of this authorization,

management of nearly all the assets of Luxalpha was delegated to BLMIS.

156.   Such a complete abdication of UBS SA's asset management responsibilities came

as a surprise even to the then Head of Portfolio Management at UBS SA, Christian Schoen, who

stated in a March 22, 2004 e-mail to another UBS SA employee:

> I am wondering how this is supposed to work and how one can
> argue that we are officially the portfolio manager but do not have a
> cent posted to our books.  To date I had assumed that Madoff
> certainly makes the trades and executes them, but that the assets lie
> with us and that in the end we settle the trades with Madoff.  This
> way I would have been in a position to exercise a certain oversight
> function.

157.   UBS SA also entered into two other agreements with BLMIS.  The first was entitled "Option Agreement," dated March 18, 2004, and the second, "Customer Agreement," was undated.

158.   In addition, UBS SA entered into a "Portfolio Advisory Agreement" with AIA (Lux) and, on August 11, 2004, entered into another "Portfolio Advisory Agreement" with AIA LLC.  AIA LLC's involvement was noted in Luxalpha's August 2004 prospectus, which indicated that the costs of AIA LLC's "advice" would be borne by UBS SA as portfolio manager.

159.   Thus, from the moment Luxalpha was created, UBS SA had delegated nearly every aspect of its custodial and asset management responsibilities to BLMIS.

160.   As a UCITS fund, Luxalpha could be marketed throughout Europe.  However, upon information and belief, the CSSF did not approve the arrangement which the UBS Defendants, the Access Defendants, and BLMIS had agreed to because all power was now concentrated in Madoff and/or BLMIS, with no checks and balances.  Concentration of power in the hands of Madoff and/or BLMIS violated the Luxembourg law implementing the UCITS directives that governed Luxalpha.

161.   Tellingly, no information about any delegation of UBS SA's responsibilities to BLMIS appeared in any of Luxalpha's sales prospectuses.  Not only did this nondisclosure serve to conceal the fact that an unfit manager was given custody and control of Luxalpha's assets, but the concealment of BLMIS's involvement with Luxalpha facilitated and enhanced the Ponzi scheme.

162.   In an August 14, 2009 interview given to *Les Echos*, a French financial publication, Jean Guill, General Director of the CSSF, expressly noted that information about the

sub-custody with a single entity of assets in a UCITS fund is information that is required to be mentioned in sales prospectuses submitted to the CSSF, and also confirmed that UBS SA never provided such information with regard to Madoff or BLMIS.

163.    The 2009 Annual Report of the CSSF further confirms the deception perpetuated by the UBS Defendants.  In that report, the CSSF states that the documents it received concerning the Luxalpha fund, upon which the CSSF based its decision to approve Luxalpha as a UCITS fund:

> did not contain any reference either to the identity of BMIS or to the multiple responsibilities carried on *de facto* by one entity. Between the launch of [Luxalpha] and the breakout of the Madoff affair in December 2008, the CSSF was never informed in a transparent manner, by the professionals involved, of the structure actually set in place nor of the role played in practice by BMIS at different levels of this structure.

164.    Such deception is also evidenced by documents submitted to the CSSF on UBS SA's behalf.  In a report dated January 15, 2008 entitled "Control Report of the Independent Auditor on the Custodian Bank Function in the Context of the CSSF Circular 02/81," UBS SA purported to, as required by the CSSF, submit a list of the funds for which UBS SA served as custodian, as well as a complete list of sub-custodians UBS SA utilizes globally.  Despite the fact that Luxalpha was included among the funds listed in the report, neither Madoff nor BLMIS was identified as a sub-custodian and is nowhere to be found in the report.  Instead, the report submitted on behalf of UBS SA deceptively identifies Brown Brothers Harriman as the only sub-custodian used by UBS SA in the United States.

165.    Upon information and belief, UBS SA submitted such reports regarding its custodial function and its global custodial network to the CSSF on an annual basis at least from 2004 through 2008, and failed to identify Madoff or BLMIS as a sub-custodian in any such report.

166.    This intentional failure to disclose the roles of Madoff or BLMIS with respect to Luxalpha was part of the UBS Defendants' overall scheme to shield Madoff and/or BLMIS from scrutiny so as not to upset the substantial stream of revenue that benefitted the UBS Defendants as a result of their facilitation of and support for many BLMIS-related funds.

167.    Although the Access entities purportedly became more involved in the management of Luxalpha at some point later on, they nevertheless performed no management functions.  In February 2007, UBSTPM signed an "Investment Advisory Agreement" with AP (Lux), which was designated as "Investment Advisor" in the March 2007 prospectus.

168.    Even when UBSTPM was brought on board as the new Management Company of Luxalpha, the UBS Defendants continued to conceal the delegation of the fund's management to BLMIS.  In Luxalpha's August 2006 prospectus, it was noted that UBSTPM, as Management Company:

> [i]s responsible for the management, the administration and the distribution of the Fund's assets but is allowed to delegate, under its supervision and control, all or part of these duties to third parties.  In case of changes or appointment of additional third parties, the prospectus will be updated accordingly.

169.    No "update" disclosing the delegation of Luxalpha's management to BLMIS was ever provided.  Further, this provision of the August 2006 prospectus fostered the misleading impression that no such delegation had taken place as of 2006, when in fact it already had taken place in 2004, when Luxalpha was first launched.  Nor did UBSTPM ever attempt to exercise any "supervision" or "control" over BLMIS.

170.    Access Mgmt Lux became the new manager of Luxalpha as a result of a "Management Company Services Agreement," dated November 17, 2008.  On the same date, a new "Investment Advisory Agreement" was signed between Access Mgmt Lux and AP (Lux), which replaced the agreement signed in February 2007 between UBSTPM and AP (Lux).

171.   Despite the shuffling of entities serving as Luxalpha's purported manager and investment advisor, Luxalpha's assets were at all times managed and controlled by BLMIS.  The organizational structure for Luxalpha was as follows:



***UBS's Operation of Luxalpha Invited a Fraud***

172.   The operational procedures for Luxalpha put in place by UBS SA, its custodian, and UBSFSL, its administrator, were tailor-made to accommodate Madoff's fraud and allow that fraud to thrive.  These procedures, set forth in internal operating memoranda prepared and distributed by the UBS Defendants, placed custody and trading authority solely in the hands of Madoff through BLMIS, and permitted complete reliance on unverified pricing and trade confirmations issued by Madoff through BLMIS, and the calculation of Luxalpha's NAV on a

52

delayed basis.  The UBS Defendants' operating procedures for Luxalpha combined to create a scenario that enabled a fraud and enhanced Madoff's Ponzi scheme.

173.    In what the Trustee believes to be the most recent of several versions of Luxalpha's internal Operating Memorandum, dated October 16, 2008 – less than two months before the collapse of BLMIS – UBS SA notes that it appointed BLMIS to be the sub-custodian for the safekeeping of Luxalpha's assets.  The Operating Memorandum then continues to state that:

> [t]he sub-custodian is also appointed as exclusive trader of the Account and the transactions involving the assets of the Fund will be executed and settled under the responsibility of the sub-custodian.  In its capacity as Account Trader, the sub-custodian has also been authorized by the Custodian and the Fund to trade directly in securities and options transactions for the purpose of the Account, based on the rules and regulations as defined in the duly signed trading authority.

174.    Madoff and/or BLMIS clearly had total custody and control of Luxalpha's assets with no system for any type of independent checks, balances or confirmations on what Madoff and/or BLMIS was reporting.  As an experienced and sophisticated financial institution, UBS SA knew, or should have known, that such an arrangement was problematic in that it could lead to fraud by a hedge fund manager.  Moreover, such an arrangement was improper as a matter of Luxembourg law.

175.    The Operating Memorandum continues to provide that any cash and security movements for Luxalpha would be communicated by Madoff and/or BLMIS on a daily basis to UBS SA, and states that, "[a]s B. Madoff is at the same time acting as investment trader, broker and sub-custodian, there will be one single confirmation form issued by BM."  The operating procedures further provide that UBSFSL, as administrator, was to take the unconfirmed and unverified information that UBS SA received from BLMIS to determine Luxalpha's NAV.

176.     With regard to the calculation of Luxalpha's NAV, the Operating Memorandum specifically notes that:

> [d]ue to the considerable delay in the dispatching of the trade confirmations and Broker statements from B. Madoff, the client has accepted that UBSFSL issues the NAV with a delay of up to 10 business days.

177.     The Operating Memorandum also provides that BLMIS, as sub-custodian, will "promptly report by fax as of each trade date the transactions entered into the Account."  These daily faxes were supposed to be sent to UBS SA.  Upon information and belief, this procedure was not followed.  Instead, BLMIS only reported trades in a delayed, hard copy-only manner.

178.     An Operating Memorandum for Luxalpha dated October 10, 2008 prepared by UBS SA, specifies that Luxalpha's Management Company, identified as Access Mgmt Lux, would provide UBS SA **"with a backdated monthly investment recommendation."** (Emphasis added.)  UBS knowingly participated in Madoff's fraud by endorsing these backdated recommendations.

179.     The net effect of the operating procedures put in place for Luxalpha was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of Luxalpha, to earn fees while in fact providing no real oversight or protection for Luxalpha's assets.  This arrangement afforded Madoff and/or BLMIS the freedom necessary to manipulate reports in order to perpetuate the Ponzi scheme.

### UBS's Role as a "Front" and Mere "Window Dressing" for Luxalpha Was Well Known and Understood by the Fund's Insiders

180.     The UBS Defendants' illusory role with respect to Luxalpha was widely acknowledged and freely discussed among Access's insiders.  For example, the minutes of Access's February 2007 Quarterly Executive Meeting state that "Luxalpha UCITS is a strange

entity; **UBS is window dressing or a front**.  PL [Patrick Littaye] is a fund director; he controls everything."  (Emphasis added.)

181.    The use of the UBS entities as a front for Luxalpha was undertaken to satisfy the requirements of the Luxembourg authorities that Luxalpha be controlled and managed by established entities in Luxembourg.  The UBS Defendants were willing to provide this façade for Luxalpha in return for millions of dollars in fees.

182.    When shown a copy of the minutes of Access's February 2007 Quarterly Executive Meeting in a Bankruptcy Rule 2004 examination, Philip H. Wogsberg, who was with AIA LLC for ten years and who served as its Director of Research, testified:  "[T]he rules are one thing, but also there is some winks and nods in regulation in Europe, and I think this was a wink and a nod to Patrick please sanitize this and get it all Luxembourgy-looking … "

183.    When also asked in a Bankruptcy Rule 2004 examination about the comment that UBS was a mere front or window dressing, Theodore Dumbauld, a former Access partner and its Chief Investment Officer, testified as follows:

> UBS was just a pass-through entity.  It really didn't have any responsibilities in the management of the product, whether it was collecting investors or maintaining a relationship with Madoff.  So, in that it was purely – Access was using its [*i.e.*, UBS's] balance sheet or its reputation in order to be compliant with the regulations in Luxembourg.

184.    Thus, from the very creation of Luxalpha in 2004 to its implosion as a result of Madoff's fraud, the UBS Defendants sold their name to provide a façade of legitimacy for the fraud.  Luxalpha was just one of several Access-related portals feeding Madoff's fraud.  The UBS Defendants willingly perpetuated a fiction that allowed Luxalpha to operate under the appearance of being a UCITS-compliant fund, thus enabling Madoff to sustain the Ponzi scheme

by facilitating the flow of billions of dollars into the fraud.  But for the deception by the UBS Defendants, the harm to BLMIS's victims would have been diminished.

**The UBS Defendants Were Paid Over $80 Million in Fees for Their "Work" on Luxalpha**

185.    Even though they claimed no responsibility and purported to disclaim all liability for the investment and management of the Luxalpha fund, upon information and belief, the UBS Defendants received over $80 million in fees for their purported duties relating to Luxalpha.

186.    Upon information and belief, UBSFSL was paid a fee of .05% of fund assets for its administration services, resulting in a total of $2,624,871.

187.    Upon information and belief, UBS SA was paid $10,539,560 in fees, purportedly for "recordkeeping and jurisdiction purposes."

188.    Upon information and belief, UBS SA was also paid $14,464,523 in "management fees" for the period February 2004 until August 2006.

189.    Upon information and belief, UBS SA was also paid $13,470,388 in "performance fees" for the period February 2004 until August 2006.

190.    Upon information and belief, UBSTPM was paid $27,167,048 in "management fees" for the period August 2006 until November 2008.

191.    Upon information and belief, UBSTPM was also paid $15,482,220 in "performance fees" for the period August 2006 until November 2008.

192.    These fees were paid to the UBS Defendants for doing essentially nothing for Luxalpha because they had delegated all the custodial and asset management functions for Luxalpha to BLMIS.  The UBS Defendants did not hold the assets of Luxalpha, and never verified their existence or their value.  They publicly misrepresented their role and further participated in and aided and abetted Madoff's fraud and breach of fiduciary duty to BLMIS's customers by, *inter alia*, concealing facts from the Luxembourg regulator.

193.    The delegation of duties to BLMIS and Madoff by the UBS Defendants and their conduct with regard to Luxalpha were authorized and approved by the Luxalpha Director Defendants – the majority of whom were employees of the UBS Defendants.

**UBS Defendants' Operation of Groupement Financier Invited a Fraud**

194.    As with their "figure head" role with respect to Luxalpha, UBSFSL and UBS SA maintained a very hands-off approach with respect to Groupement Financier.  In a Groupement Financier Operating Memorandum dated July 12, 2005, § 3.5 entitled "Not to do" reads in extra-large, bold font: "**Neither UBSL nor UBSFSL should ever enter into a direct contact with Bernard Madoff!!!**"  Upon information and belief, UBSFSL and UBS SA took this unusual step so as to avoid creating any sort of record concerning any inquiry regarding Madoff, and also to avoid any appearance that would suggest that the UBS Defendants had an active role in supervising Groupement Financier.  The UBS Defendants thus were acting contrary to their obligations.

195.    Groupement Financier was formally managed and supervised through the participation of several of the Access Defendants, including AIA Ltd., AIA LLC, and AIA Europe Ltd.  AIA Ltd. was designated as Groupement Financier's investment manager, while AIA LLC and AIA Europe Ltd. were involved, at a minimum, with the monitoring of subscriptions and redemptions for Groupement Financier.

196.    As with Luxalpha, BLMIS again had custody of Groupement Financier's assets and served as its exclusive trader, and all transactions involving the assets of Groupement Financier were permitted to be executed and settled solely by BLMIS.  The NAV for Groupement Financier was calculated by UBSFSL based on unverified and unconfirmed trade confirmations that BLMIS provided to UBS SA.  There was no third party verification of the

information provided by BLMIS.  The UBS Defendants' Operating Memorandum for

Groupement Financier further accepted the "considerable delay" with which BLMIS dispatched

trade confirmations and provided for "the issu[ance of] the NAV with a delay of **up to 9** business

days."

197.    Acting with the Access Defendants, UBS SA and UBSFSL implemented and

supported a series of operational procedures for Groupement Financier that facilitated the

opportunity for Madoff to commit and perpetuate his fraud.

## THE ACCESS DEFENDANTS FACILITATED THE SCHEME<br>THROUGH MISLEADING MARKETING AND SALES

198.    The Access Defendants facilitated and perpetuated the fraud by opening the door

to substantial investments from Europe—investments that Madoff needed to sustain the Ponzi

scheme.  The Access Defendants exploited the close relationship between Madoff and Littaye to

create, market and sell Luxalpha and Groupement Financier, both of which served to provide

BLMIS with large infusions of money from European investors.  Access misrepresented the

controls, oversight and protections in place for the Feeder Fund Defendants, and ultimately

endorsed BLMIS without performing the due diligence that was promised.

### *The Marketing of the Feeder Fund Defendants*

199.    In materials issued out of their New York office, the Access Defendants marketed

their platform of funds, including the Feeder Fund Defendants, by lauding the rigorous process

by which the funds were allegedly created and monitored.  Access's marketing materials

suggested that Access oversaw the creation of its funds by scrutinizing the background of the

managers they selected for their funds and the underlying strategies employed by those

managers.  Once a manager was approved, Access would proceed to create the fund and

negotiate and select the fund's service providers, including the administrator, auditor, prime broker and custodian.

200.    The Access Defendants marketed their funds by emphasizing the protection they purportedly provided "to avoid the three main risk [*sic*] to the hedge fund industry." Specifically, the Access Defendants claimed to protect against "[r]isk of fraud by doing an extensive due diligence" and against "[r]isk of drift by the implementation of an ongoing qualitative, operational and quantitative monitoring."

***Access's Due Diligence Procedures Did Not Apply to Madoff***

201.    The rigorous processes touted by the Access Defendants were not applied to Madoff or BLMIS.  Access's investments in BLMIS were constantly treated as exceptions to the procedures applied to Access's non-Madoff funds.

202.    As part of its stringent background checks, Access required every potential manager to complete extensive background questionnaires.  In addition, it required managers to submit to handwriting analyses done by a graphologist in Paris.

203.    Madoff was neither required to complete the background questionnaire, nor was he subjected to the handwriting analysis required of Access's other investment managers.

204.    In his Bankruptcy Rule 2004 examination, Phil Wogsberg – Access's Director of Research and the point person for its due diligence efforts – testified that he was unaware of any other manager with whom Access had assets under management who was excused from the background questionnaire requirement.  When asked why Madoff was excused, Mr. Wogsberg said he did not know, but suggested that it was because Madoff was a "special manager" whom Littaye treated differently.

205.    Another highly flaunted aspect of Access's due diligence and monitoring process was the requirement that each fund manager permit monthly visits from the Access staff.  The Access marketing materials stated:

> **"Qualitative Review (on a monthly basis)**
>
> Each month, at least one member of Access' portfolio and risk management department (i.e. Stephane Pinon and/or Phil Wogsberg) visits each fund manager at their offices to review investment strategy, trading activity and market conditions. Access continuously analyzes the **investment style** employed by the manager and the investments implemented in their underlying portfolio.
>
> Access reviews the **methods** that the manager employs in identifying different investment opportunities and the trading techniques used to establish desired positions.  Access also questions the manager and examines the necessary documents to ensure that they are adhering, at all times, to the stated **investment discipline**.
>
> All **individuals** influencing the strategies are evaluated including portfolio managers, traders, research staff and administrative employees.  This assessment helps determine whether the company can effectively produce the products and results they have indicated.
>
> Access's monitoring process allows to answer [*sic*] the following two questions:
>
>   1.  Does the manager follow the stated investment guidelines for the fund?
>
>   2.  Are there any warning signs that should trigger an exit by investors?"

206.    These regular visits to fund managers were very important to the Access Defendants' due diligence team.  However, Madoff and BLMIS were *not* subject to these monthly visits – a fact never made known to the public.  The regular Access due diligence team never met with Madoff or anyone else at BLMIS.  With the exception of one manager in Paris, who could not be visited monthly by the Access due diligence team because of geographical

reasons, Madoff was the only fund manager of Access's assets who did not receive monthly qualitative visits and reviews from the Access team.

207.    With few exceptions, the only person from Access who would visit Madoff was his longtime friend, Littaye, who did so on a less than monthly basis.  Any questions, suspicions, concerns, or worries were conveyed to Littaye, who would visit with Madoff and discuss such issues and then return with explanations.  BLMIS was the only one of Access's fund managers for whom Littaye assumed the sole responsibility for ongoing due diligence.

208.    A significant discrepancy existed between what was represented and promised by the Access Defendants as relates to due diligence and monitoring and what was actually delivered with respect to BLMIS.  Treating BLMIS as a special case which was not subject to the Access Defendants' regular claimed due diligence standards or monitoring procedures was one of many ways in which the Access Defendants facilitated and enhanced the Ponzi scheme.

### WHEN FACED WITH PLAIN EVIDENCE OF A FRAUD, THE ACCESS DEFENDANTS CHOSE TO SUPPRESS THE INFORMATION

209.    The rigorous due diligence procedures touted by the Access Defendants did not apply to BLMIS and Madoff.  Moreover, the Access Defendants failed to confront troubling signs of fraud with regard to BLMIS.  One such red flag concerned the purported volume of options trades being reported by Madoff on the trade confirmations issued by BLMIS.  Rather than thoroughly and independently verifying the legitimacy of BLMIS's and Madoff's options trading, the Access Defendants, including Littaye and Delandmeter – who sat on Luxalpha's Board of Directors with UBS executives – confirmed there was a problem, and then purposely concealed it.  Upon discovering the significant disparity between what was being reported by BLMIS and what was being seen in the market, the Access Defendants opted not to press Madoff for an explanation or to exit the relationship with BLMIS.  Instead, the Access Defendants

quashed any discussion of the issue and hid behind a disclaimer stating that Access does not validate the accuracy of the monthly portfolio movements reported by BLMIS.

***Questions Were Raised Concerning the Reported Volume of Madoff's Options Trades***

210.    In the spring of 2006, one or more individuals who worked with Access on its BLMIS investments began to raise serious questions concerning the purported volume of options trades being reported by Madoff on the trade confirmations issued by BLMIS.  Specifically, there was concern that the options trades being reported by BLMIS were not visible in publicly available information or databases for such options trades.

211.    In response to these concerns, Villehuchet asked Theodore Dumbauld, a Partner at AIA LLC and its Chief Investment Officer, to look at the options purportedly being traded by BLMIS.  Dumbauld proceeded to take the trade confirmations received from BLMIS and compared them to the information reflected in the Options Clearing Corporation ("OCC") database.  Dumbauld confirmed that the trades being reported by BLMIS did not show up anywhere in the OCC database.

212.    Dumbauld then made inquiries of people he knew in the industry to determine if there was an explanation for why the reported options trades were not showing up in the OCC database.  Dumbauld's sources confirmed for him that if the BLMIS trades were exchange-traded options, then they needed to show up in the OCC database.  The trades reported by BLMIS purported to be exchange-traded options given that the trade confirmations contained the unique ticker symbols and CUSIP numbers (*i.e.*, "Uniform Security Identification Procedures") associated solely with exchange-traded options.

213.    Dumbauld thus came to the conclusion that the options trades could not be occurring as reported by BLMIS.  When Dumbauld reported his findings to Villehuchet,

Villehuchet steadfastly refused to accept that conclusion and demanded that Dumbauld get a second opinion.

***Access Brought in Chris Cutler to Do Due Diligence on BLMIS***

214.     In order to get a second opinion on the options issue, the Access Defendants hired Chris Cutler, a consultant doing business as Manager Analysis Services LLC.  Cutler specialized in providing due diligence services on hedge funds, and he was asked to generally look at BLMIS and provide his opinion.  Cutler had previously done work for Access relating to non-Madoff funds.

215.     In doing due diligence on BLMIS, Cutler looked at a variety of information, including information on the business of BLMIS generally, its auditor, audit reports, available trade tickets and descriptions of the trading strategy.  Although he was asked to do due diligence on Madoff and BLMIS, he was specifically instructed not to speak to Madoff or anyone at BLMIS.

216.     It took Cutler the equivalent of four days' work to determine that there were serious problems with BLMIS.  In addition to confirming the impossible options volume previously identified by Dumbauld as a red flag, Cutler also identified and saw, among other things:  (i) serious problems with the feasibility of Madoff's strategy; (ii) the lack of any independent verification of trades or assets; and (iii) the opportunity for fraud caused by the delayed, paper confirmation-only way in which trades were reported to Access.

217.     With regard to the feasibility of the strategy, Cutler was rightly doubtful that Madoff could ever execute the volume of options or underlying equities trades being claimed without negatively impacting the market price and diminishing his returns or even losing money.  Cutler also raised questions about the costs of the strategy and whether they were realistic.

218.     On April 20, 2006, Cutler sent an email to Dumbauld outlining his preliminary

findings concerning BLMIS.  In that email, Cutler wrote, "Ted, if this were a new investment

product, not only would it simply fail to meet due dili standards: **you would likely shove it out**

**the door.**"  In the same email, Cutler went on to note, "EITHER extremely sloppy errors OR

serious omissions in tickets.  That's the best case ... arithmetic errors in the founder's strategy

description [found at another source], which is so basic that it suggests that the founder doesn't

really understand the costs of the option strategy."

219.     Upon the completion of his due diligence and analysis, Cutler came to the

conclusion that BLMIS certainly did not meet his standards and that the Access Defendants

should exit all of its investments with BLMIS.  Cutler was not asked to produce a formal report

or to put his findings in writing, despite having done so in the past when advising the Access

Defendants to avoid other investments.

***Access's Inner Circle Concealed Cutler's Findings***

220.     Cutler conveyed his conclusions in an oral report given to Access's inner circle.

In late April or early May 2006, Cutler attended a lunch meeting at the University Club in New

York.  Present at the meeting were Littaye, Villehuchet, Dumbauld and Chantal Lanchon, a long-

time, trusted adviser to Littaye and Villehuchet who did work for Access from time to time.

Cutler conveyed his conclusion at this meeting that the Access Defendants should exit BLMIS

and concentrate on building other aspects of their business.

221.     As he was conveying his conclusion, Cutler was interrupted by Littaye, who said

that he questioned Cutler's "business judgment" given that the Access Defendants' BLMIS

business was "going well," while the other parts of the Access Defendants' business were not

going well.  Chantal Lanchon then declared her view that Cutler's conclusions could not be

correct because she claimed BLMIS was audited on a regular basis by the SEC and FINRA, and

that there could not possibly be a problem.

222.     Littaye thus considered the subject closed, and Cutler did not conduct any further

investigation of BLMIS.  There do not appear to have been any subsequent follow-up

discussions about Cutler's findings or his recommendations within Access.

223.     On May 9, 2006, Cutler sent an e-mail to Dumbauld concerning the University

Club lunch which stated in relevant part:

> Ted, I did my best to inject doubt in a courteous yet effective
> manner.  I would actually like to follow up with Patrick via phone.

On May 10, 2006, Dumbauld replied:

> I believe you handled the lunch perfectly.  As you could tell,
> Patrick is highly sensitive and defensive of the situation.  We have
> not had a chance to discuss post lunch; I will give you some
> feedback when I have it.  I will also let you know about a call with
> Patrick.

224.     There was never any follow-up conversation between Dumbauld and any of

Littaye, Villehuchet or Lanchon, and Cutler was never given any feedback on the options volume

indication of fraud which he had easily identified.

225.     Upon information and belief, Cutler's findings were not shared with anyone else

at the Access Defendants, including its research and marketing staff.  In his Rule 2004

Bankruptcy examination, Cutler testified that it was "understood" that his conclusion would not

be shared beyond the individuals at the University Club lunch meeting.

226.     Wogsberg, the Access Defendants' long-time director of research, who was not

present at the University Club lunch meeting, testified in his Bankruptcy Rule 2004 examination

that if Cutler had formed a conclusion with respect to BLMIS, Wogsberg would have expected to

have been informed of that conclusion, but that he was unaware of whether Cutler even finished the due diligence he was asked to undertake.

227.    The Access Defendants did not just ignore red flags.  They chose to bury them. On May 12, 2006, the Access Products Committee held a meeting that was attended by, among others, Littaye, Villehuchet, Dumbauld and Lanchon.  The minutes from that meeting state as follows:

> **BMI**
>
> 1.  As a result of the conversations we had recently with various sources, it was decided we need to add additional disclosures to the monthly report describing monthly portfolio movements.  **The disclosure needs to make clear that AIA is dependent on the information provided to us by BMI and that we do not validate the accuracy of that information.**

(Emphasis added.)

228.    At that time, in May 2006, when Littaye and the Access inner circle decided to bury the suspicious facts about BLMIS's impossible reported options trading volume, the options trades being reported for just Luxalpha and Groupement Financier together **exceeded the total volume for all put and call options traded on the Chicago Board of Exchange ("CBOE")**. The volume of put options Madoff falsely reported trading for the Feeder Fund Defendants

versus the volume of those same put options traded on the entire exchange was as follows:





Cumulative Purported S&P 100 Put Options Volume for Feeder Fund Defendants
Compared to Corresponding CBOE Put Options Volume (2003–2008)

Solid line indicates actual CBOE options volume
Dashed line indicates Feeder Fund Defendants' purported options volume

The solid line represents the S&P 100 index put options on the entire CBOE between 2003 and 2008.  The dashed line – which exceeds the solid line starting in 2006 – is the volume of purported put option trades for the Feeder Fund Defendants.  These results, which are clear signs of fraud on their own, do not include the additional reported put option trades for the numerous other Access accounts that Littaye and his inner circle were provided with by BLMIS. Moreover, Littaye and the rest of the Access Defendants knew that the Access business only accounted for a portion of BLMIS's overall IA Business.

229.    The results are just as dramatic for call options:



**Cumulative Purported S&P 100 Call Options Volume for Feeder Fund Defendants Compared to Corresponding CBOE Call Options Volume (2003 – 2008)**

Solid line indicates actual CBOE options volume
Dashed line indicates Feeder Fund Defendants' purported options volume

230.    The Access Defendants willfully turned a blind eye to glaring indicators of Madoff's fraud based on publicly available information.  The Access Defendants were on actual notice of serious problems concerning the trades reported by Madoff and/or BLMIS, and, in bad faith, strategically chose to ignore and conceal that problem in order to unjustly enrich themselves through their relationship with Madoff and BLMIS.  Upon information and belief, the UBS Defendants had sufficient information to realize that the volume of options trades reported for the Feeder Fund Defendants exceeded the total volume on the CBOE as well.

**THE ACCESS DEFENDANTS IGNORED ADDITIONAL RED FLAGS**

231.    The Access Defendants willfully ignored myriad other red flags that should have served to put them on notice of Madoff's fraud.  Such red flags included:  the small, unknown

auditor used by BLMIS; the fact that trades and positions were only reported in a hard copy, paper format and on a delayed basis, which was particularly disturbing in view of Madoff's reputation in the industry for technological sophistication; the unusual secrecy insisted upon by Madoff; the unusually steady performance of BLMIS; and the unusual ability of BLMIS to enter and exit the market so as to consistently achieve very favorable prices.  Each of these red flags was acknowledged, considered and ultimately disregarded by the Access Defendants – who sat on the Boards of Directors of both Luxalpha and Groupement Financier – as they continued their participation in the fraud to their financial benefit.

***BLMIS's Auditor Friehling & Horowitz***

232.    The auditor used by BLMIS was Friehling & Horowitz, which was essentially a one-man firm from Rockland County, New York, consisting of David Friehling, a Certified Public Accountant.  The other two employees were an administrative assistant and a semi-retired accountant living in Florida.

233.    On November 3, 2009, David Friehling pled guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC, in connection with the services he performed for Madoff and BLMIS.

234.    During the course of their ongoing monitoring of BLMIS, members of the Access Defendants' due diligence and research teams became aware of the fact that BLMIS was using a small and unknown auditing firm for the reports it filed with the SEC and provided to investors, and they expressed concern after doing some preliminary research on the unknown firm. However, those concerns were again quashed by Patrick Littaye, who directed that no further inquiry be conducted.

235. In his Bankruptcy Rule 2004 examination, Wogsberg testified with respect to Access's awareness of BLMIS's use of Friehling & Horowitz as its auditor:

> And so we were – I was quite worried, and so I said, Patrick, look what we have here. It appears that he may have some conflicts and he certainly is tiny and it's always better to have a large audit firm do this sort of thing. And Patrick's response was if this audit firm is good enough for the SEC, it's good enough for Access. Don't go further.

***Access Mgmt Lux Backdated Investment Recommendations and Madoff and/or BLMIS Only Reported Trades Through Delayed Paper Confirmations***

236. Access Mgmt Lux provided UBS SA with backdated monthly investment recommendations, as UBS SA knew and endorsed in the October 10, 2008 Luxalpha Operating Memorandum. The Access Defendants thus knowingly participated in Madoff's fraud. In addition, the Access Defendants also knew, but ultimately ignored, that the trade confirmations received from BLMIS were only in a hard copy, paper format and were delayed because they were sent via regular mail service, sometimes several days after the purported trade. Both Dumbauld and Wogsberg admitted that the Access Defendants considered it "abnormal" in the mid-2000's not to have access to such information in a more timely manner and in electronic format.

237. Indeed, of all the funds for which the Access Defendants were portfolio managers, BLMIS was the lone exception in that it was the only investment for which Access did not have immediate or next day transparency through a website or next day batch reports.

238. In doing his due diligence on BLMIS for the Access Defendants, Cutler also highlighted problems with the trade confirmations issued by BLMIS. Specifically, Cutler identified that the confirmations did not have time stamps on them, which he believed was a standard practice of all broker/dealers.

239.    The Access Defendants were willing to look past BLMIS's delayed, paper trade confirmation reporting because Madoff purportedly justified his atypical reporting method by contending that it was the only way to protect his trading strategy.  The Access Defendants blindly accepted that explanation because the alternative would have been to exit BLMIS, which was the most lucrative part of their business and the basis for their very existence.

### Madoff's Purported Market-Timing Ability

240.    Another red flag known and consciously ignored by the Access Defendants was Madoff's ability to consistently enter the market close to the lowest prices of the day and to exit close to the highest prices of the day.  Within Access, there was skepticism as to whether Madoff could legitimately achieve the types of consistent returns he was reporting by agnostically employing the SSC Strategy that he purported to use.  The Access Defendants believed that there had to be a market-timing edge associated with Madoff's use of his strategy.  The Access Defendants became concerned that Madoff was engaging in illegal front-running (trading ahead of other customers' orders) or was otherwise illicitly using his market-making operation for insight as to when the market would move.

241.    The concerns that the Access Defendants had regarding Madoff's suspected market-timing edge were again ultimately quashed by Littaye, who reported to the rest of Access that BLMIS had three models – short, middle and long-term models of the market – that Madoff used to help him make his entry and exit decisions.  Access's research staff, including Wogsberg, was never provided with any detail concerning these purported models, and the Access Defendants merely accepted this explanation of Madoff's unusually successful market-timing ability.  The notion of short, middle, and long-term market models made no sense, especially because Madoff purportedly moved customer funds "out of the market" at the end of each quarter, ostensibly to avoid the disclosure requirements attendant to a 13F filing.

### *Madoff's Insistence on Secrecy*

242.     The Access Defendants further acquiesced in Madoff's insistence that his name not appear in any official offering document relating to the Feeder Fund Defendants that invested in BLMIS.  Madoff's name was not allowed to appear as the custody broker or the manager for any fund.  The Feeder Fund Defendants' offering documents only reflected an Access entity as the manager.

243.     Wogsberg testified that Madoff "just didn't want his name out there.  He thought it would attract attention."

244.     In a February 17, 2000 letter from Littaye to the Access Defendants' outside legal counsel concerning the creation of a new investment company for investment with BLMIS, Littaye instructed that "BMI should not appear in any official document."  This was the "standard" procedure for offering documents for Access products that invested in BLMIS.

245.     In a June 29, 2004 email from Littaye to several individuals at Access regarding a customer's possible investment in Luxalpha, Littaye wrote, "[w]e underline [*sic*] the confidentiality of the product and insist on the fact that BM name must never be published."

246.     The Access Defendants were willing to comply with Madoff's insistence on secrecy despite the fact that it was, in the words of Wogsberg, "quite uncommon" for the name of the manager not to appear in the offering documents.

247.     By complying with Madoff's demand for secrecy, the Access Defendants not only ignored a red flag, but also assisted Madoff in concealing the size and scope of his expanding fraud.

### *BLMIS's Unusual Performance*

248.     The Access Defendants purposely ignored that Madoff's purported performance was unusually stable and consistent.  An internal October 1999 Profile and Update Manager and

Fund Overview prepared by Wogsberg, notes that with regard to BLMIS, "[r]esults follow the estimated performance projections unusually closely." Wogsberg admitted that it was unusual that BLMIS had "[n]o negative months and very stable positive performance."

***Unidentified Counterparties***

249. The Access Defendants further purposely ignored that the purported counterparties for Madoff's options trades were never identified. In his April 20, 2006 email to Dumbauld at Access in connection with his due diligence and review of the options volume issue, Cutler noted, "I just can't find the other side of the trade." Wogsberg admitted that despite Madoff's explanation to Access that he was using custom, over the counter options, Access made no effort to identify any of Madoff's purported counterparties.

250. In a note posted to Access's internal database dated October 4, 2006, Littaye wrote:

> S. RUFFINO [Stephen Ruffino of Anglo-Irish bank, administrator for Trotanoy, another of Access's BLMIS feeder funds] HAD SENT A QUERY TO F. DI PASCALI ASKING WHO THE COUNTERPARTIES WERE FOR THE OPTIONS IN OUR PROGRAM. THERE WAS NO ANSWER. RATHER THAN LEAVE THE SUBJECT IN LIMBO, THEY SENT AGAIN THE QUERY, WITH A COVER LETTER FROM D. MC ADAMS SAYING THIS WAS A QUERY FROM EARNST [*sic*] AND YOUNG, THEIR AUDITORS. BM CALLS ME TO SAY THEY DISCLOSE THEIR COUNTERPARTIES FOR THE EQUITY SIDE BUT THEY CANNOT DO IT FOR THE OPTIONS. WHAT HE CAN SAY IS THAT THERE IS NO RISK THERE BECAUSE THOSE OPTIONS ARE PART OF "PORTFOLIO ASSURANCE PROGRAMS" (AT SOME POINT IN THE CONVERSATION I HEAR "PERFORMANCE ASSURANCE"). THE ONLY MOMENT HE WOULD DISCLOSE THE INFO WOULD BE IN CASE OF DEFAULT.
>
>                     *     *     *
>
> I TELL HIM I WILL TRANSMIT THE ANSWER AND CALL HIM BACK.

251.     As this internal note indicates, the Access Defendants were well aware of, but decidedly ignored, that Madoff refused to identify the purported counterparties for his trades, and that he provided a nonsensical excuse.

*Lack of an Independent Custodian*

252.     The Access Defendants also ignored the obvious lack of an independent custodian for the assets of the Feeder Fund Defendants and, thus, that there was no independent verification of those assets.  The lack of an independent custodian for the Feeder Fund Defendants' assets was an additional red flag for the Access Defendants.  Dumbauld confirmed that within Access "[i]t was observed that there was no independent custodian, but any concerns or red flags that raised was always answered by the fact that Madoff was an SEC registered broker-dealer and therefore the SEC was in there doing their monitoring and that was perceived to be sufficient."  This willingness to rely solely on the SEC's supervision of Madoff was contrary to, and inconsistent with the Access Defendants' representations of rigorous due diligence and monitoring.

253.     Despite numerous red flags and anomalies strongly suggesting fraud, the Access Defendants pressed ahead with their investments and withdrawals from BLMIS.  These red flags and the Access Defendants' intentional efforts to suppress all such indicia of fraud demonstrate that the Access Defendants knew that Madoff was a fraud, as they were being unjustly enriched by the fraud.

254.     Littaye was a member of Luxalpha's Board of Directors, and the UBS-dominated Board of Directors of Luxalpha knew or should have known that Madoff was a fraud.

## THE AFTERMATH

255.     Following Madoff's arrest and confession on December 11, 2008, Access received questions from investors concerned about the safety of their assets.  The Access

Defendants and the UBS Defendants had obviously not disclosed the workings of the Feeder

Fund Defendants and the delegation of duties to Madoff.

256.     A December 11, 2008 e-mail from an individual named Luca Vaiani to Prince

Michel of Yugoslavia, who was one of Access's salespeople, asks:

> The assets of Luxalpha are segregated and their [*sic*] should be no
> risk.  True?  Are you liquidating the positions to be in cash?

A subsequent email, dated December 16, 2008, from Mr. Vaiani to Prince Michel of Yugoslavia

states:

> I would like to understand if Luxalpha American Selection is in
> some way (and if yes how much) involved in the Madoff fraud; if
> affected in any way I would like to understand what is the legal
> structure of the relation between the Sicav and Madoff.

257.     An e-mail dated December 15, 2008 from Manfredo Radicati of Trendtrust SA to

Prince Michel of Yugoslavia states in part:

> Dear Michel,
>
> Like all frauds, the collapse of Madoff is a disgrace.
>
> What is astonishing is that no one, especially firms such as AIA
> that pride themselves on the thoroughness of their due diligence
> didn't see any warning sign.  This is all the more disturbing since a
> number of "red flags" should have been seen … even more so
> since you had full transparency on the portfolios.
>
> Looking at the situation at hand, AIA, together with UBS, in their
> role as sponsor, investment manager and custodian of Luxalpha,
> should answer a number of questions as to why nothing was
> detected earlier.  The most pressing task however, is to explain to
> investors how the holdings in the portfolio proved to be virtual or
> nonexistent.  Can one speak of negligence or complicity on the part
> of UBS in this matter?

258.     An e-mail dated December 15, 2008 from an individual named Alessandro Negri

to Benoit Chastel, who handled Investor Relations for Access, bears the subject "Urgent info

Groupement" and states in part:

1) When did Access carry out the last Due Diligence on Madoff and can we please have a copy.

2) Was Access aware of the creation of sub-accounts by Ubs in favour of a company related to Madoff?

3) Based on what facts were the monthly reports(Analysis of movements of the portfolio) [*sic*] sent to investors created?

4) How long ago did the business relations start between Madoff and Access?

5) Is there any type of contract/arrangement between Access and Madoff and if so can we have a copy?

6) Can we have a copy of the CSSF circular that outlines the obligations of custodian banks towards the investors?

7) Was Access aware of whoaudited [*sic*] Madoff Investment Securities?

8) When was the last inspection by the Sec carried out on Madoff Investment Securities?

9) Was Access aware that all the transactions were carried out by Madoff Investment Securities?

259. A letter dated December 29, 2008 from an unknown individual at Fondaco SGR

S.p.A. to Access Mgmt Lux and AIA LLC, also copied to the CSSF, states in part:

We have become aware, through various sources, that the management of assets of the sub-fund may have been involved in the Madoff case. We are hereby requesting you [*sic*] the following:

(i) what actions have taken [*sic*] the management company to preserve the interest of the Sicav.

(ii) can you confirm that all assets of Luxalpha Sicav – American Selection have been duly kept segregated from any other asset or accounts? [A]nd hence

(iii) can you confirm the integrity of all such assets, irrespective of their current evaluation[*sic*]?

## THE TRANSFERS

### TRANSFERS FROM BLMIS TO THE FEEDER FUND DEFENDANTS

260.     Prior to the Filing Date, the Feeder Fund Defendants, Luxalpha and Groupement

Financier, maintained two accounts, 1FR108 and 1FR096, respectively (collectively, the

"Accounts"), as set forth on Exhibit A.  Upon information and belief, for each account, the

respective Feeder Fund Defendant executed, or caused to be executed, a Customer Agreement,

an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of

Securities and Options (collectively, the "Account Agreements"), and delivered such documents,

or caused them to be delivered, to BLMIS at BLMIS's headquarters at 885 Third Avenue, New

York, New York.

261.     The Account Agreements were to be performed in New York, New York through

securities trading activities that would take place in New York, New York.  The Accounts were

held in New York, New York and the Feeder Fund Defendants sent funds to BLMIS and/or to

the 703 Account in New York, New York for application to the Accounts and the purported

conducting of trading activities.

262.     The Feeder Fund Defendants collectively invested approximately $2 billion with

BLMIS through over a hundred and fifty separate transfers via check and wire directly into the

703 Account at JPMorgan Chase in New York, New York.

263.     During the six years preceding the Filing Date, BLMIS made transfers to the

Feeder Fund Defendants in the collective amount of at least $1.12 billion (the "Six Year Initial

Transfers").  The Six Year Initial Transfers received by the Feeder Fund Defendants were made

to or for the benefit of the Feeder Fund Defendants and are set forth on Exhibits B and C.  The

Six Year Initial Transfers include transfers of approximately $766 million to Defendant

Luxalpha (the "Luxalpha Six Year Initial Transfers") and $356 million to Defendant

Groupement Financier (the "Groupement Six Year Initial Transfers"). The Feeder Fund Defendants' Six Year Initial Transfers are avoidable and recoverable under §§ 544(b), 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly SIPA §78fff-2(c)(3), and §§ 273-279 of New York Debtor and Creditor Law.

264.    The Six Year Initial Transfers include approximately $1.02 billion which BLMIS transferred to the Feeder Fund Defendants during the two years preceding the Filing Date (the "Two Year Initial Transfers"). The Two Year Initial Transfers included transfers of approximately $743 million to Luxalpha (the "Luxalpha Two Year Initial Transfers") and approximately $277 million to Groupement Financier (the "Groupement Two Year Initial Transfers"). The Two Year Initial Transfers are avoidable and recoverable under §§ 548(a), 550(a), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA §78fff-2(c)(3).

265.    The Six Year Initial Transfers and Two Year Initial Transfers include $796 million that BLMIS transferred to the Feeder Fund Defendants during the 90 days preceding the Filing Date (the "Preference Period Initial Transfers"). The Preference Period Initial Transfers included transfers of approximately $536 million to Luxalpha (the "Luxalpha Preference Period Initial Transfers") and approximately $260 million to Groupement Financier (the "Groupement Preference Period Initial Transfers"). The Preference Period Initial Transfers are avoidable and recoverable under §§ 547, 550(a), and 551 of the Bankruptcy Code, and applicable provisions of SIPA, particularly SIPA § 78fff-2(c)(3). The Six Year Initial Transfers, Two Year Initial Transfers, Preference Period Initial Transfers, and any undiscovered initial transfers, are collectively referred to herein as "Initial Transfers."

266.     As early as 2002, numerous indicia of fraud concerning BLMIS gave the Feeder

Fund Defendants actual and/or constructive knowledge of BLMIS' fraud.  These indicia of fraud,

and the Feeder Fund Defendants' willful and deliberate decision to continue investing with

BLMIS despite them, demonstrates a motive and opportunity to commit fraud, and/or conscious

misbehavior or recklessness amounting to fraudulent intent.  Given the Feeder Fund Defendants'

actual or constructive knowledge of these indicia of fraud, the Feeder Fund Defendants were

neither innocent nor good faith investors.

267.     As early as 2002, the Feeder Fund Defendants had information that put them on

actual and/or inquiry notice of fraud at BLMIS, or that BLMIS was insolvent and/or that the

transfers might have been made with a fraudulent purpose.  The Feeder Fund Defendants

strategically chose to ignore that information in order to continue to enrich themselves through

their relationship with Madoff and BLMIS.

268.     The transfers were made to avoid detection of the fraud, to retain existing

investors, and to lure other investors, and constituted an integral and essential element of the

fraud, necessary to validate the false account statements and to avoid disclosure of the fraud.

269.     The Trustee has filed this action against the Feeder Fund Defendants to avoid and

recover the Initial Transfers.

## TRANSFERS FROM THE FEEDER FUND DEFENDANTS
## TO THE LUXALPHA AND GROUPEMENT FINANCIER DIRECTOR DEFENDANTS, ACCESS DEFENDANTS, AND UBS DEFENDANTS

270.     Upon information and belief, some of the money transferred from BLMIS to the

Feeder Fund Defendants was subsequently transferred by the Feeder Fund Defendants to the

Luxalpha and Groupement Financier Director Defendants, Access Defendants, and UBS

Defendants (collectively, the "Subsequent Transferee Defendants"), including but not limited to,

in the form of fees amounting to no less than $80 million.  These payments from the Feeder Fund

Defendants constitute subsequent transfers of the Initial Transfers from BLMIS to the Feeder Fund Defendants.  All avoidable transfers from BLMIS to the Feeder Fund Defendants, which the Feeder Fund Defendants subsequently transferred, either directly or indirectly, to the Subsequent Transferee Defendants (collectively, the "Subsequent Transfers"), are recoverable from the Subsequent Transferee Defendants by the Trustee pursuant to § 550(a) of the Bankruptcy Code.

271.    The portion of the Preference Period Initial Transfers that the Feeder Fund Defendants subsequently transferred to the Subsequent Transferee Defendants will be referred to as the "Preference Period Subsequent Transfers."

272.    At the time these fees were transferred, the Subsequent Transferee Defendants knew or should have known of fraudulent activity at BLMIS, or that the Feeder Fund Defendants were invested in a fraudulent scheme.  The Subsequent Transferee Defendants did not provide value to the Feeder Fund Defendants insofar as they knew or should have known that any "maintenance" was merely perpetuating fraudulent activity.

273.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

274.    The Trustee's investigation is on-going and the Trustee reserves the right to seek to amend this Complaint, including but not limited to:  (i) supplementing the information on the Initial Transfers, Subsequent Transfers, and any additional transfers; and (ii) seeking recovery of such additional transfers.

## **CUSTOMER CLAIMS**

275.    On or about March 2, 2009, Defendant Luxalpha filed a customer claim with the Trustee that the Trustee has designated as Claim No. 004419.  On March 3, 2009, Defendant Luxalpha filed another customer claim with the Trustee that the Trustee has designated as Claim

No. 005725.  In addition, on or about March 2, 2009, Defendant UBS SA filed an additional

customer claim on behalf of Luxalpha with the Trustee, which the Trustee has designated as

Claim No. 005025.  These three customer claims are referred to herein as the "Customer

Claims."

276.    On December 23, 2008, the Bankruptcy Court entered an Order on Application

for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices,

Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing

Other Relief (the "Claims Procedures Order.")  The Claims Procedures Order includes a process

for the determination and allowance of claims under which the Trustee has been operating.  The

Trustee intends to resolve the Customer Claims and any related objection to the Trustee's

determination of such claim through a separate hearing as contemplated by the Claims

Procedures Order.

**COUNT ONE:**
**PREFERENTIAL TRANSFERS (INITIAL TRANSFEREE)**
**11 U.S.C. §§ 547(b), 550(a), AND 551**
***Against The Feeder Fund Defendants***

277.    The Trustee repeats and realleges the allegations contained in paragraphs 1

through 276 of this Amended Complaint as if fully realleged herein.

278.    At the time of each of the Preference Period Initial Transfers, each of the Feeder

Fund Defendants was a "creditor" of BLMIS within the meaning of § 101(10) of the Bankruptcy

Code and pursuant to SIPA § 78fff-2(c)(3).

279.    Each of the Preference Period Initial Transfers constitutes a transfer of an interest

of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and pursuant to

SIPA § 78fff-2(c)(3).

280.     Each of the Preference Period Initial Transfers was to or for the benefit of Luxalpha or Groupement Financier.

281.     Each of the Preference Period Initial Transfers was made for or on account of an antecedent debt owed by BLMIS before such transfer was made.

282.     Each of the Preference Period Initial Transfers was made while BLMIS was insolvent.

283.     Each of the Preference Period Initial Transfers was made during the 90-day preference period under § 547(b)(4) of the Bankruptcy Code.

284.     Each of the Preference Period Initial Transfers enabled Luxalpha and/or Groupement Financier to receive more than each of the Feeder Fund Defendants would receive if:  (i) this case was a case under chapter 7 of the Bankruptcy Code; (ii) the transfers had not been made; and (iii) the applicable fund received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

285.     Each of the Preference Period Initial Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to § 547(b) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants as initial transferees or the entities for whose benefit such transfers were made pursuant to § 550(a) of the Bankruptcy Code.

286.     As a result of the foregoing, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

287.    To the extent that either or both of the Feeder Fund Defendants are not found to have a valid antecedent debt or claim, then such transfers are avoidable and recoverable pursuant to, *inter alia*, §§ 544, 548, 550(a), 551 of the Bankruptcy Code, §§ 273-279 of the New York Debtor and Creditor Law, and/or SIPA § 78fff-2(c)(3).

**COUNT TWO:**
**PREFERENTIAL TRANSFERS (SUBSEQUENT TRANSFEREE)**
**11 U.S.C. §§ 547(b), 550(a), AND 551**
*Against The Feeder Fund Director Defendants, Access Defendants, And UBS Defendants*

288.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 287 of this Amended Complaint as if fully realleged herein.

289.    Each of the Preference Period Initial Transfers is avoidable and recoverable pursuant to §§ 547, 550 and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) of the Bankruptcy Code.  Furthermore, each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of § 101(54) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

290.    Upon information and belief, the Subsequent Transferee Defendants were immediate or mediate transferees of some portion of the Preference Period Initial Transfers pursuant to § 550(a) of the Bankruptcy Code (as defined earlier, the  "Preference Period Subsequent Transfers").

291.    Each of the Preference Period Subsequent Transfers was made directly or indirectly to or for the benefit of the Subsequent Transferee Defendants.

292.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3) recovering the Preference Period Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS.

## COUNT THREE:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551
#### *Against The Feeder Fund Defendants*

293.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 292 of this Amended Complaint as if fully realleged herein.

294.     Each of the Two Year Initial Transfers were made on or within two years before the Filing Date.

295.     Each of the Two Year Initial Transfers constituted a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

296.     Each of the Two Year Initial Transfers were made by BLMIS with the actual intent to hinder, delay or defraud some or all of BLMIS's then existing or future creditors. BLMIS made the Two Year Initial Transfers to or for the benefit of the Feeder Fund Defendants in furtherance of a fraudulent investment scheme.

297.     Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

298.     As a result of the foregoing, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers, (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551
### *Against The Feeder Fund Defendants*

299.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 298 of this Amended Complaint as if fully realleged herein.

300.     Each of the Two Year Initial Transfers were made on or within two years before the Filing Date.

301.     Each of the Two Year Initial Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of §§ 101(54) and 548(a) of the Bankruptcy Code and pursuant to SIPA § 78fff-2(c)(3).

302.     BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Initial Transfers.

303.     At the time of each of the Two Year Initial Transfers, BLMIS was insolvent, or became insolvent as a result of each of the Two Year Initial Transfers.

304.     At the time of each of the Two Year Initial Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

305.     At the time of each of the Two Year Initial Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

306.     Each of the Two Year Initial Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Feeder Fund Defendants pursuant to § 550(a) of the Bankruptcy Code and SIPA § 78fff-2(c)(3).

307.     As a result of the foregoing, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT FIVE:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a,
### 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551
### *Against The Feeder Fund Defendants*

308.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 307 of this Amended Complaint as if fully realleged herein.

309.     At all times relevant to the Six Year Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

310.     Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under § 270 of the New York Debtor and Creditor Law.

311.     Each of the Six Year Initial Transfers were made by BLMIS and transferees with the actual intent to hinder, delay or defraud the creditors of BLMIS.  BLMIS made the Six Year Initial Transfers to or for the benefit of Luxalpha and/or Groupement Financier in furtherance of a fraudulent investment scheme.

312.     Each of the Six Year Initial Transfers were received by the Feeder Fund Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the transfers and/or future creditors of BLMIS.

313.    As a result of the foregoing, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS and to return to injured BLMIS customers; and (d) recovering attorneys' fees from the Feeder Fund Defendants.

**COUNT SIX:**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278**
**AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**
***Against The Feeder Fund Defendants***

314.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 313 of this Amended Complaint as if fully realleged herein.

315.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

316.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under § 270 of the New York Debtor and Creditor Law.

317.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

318.    BLMIS was insolvent at the time it made each of the Six Year Initial Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Initial Transfers.

319.    As a result of the foregoing, pursuant to §§ 273, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six

Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

### COUNT SEVEN:
### FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)
### NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279,
### AND 11 U.S.C. §§ 544, 550(a), AND 551
### *Against The Feeder Fund Defendants*

320.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 319 of this Amended Complaint as if fully realleged herein.

321.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

322.    Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under § 270 of the New York Debtor and Creditor Law.

323.    BLMIS did not receive fair consideration for the Six Year Initial Transfers.

324.    At the time BLMIS made each of the Six Year Initial Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Initial Transfers was an unreasonably small capital.

325.    As a result of the foregoing, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

**COUNT EIGHT:**
**FRAUDULENT TRANSFERS (INITIAL TRANSFEREE)**
**NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278,**
**AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**
***Against The Feeder Fund Defendants***

326.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 325 of this Amended Complaint as if fully realleged herein.

327.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under § 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e).

328.     Each of the Six Year Initial Transfers constituted a conveyance by BLMIS as defined under § 270 of the New York Debtor and Creditor Law.

329.     BLMIS did not receive fair consideration for the Six Year Initial Transfers.

330.     At the time BLMIS made each of the Six Year Initial Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

331.     As a result of the foregoing, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS.

## COUNT NINE:
### RECOVERY OF SUBSEQUENT TRANSFERS:  NEW YORK DEBTOR AND CREDITOR LAW §§ 273 - 279 AND 11 U.S.C. §§ 544, 547, 548, 550(a) AND 551
*Against The Feeder Fund Director Defendants, Access Defendants, And UBS Defendants*

332.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 331 of this Amended Complaint as if fully realleged herein.

333.    Each of the Initial Transfers is avoidable under §§ 273 through 279 of the New York Debtor and Creditor Law, §§ 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3).

334.    Upon information and belief, some or all of the Initial Transfers were subsequently transferred to the Subsequent Transferee Defendants and Subsequent Transferee Defendants were immediate or mediate transferees of all or some portion of the Initial Transfers pursuant to § 550(a)(2) of the Bankruptcy Code.

335.    Each of the Subsequent Transfers were made directly or indirectly to or for the benefit of the Subsequent Transferee Defendants.

336.    Each of the Subsequent Transfers was received by the Subsequent Transferee Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Subsequent Transfers, and/or future creditors of BLMIS.

337.    As a result of the foregoing, pursuant to §§ 273 – 279 of the New York Debtor and Creditor Law, §§ 544, 547, 548, 550(a) and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, from the Subsequent Transferee Defendants for the benefit of the estate of BLMIS, and recovering attorneys' fees from the Subsequent Transferee Defendants.

**COUNT TEN:**
**DISALLOWANCE OF CUSTOMER CLAIMS**
*Against Luxalpha And UBS SA*

338.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 337 of this Amended Complaint as if fully realleged herein.

339.    On or about March 2-3, 2009, Defendants Luxalpha and UBS SA, on behalf of Luxalpha, filed the Customer Claims in the SIPA Proceeding.

340.    Luxalpha is the recipient, as a direct transferee, of transfers of Customer Property. The Trustee has commenced this adversary proceeding against Luxalpha to avoid and recover the Initial Transfers under §§ 544(b), 547, 548, and 550 of the Bankruptcy Code, NY Debtor and Creditor Law 270 *et seq*., and applicable sections of SIPA, including § 78fff-2(c)(3).  Luxalpha has not returned the Initial Transfers to the Trustee.

341.    As a result of the foregoing, pursuant to § 502(d), Luxalpha's and UBS SA's Customer Claims must be disallowed unless and until Luxalpha returns the Initial Transfers to the Trustee.

342.    The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  The Trustee intends to resolve Luxalpha's and UBS SA's Customer Claims and any related objections through the mechanisms contemplated by the Claims Procedures Order.

343.    As a result of the foregoing, the Trustee is entitled to an order disallowing the Customer Claims and/or that Luxalpha is not entitled to customer status.

**COUNT ELEVEN:**
**EQUITABLE SUBORDINATION OF CUSTOMER CLAIMS**
*Against Luxalpha And UBS SA*

344.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 343 of this Amended Complaint as if fully realleged herein.

345. Luxalpha and UBS SA engaged in inequitable conduct, including behavior described in this Amended Complaint, that has resulted in injury to customers, creditors and/or BLMIS, and has conferred an unfair advantage on Luxalpha and UBS SA.

346. Based on Luxalpha and UBS SA's inequitable conduct, as described above, the customers of Madoff and/or BLMIS have been misled as to the true financial condition of the debtor, customers have been induced to invest without knowledge of the actual facts regarding BLMIS's financial condition, and/or customers and creditors are less likely to recover the full amounts due to them because of the conduct of Luxalpha and UBS SA.

347. The Court should exercise the full extent of its equitable powers to ensure that claims, payments, or benefits, of whatever kind or nature, which are asserted or sought by Luxalpha and/or UBS SA directly or indirectly against the estate – and only to the extent such claims are allowed – are subordinated for distribution purposes pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code.

348. Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## COUNT TWELVE:
### AIDING AND ABETTING FRAUD
*Against The UBS Defendants*

349. The Trustee repeats and realleges the allegations contained in paragraphs 1 through 348 of this Amended Complaint as if fully realleged herein.

350. Madoff, through his domination and control of BLMIS, committed a massive fraud with the substantial assistance of the UBS Defendants, who had actual knowledge of the fraud. At a minimum, the UBS Defendants consciously avoided knowledge of the fraud.

351. Through their actions to accommodate Madoff's fraud while attempting to distance themselves from liability, it is clear that the UBS Defendants knew that Madoff and/or

BLMIS were engaging in fraudulent activities.  The UBS Defendants lent their name to the Feeder Fund Defendants and serviced the Feeder Fund Defendants in a variety of roles, all the while disclaiming any liability for the funds in undisclosed indemnity agreements and all the while delegating their key responsibility of custodian to Madoff and/or BLMIS and relying on Madoff and/or BLMIS for the numbers underlying the NAV without seeking independent verification of those numbers.  Moreover, the UBS Defendants conducted due diligence on Madoff and/or BLMIS and profited for years off of the Feeder Fund Defendants, while at the same time, they consistently refused to market or recommend either of the Feeder Fund Defendants to their own clients for investment, and had no exposure, or no significant exposure, themselves to Madoff and/or BLMIS, and at all times designated Madoff as a non-approved manager.

352.    At a minimum, the UBS Defendants were willfully blind to the fraud, as they profited from it.  In addition to the knowledge they obtained through due diligence on Madoff and/or BLMIS, the UBS Defendants, in their roles as custodian, manager and administrator, and as a result of the procedures set forth in the Feeder Fund Defendants' Operating Memoranda, had access to and were required to review data and information – information demonstrating that Madoff and/or BLMIS was a fraud.  The troubling information about Madoff and/or BLMIS known by the UBS Defendants by virtue of the roles in which they served for the Feeder Fund Defendants included, but was not limited to: (a) the impossible volume of options and equities trading being reported by BLMIS; (b) BLMIS's improbable rates of return; (c) the failure of BLMIS to ever identify counterparties; (d) the use of backdated investment recommendations knowingly relied on by the UBS Defendants; (e) the use of delayed, hard copy-only trade confirmations by BLMIS; (f) BLMIS's reporting of stock trades that were outside the range of

prices for such stocks on the reported days; and (g) BLMIS's use of a small, unknown auditing firm.

353.    The UBS Defendants actively and substantially assisted Madoff and/or BLMIS in perpetuating the fraud, by, among other things: (a) serving as the sponsor and outwardly serving as custodian, manager and administrator of the Feeder Fund Defendants, thereby providing the Feeder Fund Defendants with an appearance of legitimacy, increasing the level of investment in the Feeder Fund Defendants as a result of marketing with the UBS brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; (b) agreeing to serve as a mere façade for the Feeder Fund Defendants; (c) agreeing to implement and implementing atypical procedures that were tailored to accommodate Madoff's suspicious methods; (d) ignoring the numerous red flags that were apparent through the data and information that they had access to and were required to review; and (e) repeatedly and knowingly concealing the roles of Madoff and/or BLMIS as sub-custodian and manager from the CSSF in documents required to be submitted for initial and continuing approval of Luxalpha's status as a UCITS fund.

354.    The UBS Defendants' assistance was a proximate cause of the fraud.  Without the UBS Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

355.    As a result of the UBS Defendants' aiding and abetting Madoff's and/or BLMIS's fraud, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT THIRTEEN:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
*Against The UBS Defendants*

356.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 355 of this Amended Complaint as if fully realleged herein.

357.     Madoff and/or BLMIS owed a fiduciary duty to its BLMIS customers, and Madoff and/or BLMIS, as an investment advisor and otherwise, held a position of superior knowledge and expertise over the Feeder Fund Defendants, and the Feeder Fund Defendants relied on and reposed trust and confidence in Madoff and/or BLMIS.  Madoff and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme and stealing billions of dollars from BLMIS customers and creditors.

358.     The UBS Defendants knowingly participated in the breach, substantially assisted in it, and proximately caused the damages suffered by customers, creditors and/or BLMIS as a result of the breach.  At a minimum, the UBS Defendants consciously avoided knowledge of the breach.

359.     Through their actions to accommodate Madoff's fraud while attempting to distance themselves from liability, it is clear that the UBS Defendants knew that Madoff and/or BLMIS were engaging in fraudulent activities or consciously avoided such knowledge.  The UBS Defendants lent their name to the Feeder Fund Defendants and serviced the Feeder Fund Defendants in a variety of roles, all the while disclaiming any liability for the funds in undisclosed indemnity agreements and all the while delegating their key responsibility of custodian to Madoff and/or BLMIS and relying on Madoff and/or BLMIS for the numbers underlying the NAV without seeking independent verification of those numbers.  Moreover, the UBS Defendants conducted due diligence on Madoff and/or BLMIS and profited for years off of the Feeder Fund Defendants, while at the same time consistently refused to market or recommend either of the Feeder Fund Defendants to their own clients for investment, and had no exposure, or no significant exposure, themselves to Madoff and/or BLMIS, and at all times designated Madoff as a non-approved manager.

360.     At a minimum, the UBS Defendants were willfully blind to the fraud, as they profited from it.  In addition to the knowledge they obtained through due diligence on Madoff and/or BLMIS, the UBS Defendants, in their roles as custodian, manager and administrator, and as a result of the procedures set forth in the Feeder Fund Defendants' Operating Memoranda, had access to and were required to review data and information – information demonstrating that Madoff and/or BLMIS was a fraud.  The troubling information about Madoff and/or BLMIS known by the UBS Defendants by virtue of the roles in which they served for the Feeder Fund Defendants included, but was not limited to: (a) the impossible volume of options and equities trading being reported by BLMIS; (b) BLMIS's improbable rates of return; (c) the failure of BLMIS to ever identify counterparties; (d) the use of backdated investment recommendations knowingly relied on by the UBS Defendants; (e) the use of delayed, hard copy-only trade confirmations by BLMIS; (f) BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and (g) BLMIS's use of a small, unknown auditing firm.

361.     The UBS Defendants actively and substantially assisted Madoff and/or BLMIS in perpetuating the fraud, by, among other things: (a) serving as the sponsor and outwardly serving as custodian, manager and administrator of the Feeder Fund Defendants, thereby providing the Feeder Fund Defendants with an appearance of legitimacy, increasing the level of investment in the Feeder Fund Defendants as a result of marketing with the UBS brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; (b) agreeing to serve as a mere façade for the Feeder Fund Defendants; (c) agreeing to implement and implementing atypical procedures that were tailored to accommodate Madoff's suspicious methods; (d) ignoring the numerous red flags that were apparent through the data and information that they

had access to and were required to review; and (e) repeatedly and knowingly concealing the roles

of Madoff and/or BLMIS as sub-custodian and manager from the CSSF in documents required to

be submitted for initial and continuing approval of Luxalpha's status as a UCITS fund.

362.     The UBS Defendants' assistance was a proximate cause of the breach.  Without

the UBS Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to

operate the Ponzi scheme.

363.     As a result of the UBS Defendants' aiding and abetting this breach of fiduciary

duty, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT FOURTEEN:**
**AIDING AND ABETTING CONVERSION**
***Against The UBS Defendants***

364.     The Trustee repeats and realleges the allegations contained in paragraphs 1

through 363 of this Amended Complaint as if fully realleged herein.

365.     Through the IA Business, Madoff and/or BLMIS converted billions of dollars of

Customer Property.

366.     BLMIS customers have a legal right and interest in the billions of dollars they

personally invested with BLMIS.  Madoff and/or BLMIS exercised unauthorized dominion and

control over this Customer Property in derogation of BLMIS customers' rights, by failing to

invest Customer Property in securities.  Instead, Madoff and/or BLMIS used BLMIS customers'

money to make payments to friends and family and to fund redemptions of other investors.

Madoff's and/or BLMIS's unauthorized use of Customer Property resulted in the wrongful

conversion of BLMIS customers' specifically identifiable funds.  The UBS Defendants had

actual knowledge of the conversion and lent substantial assistance to Madoff and/or BLMIS in

converting these monies.

367.    At a minimum, the UBS Defendants consciously avoided knowledge of the conversion.  The UBS Defendants suspected, and even realized there was a high probability, that Madoff and/or BLMIS were converting BLMIS customers' money, but refrained from confirming their suspicions in order to later deny knowledge of the conversion.  The UBS Defendants' actions proximately caused the conversion that resulted in billions of dollars in damages to customers, creditors, and/or BLMIS.  The UBS Defendants were aware that Madoff and/or BLMIS were a broker-dealer and an investment adviser, and had reviewed and executed account agreements in which Madoff and/or BLMIS agreed to invest BLMIS customers' money pursuant to specific terms.

368.    Madoff and/or BLMIS converted billions of dollars of BLMIS customers' money. Madoff and/or BLMIS told BLMIS customers that he would invest their money pursuant to the SSC Strategy, but instead stole that money and did not purchase securities as he claimed.

369.    The UBS Defendants knew, or at least consciously avoided knowing, that Madoff and/or BLMIS did not purchase securities but instead stole BLMIS customers' money.  At a minimum, the UBS Defendants knew of suspicious conduct by and facts concerning Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS did not purchase securities but instead stole BLMIS customers' money, and the UBS Defendants failed to inquire whether Madoff and/or BLMIS were not purchasing securities but instead were stealing BLMIS customers' money.  Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were not purchasing securities but instead were stealing BLMIS customers' money.

370.    The UBS Defendants knew of the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; Madoff's and/or BLMIS's improbable rates of

return; the failure of Madoff and/or BLMIS to ever identify counterparties; the use of backdated investment recommendations; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and BLMIS's use of a small, unknown auditing firm.

371.    After performing due diligence on Madoff and BLMIS and BLMIS feeder funds, the UBS Defendants knew Madoff was engaging in fraud, or consciously avoided such knowledge. The UBS Defendants consistently refused to market or recommend either of the Feeder Fund Defendants to their own clients for investment, and had no exposure, or no significant exposure, themselves to Madoff and/or BLMIS, and at all times designated Madoff as a non-approved manager.  The UBS Defendants lent their name to the Feeder Fund Defendants and serviced the Feeder Fund Defendants in a variety of roles, all the while disclaiming any liability for the funds in undisclosed indemnity agreements.

372.    The UBS Defendants substantially assisted Madoff and/or BLMIS in converting Customer Property.  The UBS Defendants served as the sponsor and outwardly served as custodian, manager and administrator of the Feeder Fund Defendants, thereby providing the Feeder Fund Defendants with an appearance of legitimacy, increasing the level of investment in the Feeder Fund Defendants as a result of marketing with the UBS brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; agreed to serve as a mere façade for the Feeder Fund Defendants; and agreed to and implemented atypical procedures that were tailored to accommodate Madoff's suspicious methods.

373.     The UBS Defendants' assistance was a proximate cause of the conversion. Without it, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

374.     As a result of the UBS Defendants' aiding and abetting Madoff's and/or BLMIS's conversion, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT FIFTEEN:**
**KNOWING PARTICIPATION IN A BREACH OF TRUST**
***Against The UBS Defendants***

375.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 374 of this Amended Complaint as if fully realleged herein.

376.     In purporting to act as investment adviser and otherwise, Madoff and/or BLMIS had fiduciary duties to BLMIS customers.  Madoff and/or BLMIS were in a position of superior knowledge and expertise to BLMIS customers, who relied on and reposed their trust and confidence in Madoff and/or BLMIS.  This created a relationship of high trust and confidence whereby Madoff and/or BLMIS were entrusted with the funds BLMIS customers provided for investment.

377.     The UBS Defendants knew that Madoff and/or BLMIS were operating an investment advisory business or, at a minimum, were operating as broker-dealers with authority to manage discretionary accounts, and in that capacity were holding customer funds as fiduciaries.  For example, the UBS Defendants knew that Madoff and/or BLMIS had discretionary control over Luxalpha's and Groupement Financier's investments.

378.     In addition, since at least 2006, the UBS Defendants knew, among other things, that Madoff and/or BLMIS were registered investment advisers, as evidenced by public filings, and that Madoff and/or BLMIS were exercising discretion over their customer accounts.

379.    Moreover, since at least 2004, the UBS Defendants knew that Madoff and/or BLMIS were implementing a discretionary strategy, as indicated in the Trading Authorization that UBS SA executed on behalf of Luxalpha.  Further, the Operating Memorandum for both Luxalpha and Groupement Financier made it clear that Madoff and/or BLMIS had discretionary control over the funds' investments.

380.    The UBS Defendants further knew that UBS SA was a fiduciary in its own right by virtue of the fact that, at a minimum, it was the custodian and, at times, manager of Luxalpha, and that UBS SA had delegated its fiduciary duties to Madoff.

381.    Madoff and/or BLMIS breached this trust by misappropriating and diverting the BLMIS customer funds.

382.    The UBS Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds.  At a minimum, the UBS Defendants knew of suspicious conduct by and facts concerning Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, and the UBS Defendants failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

383.    The UBS Defendants knew of the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; Madoff's and/or BLMIS's improbable rates of return; the failure of Madoff and/or BLMIS to ever identify counterparties; the use of backdated investment recommendations; the use of delayed, hard copy-only trade confirmations by Madoff

and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.

384.    After performing due diligence on Madoff and BLMIS and the BLMIS feeder funds, the UBS Defendants knew Madoff was engaging in fraud, or consciously avoided such knowledge.  The UBS Defendants consistently refused to market or recommend either of the Feeder Fund Defendants to their own clients for investment, and had no exposure, or no significant exposure, themselves to Madoff and/or BLMIS, and at all times designated Madoff as a non-approved manager.  The UBS Defendants lent their name to the Feeder Fund Defendants and serviced the Feeder Fund Defendants in a variety of roles, all the while disclaiming any liability for the funds in undisclosed indemnity agreements.

385.    The UBS Defendants repeatedly and knowingly concealed the roles of Madoff and/or BLMIS as sub-custodian and manager from the CSSF in documents required to be submitted for initial and continuing approval of Luxalpha's status as a UCITS fund, hiding Madoff's fraud.

386.    Despite this knowledge, the UBS Defendants knowingly participated in Madoff's and/or BLMIS's fraud, serving as the sponsor and outward custodian, manager and administrator of the Feeder Fund Defendants, thereby providing the Feeder Fund Defendants with an appearance of legitimacy, increasing the level of investment in the Feeder Fund Defendants as a result of marketing with the UBS brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; agreed to serve as a mere façade for the Feeder Fund Defendants; and agreed to and implemented irregular procedures that were tailored to accommodate Madoff's suspicious methods.

387.     The UBS Defendants are therefore liable for all funds Madoff and/or BLMIS misappropriated from investors after the point at which the UBS Defendants knew or through reasonable inquiry would have known that Madoff and/or BLMIS were misappropriating those funds.

388.     As a result of the UBS Defendants' knowing participation in this breach of trust, customers, creditors and/or BLMIS lost billions of dollars.

### COUNT SIXTEEN:
### CONVERSION
### *Against The UBS Defendants*

389.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 388 of this Amended Complaint as if fully realleged herein.

390.     BLMIS customers have a possessory right and interest in the billions of dollars they invested with BLMIS.  These investment funds constitute Customer Property under SIPA and are recoverable by the Trustee.

391.     The fees received by the UBS Defendants through the Feeder Fund Defendants were derived from monies, consisting of Customer Property, withdrawn from BLMIS.

392.     The UBS Defendants have intentionally exercised dominion and control over Customer Property in a manner inconsistent with and in willful disregard of their interests.  The UBS Defendants are therefore liable for having wrongfully converted these monies and are now obligated to return all such monies.

### COUNT SEVENTEEN:
### UNJUST ENRICHMENT
### *Against The UBS Defendants*

393.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 392 of this Amended Complaint as if fully realleged herein.

394.     The UBS Defendants have been unjustly enriched.  The UBS Defendants have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and the Feeder Fund Defendants, for which UBS did not in good faith provide fair value.  Rather, the UBS Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected, had they not been willfully blind.

395.     The UBS Defendants benefited greatly from their involvement in Madoff's fraud. The UBS Defendants received over $80 million, and potentially much more, in fees for purportedly serving the Feeder Fund Defendants in various capacities.  The UBS Defendants acted as a mere façade for the Feeder Fund Defendants, and did so despite having done their own due diligence on Madoff and/or BLMIS that resulted in their refusal to recommend or market the very Feeder Fund Defendants from which they derived their substantial fees.

396.     The UBS Defendants chose to ignore compelling evidence of Madoff's fraud.  As a result, the UBS Defendants have pocketed a sum of at least over $80 million, and likely much more, that rightfully belongs to BLMIS's customers and creditors.  The UBS Defendants have been enriched at the expense of BLMIS and, ultimately, at the expense of BLMIS's customers and creditors.

397.     Equity and good conscience require full restitution of the monies received by the UBS Defendants, directly and indirectly, from BLMIS.  This includes not only Customer Property that the UBS Defendants received directly from BLMIS, but also any profits made and/or fees earned from their use of this money is recoverable by the Trustee as restitution.

## COUNT EIGHTEEN:
## MONEY HAD AND RECEIVED
### *Against The UBS Defendants*

398.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 397 of this Amended Complaint as if fully realleged herein.

399.     The UBS Defendants are currently in possession, or have control over, money which originated from BLMIS.  This money is Customer Property and belongs to the customer fund under the Trustee's control.  The UBS Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit and/or mistake.

400.     In equity and good conscience, the UBS Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The UBS Defendants are obligated to return all such money to the Trustee.

## COUNT NINETEEN:
## AIDING AND ABETTING FRAUD
### *Against The Access Defendants*

401.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 400 of this Amended Complaint as if fully realleged herein.

402.     The Access Defendants had actual knowledge of Madoff's fraud and lent substantial assistance to BLMIS in committing the fraud.  At a minimum, the Access Defendants consciously avoided knowledge of the fraud.

403.     The Access Defendants knew that Madoff, through BLMIS, was engaging in fraudulent activities.  The Access Defendants treated Madoff as an exception who was not subject to their normal due diligence procedures and requirements.  The Access Defendants were aware of and intentionally hid evidence that Madoff was engaging in a fraud, including, but not limited to, the impossible volume of options trading reported by BLMIS.

404.     At a minimum, the Access Defendants were willfully blind and consciously avoided knowledge of the fraud after learning about a number of red flags surrounding Madoff and/or BLMIS.  In the course of their due diligence and monitoring of the Feeder Fund Defendants, and, as a result of their positions as portfolio advisor, administrative agent, investment manager, investment advisor and portfolio manager for the Feeder Fund Defendants, the Access Defendants had access to and were required to review data and information demonstrating that Madoff and/or BLMIS was a fraud.  The troubling information about Madoff and/or BLMIS known by the Access Defendants by virtue of the roles in which they served for the Feeder Fund Defendants included, but was not limited to:  (a) the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; (b) Madoff's and/or BLMIS's improbable rates of return; (c) the failure of Madoff and/or BLMIS to ever identify counterparties; (d) Access Mgmt Lux's creation of backdated investment recommendations for Madoff; (e) the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; (f) Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and (g) Madoff's and/or BLMIS's use of a small, unknown auditing firm.

405.     The Access Defendants actively and substantially assisted Madoff and/or BLMIS in perpetuating the fraud, by, among other things: (a) marketing the Feeder Fund Defendants to investors throughout Europe; (b) serving as promoter, portfolio advisor, administrative agent, investment manager, investment advisor, and portfolio manager for the Feeder Fund Defendants, thereby providing the infrastructure for more than a billion dollars in investments into BLMIS; (c) agreeing to and implementing abnormal procedures that were tailored to accommodate Madoff's suspicious methods; (d) intentionally hiding information from investors concerning the

106

impossible volume of options trades being reported by Madoff and/or BLMIS; (e) ignoring the numerous red flags that were apparent through the data and information that they had access to and were required to review; and (f) failing to report Madoff's fraudulent activities.

406.    The Access Defendants' assistance was a proximate cause of the fraud.  Without the Access Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

407.    As a result of the Access Defendants' aiding and abetting Madoff's and/or BLMIS's fraud, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT TWENTY:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
*Against The Access Defendants*

408.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 407 of this Amended Complaint as if fully realleged herein.

409.    Madoff and/or BLMIS owed a fiduciary duty to its customers, and Madoff and/or BLMIS, as an investment advisor and otherwise, held a position of superior knowledge and expertise over the Feeder Fund Defendants, and the Feeder Fund Defendants relied on and reposed trust and confidence in Madoff and/or BLMIS.  Madoff and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme, and BLMIS customers and creditors lost billions of dollars as a result.

410.    The Access Defendants had actual knowledge that Madoff, through BLMIS, owed a fiduciary duty to its customers, and that Madoff's fraudulent activities were a breach of that fiduciary duty.  The Access Defendants' actual knowledge of the breach is evident because the Access Defendants were aware of and intentionally hid evidence that Madoff was engaging in a fraud, including but not limited to, the impossible volume of options trading reported by BLMIS. The Access Defendants, through their due diligence and monitoring of the Feeder Fund

Defendants, knew of, were willfully blind to, or consciously avoided the fact that Madoff was breaching his fiduciary duty.

411.    At a minimum, the Access Defendants were willfully blind and consciously avoided knowledge of the fraud after learning about a number of red flags surrounding Madoff and/or BLMIS.  In the course of their due diligence and monitoring of the Feeder Fund Defendants, and, as a result of their positions as portfolio advisor, administrative agent, investment manager, investment advisor and portfolio manager for the Feeder Fund Defendants, the Access Defendants had access to and were required to review data and information demonstrating that Madoff and/or BLMIS was a fraud.  The troubling information about Madoff and/or BLMIS known by the Access Defendants by virtue of the roles in which they served for the Feeder Fund Defendants included, but was not limited to:  (a) the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; (b) Madoff's and/or BLMIS's improbable rates of return; (c) the failure of Madoff and/or BLMIS to ever identify counterparties; (d) Access Mgmt Lux's creation of backdated investment recommendations for Madoff; (e) the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; (f) Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and (g) Madoff's and/or BLMIS's use of a small, unknown auditing firm.

412.    The Access Defendants participated in and substantially assisted with Madoff's breach by, among other things: (a) marketing the Feeder Fund Defendants to investors throughout Europe; (b) serving as portfolio advisor, administrative agent, investment manager, investment advisor, and portfolio manager for the Feeder Fund Defendants, thereby providing the infrastructure for more than a billion dollars in investments into BLMIS; (c) agreeing to and

implementing atypical procedures that were tailored to accommodate Madoff's suspicious methods; (d) intentionally hiding information from investors concerning the impossible volume of options trades being reported by Madoff and/or BLMIS; (e) ignoring the numerous red flags that were apparent through the data and information that they had access to and were required to review; and (f) failing to report Madoff's fraudulent activities.

413.    The Access Defendants' assistance was a proximate cause of the breach.  Without the Access Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

414.    As a result of the Access Defendants' aiding and abetting this breach of fiduciary duty, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT TWENTY-ONE:**
**AIDING AND ABETTING CONVERSION**
*Against The Access Defendants*

415.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 414 of this Amended Complaint as if fully realleged herein.

416.    Through the IA Business, Madoff and/or BLMIS converted billions of dollars of Customer Property.

417.    BLMIS customers have a legal right and interest in the billions of dollars they personally invested with BLMIS.  Madoff and/or BLMIS exercised unauthorized dominion and control over this Customer Property in derogation of BLMIS customers' rights, by failing to invest Customer Property in securities.  Instead, Madoff and/or BLMIS used BLMIS customers' money to make payments to friends and family and to fund redemptions of other investors.  Madoff and/or BLMIS's unauthorized use of Customer Property resulted in the wrongful conversion of BLMIS customers' specifically identifiable funds.

418.    The Access Defendants had actual knowledge of the conversion and lent substantial assistance to Madoff and/or BLMIS in converting these monies.  At a minimum, the Access Defendants consciously avoided knowledge of the conversion.  The Access Defendants suspected, and even realized there was a high probability, that Madoff and/or BLMIS were converting BLMIS customers' money, but refrained from confirming their suspicions in order to later deny knowledge of the conversion.  The Access Defendants' actions proximately caused the conversion that resulted in billions of dollars in damages to customers, creditors, and/or BLMIS.

419.    The Access Defendants were aware that Madoff and/or BLMIS were a broker-dealer and an investment adviser, and had reviewed and executed account agreements in which Madoff and/or BLMIS agreed to invest BLMIS customers' money pursuant to specific terms.

420.    Madoff and/or BLMIS converted billions of dollars of BLMIS customers' money. Madoff and/or BLMIS told BLMIS customers that he would invest their money pursuant to the SSC Strategy, but instead stole that money and did not purchase securities as he claimed.

421.    The Access Defendants knew, or at least consciously avoided knowing, that Madoff and/or BLMIS did not purchase securities but instead stole BLMIS customers' money. At a minimum, the Access Defendants knew of suspicious conduct by and facts concerning Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS did not purchase securities but instead stole BLMIS customers' money, and the Access Defendants failed to inquire whether Madoff and/or BLMIS were not purchasing securities but instead were stealing BLMIS customers' money.  Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were not purchasing securities but instead were stealing BLMIS customers' money.

422.     The Access Defendants knew of the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; Madoff's and/or BLMIS's improbable rates of return; the failure of Madoff and/or BLMIS to ever identify counterparties; Access Mgmt Lux's creation of backdated investment recommendations for Madoff; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.  In addition, and as set forth above, the Access Defendants intentionally hid evidence that Madoff was engaging in a fraud.

423.     The Access Defendants substantially assisted Madoff and/or BLMIS in converting Customer Property by, among other things, marketing the Feeder Fund Defendants to investors throughout Europe; serving as portfolio advisor, administrative agent, investment manager, investment advisor, and portfolio manager for the Feeder Fund Defendants, thereby providing the infrastructure for more than a billion dollars in investments into BLMIS; agreeing to and implementing atypical procedures that were tailored to accommodate Madoff's suspicious methods; intentionally hiding information from investors concerning the impossible volume of options trades being reported by Madoff and/or BLMIS; ignoring the numerous red flags that were apparent through the data and information that they had access to and were required to review; and failing to report Madoff's fraudulent activities.

424.     The Access Defendants' assistance was a proximate cause of the conversion. Without it, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

425.     As a result of the Access Defendants' aiding and abetting Madoff's and/or BLMIS's conversion, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT TWENTY-TWO:**
**KNOWING PARTICIPATION IN A BREACH OF TRUST**
*Against The Access Defendants*

426.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 425 of this Amended Complaint as if fully realleged herein.

427.     In purporting to act as investment adviser and otherwise, Madoff and/or BLMIS had fiduciary duties to BLMIS customers.  Madoff and/or BLMIS were in a position of superior knowledge and expertise to BLMIS customers, who relied on and reposed their trust and confidence in Madoff and/or BLMIS.  This created a relationship of high trust and confidence whereby Madoff and/or BLMIS were entrusted with the funds BLMIS customers provided for investment.

428.     The Access Defendants knew that Madoff and/or BLMIS were operating an investment advisory business or, at a minimum, were operating as broker-dealers with authority to manage discretionary accounts, and in that capacity were holding customer funds as fiduciaries.  For example, the Access Defendants knew that Madoff and/or BLMIS had discretionary control over Luxalpha's and Groupement Financier's investments.

429.     In addition, since at least 2006, the Access Defendants knew, among other things, that Madoff and/or BLMIS were registered investment advisers, as evidenced by public filings, and that Madoff and/or BLMIS were exercising discretion over their customer accounts.

430.     Moreover, as set forth above, AIA LLC, AIA Ltd., AP (Suisse), Access Mgmt Lux, and AP (Lux) each served as either the portfolio advisor, investment manager, or investment advisor for Luxalpha or Groupement Financier and thereby knew that Madoff and/or BLMIS had discretionary control over Luxalpha's and Groupement Financier's investments.

431.     The Access Defendants further knew that, by virtue of these roles as portfolio advisor, investment manager, and investment advisor, AIA LLC, AIA Ltd., AP (Suisse), Access

Mgmt Lux, and AP (Lux) were each fiduciaries in their own right and that each had delegated its fiduciary duties to Madoff.

432.    Madoff and/or BLMIS breached this trust by misappropriating and diverting the BLMIS customer funds.

433.    The Access Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds.  At a minimum, the Access Defendants knew of suspicious conduct by and facts concerning Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, and the Access Defendants failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

434.    The Access Defendants knew of the impossible volume of options and equities trading being reported by Madoff and/or BLMIS; Madoff's and/or BLMIS's improbable rates of return; the failure of Madoff and/or BLMIS to ever identify counterparties; Access Mgmt Lux's creation of backdated investment recommendations for Madoff; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.  In addition, and as set forth above, the Access Defendants intentionally hid evidence that Madoff was engaging in a fraud.

435.    Despite this knowledge, the Access Defendants knowingly participated in Madoff's and/or BLMIS's fraud, marketing the Feeder Fund Defendants to investors throughout

Europe; served as portfolio advisor, administrative agent, investment manager, investment advisor, and portfolio manager for the Feeder Fund Defendants, thereby providing the infrastructure for more than a billion dollars in investments into BLMIS; agreed to and implemented irregular procedures that were tailored to accommodate Madoff's suspicious methods; intentionally hid information from investors concerning the impossible volume of options trades being reported by Madoff and/or BLMIS; ignored the numerous red flags that were apparent through the data and information that they had access to and were required to review; and failed to report Madoff's fraudulent activities.

436.    The Access Defendants are therefore liable for all funds Madoff and/or BLMIS misappropriated from investors after the point at which the Access Defendants knew or through reasonable inquiry would have known that Madoff and/or BLMIS were misappropriating those funds.

437.    As a result of the Access Defendants' knowing participation in this breach of trust, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT TWENTY-THREE:**
**CONVERSION**
*Against The Access Defendants*

438.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 437 of this Amended Complaint as if fully realleged herein.

439.    BLMIS customers have the possessory right and interest to the billions of dollars they personally invested with BLMIS.

440.    The advisory and management fees derived by the Access Defendants through the Feeder Fund Defendants were taken from monies, consisting of Customer Property, withdrawn from BLMIS.

441.     The Access Defendants have intentionally exercised dominion and control over customers' monies in a manner inconsistent with and in willful disregard of their interests.  The Access Defendants are therefore liable for having wrongfully converted these monies and are now obligated to return all such monies.

**COUNT TWENTY-FOUR:**
**UNJUST ENRICHMENT**
*Against The Access Defendants*

442.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 441 of this Amended Complaint as if fully realleged herein.

443.     The Access Defendants have been unjustly enriched.  The Access Defendants have wrongfully and unconscionably benefited from the receipt of stolen money from BLMIS and from the Feeder Fund Defendants, for which they did not in good faith provide fair value.  Rather, the Access Defendants received these monies only as a result of perpetuating and participating in a fraudulent scheme that they were aware of or, at a minimum, should have detected.

444.     The Access Defendants benefited greatly from their involvement in Madoff's fraud.  The Access Defendants received millions of dollars in fees for purportedly serving the Feeder Fund Defendants in various capacities.  The Access Defendants knowingly failed to perform the due diligence they promised and treated Madoff and/or BLMIS as a special exception in order to allow his fraud to thrive.  The Access Defendants knowingly hid evidence of Madoff's fraud, and willfully turned a blind eye to numerous red flags, all the while continuing to market the Feeder Fund Defendants and continuing to solicit investments for Madoff and/or BLMIS.

445.     The Access Defendants chose to ignore the compelling evidence of Madoff's fraud.  As a result, the Access Defendants have pocketed millions of dollars that rightfully

115

belong to customers, creditors and/or BLMIS. The Access Defendants have been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers and creditors.

446.    Equity and good conscience require full restitution of the monies received by the Access Defendants, directly and indirectly, from BLMIS. This includes not only the money itself that the Access Defendants received, but also the proceeds of that money. Any profits earned with the money they received must be returned to the Trustee.

### COUNT TWENTY-FIVE:
### MONEY HAD AND RECEIVED
### *Against The Access Defendants*

447.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 446 of this Amended Complaint as if fully realleged herein.

448.    The Access Defendants are currently in possession, or have control over, money which originated from BLMIS. This money is Customer Property and belongs to the customer fund under the Trustee's control. The Access Defendants have no lawful or equitable right to this money, having obtained it through fraud, deceit and/or mistake.

449.    In equity and good conscience, the Access Defendants may not retain possession or control of this money, which rightfully belongs to the customer fund under the Trustee's control. The Access Defendants are obligated to return all such money to the Trustee.

### COUNT TWENTY-SIX:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### *Against The Luxalpha Director Defendants*

450.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 449 of this Amended Complaint as if fully realleged herein.

451.    Madoff and/or BLMIS owed a fiduciary duty to its customers, and Madoff and/or BLMIS, as an investment advisor and otherwise, held a position of superior knowledge and expertise over the Feeder Fund Defendants, and the Feeder Fund Defendants relied on and

reposed trust and confidence in Madoff and/or BLMIS. Madoff and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme, and BLMIS customers and creditors lost billions of dollars as a result.

452.    The Luxalpha Director Defendants had actual knowledge that Madoff, through BLMIS, owed a fiduciary duty to his customers, and that Madoff's fraudulent activities were a breach of that fiduciary duty. The Luxalpha Director Defendants' actual knowledge of the breach is evident because the Luxalpha Director Defendants, who were all UBS or Access employees with substantial fund experience, knew Luxalpha was set up to funnel huge amounts of money to Madoff and/or BLMIS behind the façade created by the UBS Defendants even though Madoff and/or BLMIS was not disclosed in any Luxalpha prospectus, and even though Madoff was not approved by the CSSF as a UCITS fund manager. The Luxalpha Director Defendants, knew of, were willfully blind to, or consciously avoided the fact that Madoff and/or BLMIS was breaching his fiduciary duty.

453.    The Luxalpha Director Defendants participated in and substantially assisted with Madoff's breach by, among other things: (a) authorizing the delegation of custody and control over Luxalpha's assets to Madoff and/or BLMIS; (b) entering into agreements with the UBS Defendants that allowed the UBS Defendants to serve as a façade for the fund which served to help conceal both the true nature of Madoff's involvement and the scope of his operations; and (c) allowing operational procedures to be established for Luxalpha which invited a fraud.

454.    The Luxalpha Director Defendants' assistance was a proximate cause of the breach. Without the Luxalpha Director Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

455.     As a result of the Luxalpha Director Defendants' aiding and abetting this breach of fiduciary duty, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT TWENTY-SEVEN:**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
***Against The Groupement Financier Director Defendants***

456.     The Trustee repeats and realleges the allegations contained in paragraphs 1 through 455 of this Amended Complaint as if fully realleged herein.

457.     Madoff and/or BLMIS owed a fiduciary duty to its customers, and Madoff and/or BLMIS, as an investment advisor and otherwise, held a position of superior knowledge and expertise over the Feeder Fund Defendants, and the Feeder Fund Defendants relied on and reposed trust and confidence in Madoff and/or BLMIS.  Madoff and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme, and BLMIS customers and creditors lost billions of dollars as a result.

458.     The Groupement Financier Director Defendants had actual knowledge that Madoff, through BLMIS, owed a fiduciary duty to his customers, and that Madoff's and/or BLMIS's fraudulent activities were a breach of that fiduciary duty.  The Groupement Financier Director Defendants' actual knowledge of the breach is evident because, as principals of Access, they were aware of and intentionally hid evidence that Madoff and/or BLMIS was engaging in a fraud, including but not limited to the impossible volume of options trading reported by BLMIS. The Groupement Financier Director Defendants knew of, were willfully blind to, or consciously avoided the fact that Madoff and/or BLMIS were breaching their fiduciary duty.

459.     The Groupement Financier Director Defendants participated in and substantially assisted with Madoff's and/or BLMIS's breach by, among other things: (a) authorizing the delegation of custody and control over Groupement Financier's assets to Madoff and/or BLMIS;

118

and (b) allowing operational procedures to be established for Groupement Financier which invited a fraud.

460.    The Groupement Financier Director Defendants' assistance was a proximate cause of the breach.  Without the Groupement Financier Director Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme.

461.    As a result of the Groupement Financier Director Defendants' aiding and abetting this breach of fiduciary duty, customers, creditors and/or BLMIS lost billions of dollars.

**COUNT TWENTY-EIGHT:**
**CONTRIBUTION**
***Against All Defendants***

462.    The Trustee repeats and realleges the allegations contained in paragraphs 1 through 461 of this Amended Complaint as if fully realleged herein.

463.    The Defendants and BLMIS acted in concert as joint tortfeasors.

464.    Without the Defendants' tortious conduct, Madoff would have been unable to run BLMIS as the Ponzi scheme that went unabated for so many years.  The actions taken by the Defendants facilitated the harm committed and augmented the injury suffered by BLMIS customers.

465.    To date, the Trustee has allowed approximately $6.9 billion in customer claims. Furthermore, the Trustee has advanced almost $800 million in SIPC funds, and the Trustee moved to distribute approximately $272 million to BLMIS's customers, which motion has been approved by the bankruptcy court.  More money will be distributed as additional recoveries of BLMIS Customer Property are made.

466.    The Trustee, acting as successor-in-interest to BLMIS, brings this claim against the Defendants to the extent they contributed to the damages suffered by BLMIS's customers who have filed customer claims in the SIPA Proceeding.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

(i)     On the First Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Preference Period Initial Transfers; (b) directing that the Preference Period Initial Transfers be set aside; and (c) recovering the Preference Period Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(ii)    On the Second Claim for Relief, pursuant to §§ 547(b), 550(a), and 551 of the Bankruptcy Code and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment recovering the Preference Period Subsequent Transfers, or the value thereof, from the Feeder Fund Director Defendants, Access Defendants, and UBS Defendants for the benefit of the estate of BLMIS;

(iii)   On the Third Claim for Relief, pursuant to §§ 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(iv)    On the Fourth Claim for Relief, pursuant to §§ 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Two Year Initial Transfers; (b) directing that the Two Year Initial Transfers be set aside; and (c) recovering the Two Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(v)        On the Fifth Claim for Relief, pursuant to §§ 276, 276-a, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from the Feeder Fund Defendants;

(vi)        On the Sixth Claim for Relief, pursuant to §§ 273, 278, and 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(vii)        On the Seventh Claim for Relief, pursuant to §§ 274, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b) and 550(a) of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder Fund Defendants for the benefit of the estate of BLMIS;

(viii)        On the Eighth Claim for Relief, pursuant to §§ 275, 278, and/or 279 of the New York Debtor and Creditor Law, §§ 544(b), 550(a), and 551 of the Bankruptcy Code, and SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment:  (a) avoiding and preserving the Six Year Initial Transfers; (b) directing that the Six Year Initial Transfers be set

aside; and (c) recovering the Six Year Initial Transfers, or the value thereof, from the Feeder

Fund Defendants for the benefit of the estate of BLMIS;

(ix)    On the Ninth Claim for Relief, pursuant to §§ 273 – 279 of the

New York Debtor and Creditor Law, §§ 544, 548, 550(a) and 551 of the Bankruptcy Code, and

SIPA § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Subsequent Transferee

Defendants recovering the Subsequent Transfers, or the value thereof, from the Feeder Fund

Director Defendants, Access Defendants, and UBS Defendants for the benefit of the estate of

BLMIS; and recovering attorneys' fees from the Subsequent Transferee Defendants.

(x)    On the Tenth Claim for Relief, the Trustee is entitled to a judgment

that the Customer Claims filed by Luxalpha and UBS AG be disallowed pursuant to § 502(d) of

the Bankruptcy Code;

(xi)    On the Eleventh Claim for Relief, the Trustee is entitled to a

judgment that the Customer Claims filed by Luxalpha and UBS AG be equitably subordinated

for distribution purposes pursuant to §§ 510(c)(1) and 105(a) of the Bankruptcy Code;

(xii)    On the Twelfth through Sixteenth, Nineteenth through Twenty-

Third and Twenty-Sixth and Twenty-Seventh Claims for Relief, compensatory and/or

consequential damages of at least $2 billion, and, as permitted by law, exemplary and punitive

damages, with the specific amounts of compensatory, consequential, exemplary and punitive

damages to be determined at trial;

(xiii)    On the Twenty-Eighth Claim for Relief, contribution for

Defendants' proportionate share of damages suffered by the BLMIS customers, in an amount to

be determined at trial;

(xiv)    On the First through the Ninth, the Seventeenth, Eighteenth, Twenty-Fourth and Twenty-Fifth Claims for Relief, disgorgement of profits and fees received by Defendants in connection with the conduct alleged herein in favor of the Trustee for the benefit of BLMIS's estate and the Customer Property estate;

(xv)    On the Seventeenth, Eighteenth, Twenty-Fourth and Twenty-Fifth Claims for Relief, restitution of monies Defendants received from Madoff and/or BLMIS and any profits earned through Defendants' use of these monies;

(xvi)    Establishment of a constructive trust over the proceeds of the Initial Transfers, Subsequent Transfers and unjust enrichment to Defendants in favor of the Trustee for the benefit of BLMIS's estate and the Customer Property estate;

(xvii)    On all claims for relief, an accounting of all Initial Transfers and Subsequent Transfers regarding interest, fees, profits and any other financial benefit in connection with the Initial Transfers and Subsequent Transfers.

(xviii)    Awarding the Trustee all applicable interest, including pre-judgment interest, costs, and disbursements of this action; and

(xix)    Granting the Trustee such other, further and different relief as the Court deems just, proper and equitable.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims so triable.

Dated:     August 17, 2011
           New York, New York

Respectfully submitted,

s/ Deborah H. Renner
**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
E-mail: dsheehan@bakerlaw.com
Deborah H. Renner
E-mail: drenner@bakerlaw.com
Gonzalo S. Zeballos
Email:  gzeballos@bakerlaw.com
Benjamin D. Pergament
E-mail: bpergament@bakerlaw.com
Keith R. Murphy
Email:  kmurphy@bakerlaw.com
Marc Skapof
Email:  mskapof@bakerlaw.com
Michelle K. Marck
E-mail: mmarck@bakerlaw.com
Deborah A. Kaplan
Email:  dkaplan@bakerlaw.com
Jocelyn L. Burgos
E-mail:  jburgos@bakerlaw.com
Sammantha E. Clegg
Email:  sclegg@bakerlaw.com

*Of Counsel*:

Mark A. Kornfeld
Email:  mkornfeld@bakerlaw.com
Oren J. Warshavsky
Email:  owarshavsky@bakerlaw.com
Timothy Scott Pfeifer
Email:  tpfeifer@bakerlaw.com
Seanna R. Brown
Email:  sbrown@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and Estate of Bernard L. Madoff*

124

EXHIBIT A
SUMMARY OF TRANSFERS BY BLMIS IA ACCOUNT - GROUPEMENT AND LUXALPHA

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 |
|---|---|---|---|---|---|---|---|---|
| Account Number | Account Name | 90-Day Preferential Transfers | Two Year Fictitious Profit Transfers | Two Year Principal Transfers | Six Year Fictitious Profit Transfers | Six Year Principal Transfers | Full History Fictitious Profit Transfers | Full History Principal Transfers |
| | GROUPEMENT FINANCIER LTD 5-11 | | | | | | | |
| 1FR096 | LAVINGTON STREET | 260,324,947 | - | 276,971,158 | - | 356,081,953 | - | 356,081,953 |
| 1FR108 | UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV | 536,210,431 | - | 743,334,785 | - | 766,477,098 | - | 766,477,098 |
| | | $ 796,535,378 | $ - | $ 1,020,305,943 | $ - | $ 1,122,559,050 | $ - | $ 1,122,559,050 |

MADC1159_00000001

Exhibit B

MADC1159_00000002

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/22/2004 | CHECK WIRE | 146,100,000 | 146,100,000 | - | - | - | 146,100,000 | - | - | - |
| 3/23/2004 | CHECK WIRE | 101,999,980 | 101,999,980 | - | - | - | 247,299,980 | - | - | - |
| 3/24/2004 | CHECK WIRE | 35,000,000 | 35,000,000 | - | - | - | 282,299,980 | - | - | - |
| 3/26/2004 | CHECK WIRE | 60,400,000 | 60,400,000 | - | - | - | 342,699,980 | - | - | - |
| 4/1/2004 | CHECK WIRE | (2,200,000) | - | (2,200,000) | - | - | 340,499,980 | - | - | (2,200,000) |
| 4/5/2004 | CHECK WIRE | (3,000,000) | - | (3,000,000) | - | - | 337,499,980 | - | - | (3,000,000) |
| 4/6/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 337,499,978 | - | - | (2) |
| 4/16/2004 | CHECK WIRE | 37,999,980 | 37,999,980 | - | - | - | 375,499,958 | - | - | - |
| 4/28/2004 | CHECK WIRE | 26,999,980 | 26,999,980 | - | - | - | 402,499,938 | - | - | - |
| 4/30/2004 | WH TAX DIV MWD | (2,184) | - | (2,184) | - | - | 402,497,754 | - | - | (2,184) |
| 4/30/2004 | WH TAX DIV JPM | (1,677) | - | (1,677) | - | - | 402,496,077 | - | - | (1,677) |
| 5/3/2004 | WH TAX DIV MRZ | (8,410) | - | (8,410) | - | - | 402,487,667 | - | - | (8,410) |
| 5/3/2004 | WH TAX DIV SBC | (8,274) | - | (8,274) | - | - | 402,479,393 | - | - | (8,274) |
| 5/11/2004 | CHECK WIRE | 39,999,980 | 39,999,980 | - | - | - | 442,479,373 | - | - | - |
| 5/11/2004 | CHECK WIRE | 38,999,980 | 38,999,980 | - | - | - | 481,479,353 | - | - | - |
| 5/11/2004 | CANCEL C&S 5/11/04 | (39,999,980) | (39,999,980) | - | - | - | 441,479,373 | - | - | - |
| 5/14/2004 | WH TAX DIV FO | (6,432) | - | (6,432) | - | - | 441,472,941 | - | - | (6,432) |
| 5/17/2004 | WH TAX DIV TXN | (375) | - | (375) | - | - | 441,472,566 | - | - | (375) |
| 5/26/2004 | WH TAX DIV MER | (1,617) | - | (1,617) | - | - | 441,470,949 | - | - | (1,617) |
| 5/28/2004 | CHECK WIRE | 8,999,980 | 8,999,980 | - | - | - | 450,470,929 | - | - | - |
| 5/28/2004 | WH TAX DIV C | (20,951) | - | (20,951) | - | - | 450,449,978 | - | - | (20,951) |
| 6/1/2004 | WH TAX DIV MTC | (2,617) | - | (2,617) | - | - | 450,447,361 | - | - | (2,617) |
| 6/1/2004 | WH TAX DIV WFC | (7,857) | - | (7,857) | - | - | 450,439,504 | - | - | (7,857) |
| 6/4/2004 | WH TAX DIV G | (1,643) | - | (1,643) | - | - | 450,437,861 | - | - | (1,643) |
| 6/4/2004 | WH TAX DIV PFE | (13,085) | - | (13,085) | - | - | 450,424,776 | - | - | (13,085) |
| 6/7/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 450,424,763 | - | - | (13) |
| 6/7/2004 | WH TAX DIV WMT | (3,888) | - | (3,888) | - | - | 450,420,875 | - | - | (3,888) |
| 6/8/2004 | WH TAX DIV JNJ | (8,581) | - | (8,581) | - | - | 450,412,294 | - | - | (8,581) |
| 6/9/2004 | WH TAX DIV BUD | (1,819) | - | (1,819) | - | - | 450,410,475 | - | - | (1,819) |
| 6/10/2004 | WH TAX DIV UTX | (1,312) | - | (1,312) | - | - | 450,409,163 | - | - | (1,312) |
| 6/10/2004 | WH TAX DIV XOM | (17,863) | - | (17,863) | - | - | 450,391,300 | - | - | (17,863) |
| 6/10/2004 | WH TAX DIV SOM | (3,143) | - | (3,143) | - | - | 450,388,157 | - | - | (3,143) |
| 6/11/2004 | WH TAX DIV BA | (1,125) | - | (1,125) | - | - | 450,387,032 | - | - | (1,125) |
| 6/14/2004 | WH TAX DIV MMM | (2,025) | - | (2,025) | - | - | 450,385,007 | - | - | (2,025) |
| 6/14/2004 | WH TAX DIV DD | (3,538) | - | (3,538) | - | - | 450,381,469 | - | - | (3,538) |
| 6/15/2004 | CHECK WIRE | 16,999,980 | 16,999,980 | - | - | - | 467,381,449 | - | - | - |
| 6/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 467,381,448 | - | - | (1) |
| 6/24/2004 | WH TAX DIV HD | (2,652) | - | (2,652) | - | - | 467,378,796 | - | - | (2,652) |
| 6/30/2004 | WH TAX DIV PEP | (5,454) | - | (5,454) | - | - | 467,373,342 | - | - | (5,454) |
| 7/1/2004 | WH TAX DIV KO | (8,425) | - | (8,425) | - | - | 467,364,917 | - | - | (8,425) |
| 7/6/2004 | CHECK WIRE | (4,000,000) | - | (4,000,000) | - | - | 463,364,917 | - | - | (4,000,000) |
| 7/9/2004 | WH TAX DIV HPQ | (3,265) | - | (3,265) | - | - | 463,361,652 | - | - | (3,265) |
| 7/9/2004 | WH TAX DIV MO | (19,224) | - | (19,224) | - | - | 463,342,428 | - | - | (19,224) |
| 7/12/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 463,342,420 | - | - | (8) |
| 7/20/2004 | CHECK WIRE | 7,999,980 | 7,999,980 | - | - | - | 471,342,400 | - | - | - |
| 7/20/2004 | WH TAX DIV GE | (3,116) | - | (3,116) | - | - | 471,339,284 | - | - | (3,116) |
| 8/2/2004 | CHECK WIRE | (4,000,000) | - | (4,000,000) | - | - | 467,339,284 | - | - | (4,000,000) |
| 8/11/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 467,339,281 | - | - | (3) |
| 8/16/2004 | CHECK WIRE | 14,499,980 | 14,499,980 | - | - | - | 481,839,261 | - | - | - |
| 8/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 481,839,261 | - | - | (0) |
| 8/29/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 481,839,261 | - | - | (0) |
| 9/10/2004 | WH TAX DIV UTX | (2,116) | - | (2,116) | - | - | 481,837,145 | - | - | (2,116) |
| 9/13/2004 | WH TAX DIV MMM | (3,265) | - | (3,265) | - | - | 481,833,880 | - | - | (3,265) |
| 9/14/2004 | WH TAX DIV MSFT | (13,592) | - | (13,592) | - | - | 481,820,288 | - | - | (13,592) |
| 9/15/2004 | CHECK WIRE | 15,999,980 | 15,999,980 | - | - | - | 497,820,268 | - | - | - |
| 9/16/2004 | WH TAX DIV HD | (3,022) | - | (3,022) | - | - | 497,817,246 | - | - | (3,022) |
| 9/17/2004 | WH TAX DIV AIG | (3,093) | - | (3,093) | - | - | 497,814,153 | - | - | (3,093) |
| 9/24/2004 | WH TAX DIV BAC | (29,439) | - | (29,439) | - | - | 497,784,714 | - | - | (29,439) |
| 9/30/2004 | WH TAX DIV PEP | (6,215) | - | (6,215) | - | - | 497,778,499 | - | - | (6,215) |
| 10/1/2004 | WH TAX DIV MRK | (13,510) | - | (13,510) | - | - | 497,764,989 | - | - | (13,510) |
| 10/1/2004 | WH TAX DIV WAG | (1,607) | - | (1,607) | - | - | 497,763,382 | - | - | (1,607) |
| 10/1/2004 | WH TAX DIV KO | (9,600) | - | (9,600) | - | - | 497,753,782 | - | - | (9,600) |
| 10/6/2004 | WH TAX DIV HPQ | (3,688) | - | (3,688) | - | - | 497,750,094 | - | - | (3,688) |
| 10/12/2004 | WH TAX DIV MO | (23,878) | - | (23,878) | - | - | 497,726,216 | - | - | (23,878) |

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

MADC1159_00000003

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 10/15/2004 | CHECK WIRE | 50,999,980 | 50,999,980 | | | | 548,719,564 | | | |
| 10/28/2004 | CHECK WIRE | 2,999,980 | 2,999,980 | | | | 551,719,544 | | | |
| 11/3/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (38) | | (38) | | | 551,719,506 | | | (38) |
| 11/4/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 551,719,506 | | | (0) |
| 11/9/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 551,719,505 | | | (0) |
| 11/10/2004 | CHECK WIRE | 71,999,980 | 71,999,980 | | | | 623,719,485 | | | |
| 11/24/2004 | WH TAX DIV MER | (1,384) | | (1,384) | | | 623,718,101 | | | (1,384) |
| 11/26/2004 | CHECK WIRE | 4,499,980 | 4,499,980 | | | | 628,218,081 | | | |
| 12/1/2004 | WH TAX DIV INTC | (2,278) | | (2,278) | | | 628,215,803 | | | (2,278) |
| 12/1/2004 | WH TAX DIV WFC | (7,172) | | (7,172) | | | 628,208,630 | | | (7,172) |
| 12/3/2004 | WH TAX DIV PFE | (18,371) | | (18,371) | | | 628,190,259 | | | (18,371) |
| 12/7/2004 | WH TAX DIV GD | (2,303) | | (2,303) | | | 628,187,956 | | | (2,303) |
| 12/7/2004 | WH TAX DIV PNJ | (4,634) | | (4,634) | | | 628,183,323 | | | (4,634) |
| 12/10/2004 | WH TAX DIV XOM | (25,219) | | (25,219) | | | 628,158,104 | | | (25,219) |
| 12/10/2004 | WH TAX DIV IBM | (4,376) | | (4,376) | | | 628,153,728 | | | (4,376) |
| 12/13/2004 | CHECK WIRE | 37,999,980 | 37,999,980 | | | | 666,153,708 | | | |
| 12/14/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | | (17) | | | 666,153,691 | | | (17) |
| 12/14/2004 | WH TAX DIV DD | (4,926) | | (4,926) | | | 666,148,765 | | | (4,926) |
| 12/16/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 666,148,764 | | | (1) |
| 12/31/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | | (3) | | | 666,148,761 | | | (3) |
| 1/3/2005 | WH TAX DIV WMT | (2,959) | | (2,959) | | | 666,145,802 | | | (2,959) |
| 1/18/2005 | CHECK WIRE | 4,999,980 | 4,999,980 | | | | 671,145,782 | | | |
| 2/7/2005 | CHECK WIRE | 4,999,980 | 4,999,980 | | | | 676,145,762 | | | |
| 2/14/2005 | WH TAX DIV TXN | (907) | | (907) | | | 676,144,855 | | | (907) |
| 2/22/2005 | CHECK WIRE | 4,999,980 | 4,999,980 | | | | 681,144,835 | | | |
| 2/22/2005 | WH TAX DIV GS | (378) | | (378) | | | 681,144,457 | | | (378) |
| 2/25/2005 | WH TAX DIV PFE | (47,871) | | (47,871) | | | 681,096,586 | | | (47,871) |
| 2/28/2005 | WH TAX DIV MER | (3,054) | | (3,054) | | | 681,093,532 | | | (3,054) |
| 3/1/2005 | WH TAX DIV WFC | (17,408) | | (17,408) | | | 681,076,124 | | | (17,408) |
| 3/1/2005 | WH TAX DIV INTC | (10,651) | | (10,651) | | | 681,065,473 | | | (10,651) |
| 3/4/2005 | WH TAX DIV G | (3,412) | | (3,412) | | | 681,062,062 | | | (3,412) |
| 3/4/2005 | WH TAX DIV BA | (4,295) | | (4,295) | | | 681,057,767 | | | (4,295) |
| 3/7/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (42) | | (42) | | | 681,057,725 | | | (42) |
| 3/8/2005 | WH TAX DIV JNJ | (17,815) | | (17,815) | | | 681,039,909 | | | (17,815) |
| 3/8/2005 | WH TAX DIV PFE | (30,101) | | (30,101) | | | 681,009,808 | | | (30,101) |
| 3/9/2005 | WH TAX DIV BUD | (4,209) | | (4,209) | | | 681,005,600 | | | (4,209) |
| 3/10/2005 | WH TAX DIV ABT | (8,847) | | (8,847) | | | 680,996,752 | | | (8,847) |
| 3/10/2005 | WH TAX DIV UTX | (5,039) | | (5,039) | | | 680,991,713 | | | (5,039) |
| 3/10/2005 | WH TAX DIV IBM | (6,184) | | (6,184) | | | 680,985,529 | | | (6,184) |
| 3/10/2005 | WH TAX DIV XOM | (36,591) | | (36,591) | | | 680,948,938 | | | (36,591) |
| 3/14/2005 | WH TAX DIV MMM | (7,215) | | (7,215) | | | 680,941,723 | | | (7,215) |
| 3/14/2005 | WH TAX DIV SO | (7,349) | | (7,349) | | | 680,934,374 | | | (7,349) |
| 3/16/2005 | CHECK WIRE | 44,999,980 | 44,999,980 | | | | 725,874,935 | | | |
| 3/18/2005 | WH TAX DIV AIG | (13,838) | | (13,838) | | | 725,861,097 | | | (13,838) |
| 3/24/2005 | WH TAX DIV HD | (9,162) | | (9,162) | | | 725,851,935 | | | (9,162) |
| 3/28/2005 | WH TAX DIV BAC | (76,443) | | (76,443) | | | 725,775,492 | | | (76,443) |
| 3/30/2005 | FIDELITY SPARTAN US TREAS MONEY MARKET INVESTMENT | (300,866) | | (300,866) | | | 725,474,626 | | | (300,866) |
| 3/31/2005 | WH TAX DIV PEP | (16,682) | | (16,682) | | | 725,457,944 | | | (16,682) |
| 3/31/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (40) | | (40) | | | 725,457,904 | | | (40) |
| 3/31/2005 | WH TAX DIV JAN & FEB 2005 | (55,169) | | (55,169) | | | 725,402,735 | | | (55,169) |
| 4/1/2005 | WH TAX DIV KO | (22,511) | | (22,511) | | | 725,380,224 | | | (22,511) |
| 4/1/2005 | WH TAX DIV MRK | (34,816) | | (34,816) | | | 725,345,408 | | | (34,816) |
| 4/1/2005 | WH TAX DIV VIA.B | (2,539) | | (2,539) | | | 725,342,869 | | | (2,539) |
| 4/6/2005 | CHECK WIRE | 350,866 | 350,866 | | | | 725,693,735 | | | |
| 4/7/2005 | WH TAX DIV HPQ | (5,031) | | (5,031) | | | 725,688,704 | | | (5,031) |
| 4/11/2005 | WH TAX DIV MO | (49,995) | | (49,995) | | | 725,638,709 | | | (49,995) |
| 4/13/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | | (6) | | | 725,638,703 | | | (6) |
| 4/25/2005 | WH TAX DIV GE | (48,815) | | (48,815) | | | 725,589,888 | | | (48,815) |
| 4/29/2005 | WH ADJ | (51,354) | | (51,354) | | | 725,538,534 | | | (51,354) |
| 4/29/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | | (8) | | | 725,538,526 | | | (8) |
| 4/29/2005 | WH ADJ | (168,558) | | (168,558) | | | 725,369,968 | | | (168,558) |
| 5/23/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | | (8) | | | 725,369,960 | | | (8) |
| 6/6/2005 | WH TAX DIV WMT | (6,783) | | (6,783) | | | 725,363,177 | | | (6,783) |
| 6/10/2005 | CHECK WIRE | (3,000,000) | | (3,000,000) | | | 722,363,177 | | | (3,000,000) |
| 6/10/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | | (19) | | | 722,363,158 | | | (19) |

Exhibit B

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/10/2005 | W/H TAX DIV UTX | (3,227) | - | (3,227) | - | - | 722,339,930 | - | - | (3,227) |
| 6/13/2005 | W/H TAX DIV MMM | (4,630) | - | (4,630) | - | - | 722,335,310 | - | - | (4,630) |
| 6/17/2005 | W/H TAX DIV AIG | (11,261) | - | (11,261) | - | - | 722,344,049 | - | - | (11,261) |
| 6/20/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 722,344,041 | - | - | (8) |
| 6/23/2005 | W/H TAX DIV HD | (7,544) | - | (7,544) | - | - | 722,336,497 | - | - | (7,544) |
| 6/24/2005 | W/H TAX DIV BAC | (62,907) | - | (62,907) | - | - | 722,273,590 | - | - | (62,907) |
| 6/30/2005 | W/H TAX DIV PEP | (15,346) | - | (15,346) | - | - | 722,258,244 | - | - | (15,346) |
| 7/1/2005 | W/H TAX DIV KO | (21,746) | - | (21,746) | - | - | 722,236,499 | - | - | (21,746) |
| 7/1/2005 | W/H TAX DIV VIA.B | (4,132) | - | (4,132) | - | - | 722,232,367 | - | - | (4,132) |
| 7/1/2005 | W/H TAX DIV MRK | (28,331) | - | (28,331) | - | - | 722,204,036 | - | - | (28,331) |
| 7/1/2005 | W/H TAX DIV ALL | (7,631) | - | (7,631) | - | - | 722,196,405 | - | - | (7,631) |
| 7/5/2005 | W/H TAX DIV HPQ | (8,121) | - | (8,121) | - | - | 722,188,284 | - | - | (8,121) |
| 7/8/2005 | W/H TAX DIV SLB | (4,567) | - | (4,567) | - | - | 722,183,718 | - | - | (4,567) |
| 7/11/2005 | W/H TAX DIV MO | (52,158) | - | (52,158) | - | - | 722,131,560 | - | - | (52,158) |
| 7/25/2005 | W/H TAX DIV GE | (80,424) | - | (80,424) | - | - | 722,051,136 | - | - | (80,424) |
| 8/2/2005 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 727,051,116 | - | - | - |
| 8/16/2005 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 732,051,096 | - | - | - |
| 8/1/2005 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 737,051,076 | - | - | - |
| 9/8/2005 | W/H TAX DIV HPQ | (327) | - | (327) | - | - | 737,050,748 | - | - | (327) |
| 9/12/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 737,090,745 | - | - | (3) |
| 9/20/2005 | W/H TAX DIV S | (1,825) | - | (1,825) | - | - | 737,048,921 | - | - | (1,825) |
| 9/30/2005 | W/H TAX DIV PEP | (10,695) | - | (10,695) | - | - | 737,037,495 | - | - | (10,695) |
| 10/3/2005 | W/H TAX DIV KO | (30,684) | - | (30,684) | - | - | 737,007,311 | - | - | (30,684) |
| 10/5/2005 | W/H TAX DIV HPQ | (11,122) | - | (11,122) | - | - | 736,996,189 | - | - | (11,122) |
| 10/7/2005 | CHECK WIRE | 7,999,980 | 7,999,980 | - | - | - | 744,996,169 | - | - | - |
| 10/11/2005 | W/H TAX DIV MO | (79,118) | - | (79,118) | - | - | 744,917,051 | - | - | (79,118) |
| 10/12/2005 | W/H TAX DIV HPQ | (89) | - | (89) | - | - | 744,916,962 | - | - | (89) |
| 10/13/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 744,916,961 | - | - | (1) |
| 10/14/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 744,916,961 | - | - | (0) |
| 10/19/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 744,916,959 | - | - | (2) |
| 10/25/2005 | W/H TAX DIV GE | (82,283) | - | (82,283) | - | - | 744,834,676 | - | - | (82,283) |
| 10/31/2005 | W/H TAX DIV WMD | (9,758) | - | (9,758) | - | - | 744,824,958 | - | - | (9,758) |
| 11/15/2005 | W/H TAX DIV ABT | (14,847) | - | (14,847) | - | - | 744,810,111 | - | - | (14,847) |
| 11/15/2005 | W/H TAX DIV PG | (49,563) | - | (49,563) | - | - | 744,760,549 | - | - | (49,563) |
| 11/17/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (25) | - | (25) | - | - | 744,760,524 | - | - | (25) |
| 11/21/2005 | W/H TAX DIV GS | (5,673) | - | (5,673) | - | - | 744,754,850 | - | - | (5,673) |
| 11/21/2005 | W/H TAX DIV XN | (2,545) | - | (2,545) | - | - | 744,752,305 | - | - | (2,545) |
| 11/23/2005 | W/H TAX DIV C | (115,828) | - | (115,828) | - | - | 744,636,477 | - | - | (115,828) |
| 11/23/2005 | W/H TAX DIV MER | (9,077) | - | (9,077) | - | - | 744,627,400 | - | - | (9,077) |
| 11/30/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 744,627,394 | - | - | (5) |
| 12/1/2005 | W/H TAX DIV WFC | (44,842) | - | (44,842) | - | - | 744,582,552 | - | - | (44,842) |
| 12/1/2005 | W/H TAX DIV TRV | (24,020) | - | (24,020) | - | - | 744,558,532 | - | - | (24,020) |
| 12/2/2005 | W/H TAX DIV BA | (10,212) | - | (10,212) | - | - | 744,547,520 | - | - | (10,212) |
| 12/6/2005 | W/H TAX DIV PFE | (72,145) | - | (72,145) | - | - | 744,475,375 | - | - | (72,145) |
| 12/8/2005 | W/H TAX DIV MSFT | (37,639) | - | (37,639) | - | - | 744,437,736 | - | - | (37,639) |
| 12/9/2005 | W/H TAX DIV COM | (59,777) | - | (59,777) | - | - | 744,393,960 | - | - | (59,777) |
| 12/12/2005 | W/H TAX DIV XX | (52,479) | - | (52,479) | - | - | 744,341,480 | - | - | (52,479) |
| 12/12/2005 | W/H TAX DIV IBM | (16,339) | - | (16,339) | - | - | 744,325,141 | - | - | (16,339) |
| 12/12/2005 | W/H TAX DIV MMM | (17,156) | - | (17,156) | - | - | 744,257,985 | - | - | (17,156) |
| 12/12/2005 | W/H TAX DIV UTX | (11,644) | - | (11,644) | - | - | 744,246,341 | - | - | (11,644) |
| 12/13/2005 | W/H TAX DIV PNJ | (50,761) | - | (50,761) | - | - | 744,195,580 | - | - | (50,761) |
| 12/13/2005 | W/H TAX DIV TMX | (11,931) | - | (11,931) | - | - | 744,183,429 | - | - | (11,931) |
| 12/15/2005 | W/H TAX DIV KO | (29,367) | - | (29,367) | - | - | 744,154,262 | - | - | (29,367) |
| 12/15/2005 | W/H TAX DIV HD | (10,893) | - | (10,893) | - | - | 744,143,369 | - | - | (10,893) |
| 12/16/2005 | W/H TAX DIV AIG | (19,743) | - | (19,743) | - | - | 744,123,626 | - | - | (19,743) |
| 12/16/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 744,123,622 | - | - | (3) |
| 12/20/2005 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 759,123,602 | - | - | - |
| 12/22/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 759,123,588 | - | - | (15) |
| 12/23/2005 | W/H TAX DIV BAC | (102,121) | - | (102,121) | - | - | 759,021,467 | - | - | (102,121) |
| 12/30/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 759,021,461 | - | - | (6) |
| 1/3/2006 | W/H TAX DIV S | (3,744) | - | (3,744) | - | - | 759,017,717 | - | - | (3,744) |
| 1/3/2006 | W/H TAX DIV SLAB | (5,919) | - | (5,919) | - | - | 759,011,798 | - | - | (5,919) |
| 1/3/2006 | W/H TAX DIV MRK | (43,118) | - | (43,118) | - | - | 758,968,680 | - | - | (43,118) |
| 1/3/2006 | W/H TAX DIV WMT | (12,581) | - | (12,581) | - | - | 758,956,299 | - | - | (12,581) |
| 1/3/2006 | W/H TAX DIV PEP | (22,421) | - | (22,421) | - | - | 758,933,878 | - | - | (22,421) |

MADC1159_00000004

Exhibit B

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/4/2006 | W/H TAX DIV HPQ | (11,748) | - | (11,748) | - | - | 758,922,130 | - | - | (11,748) |
| 1/6/2006 | W/H TAX DIV HIS | (28,185) | - | (28,185) | - | - | 758,893,944 | - | - | (28,185) |
| 1/3/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 758,893,927 | - | - | (17) |
| 1/17/2006 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 763,893,907 | - | - | - |
| 1/31/2006 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 768,893,887 | - | - | - |
| 1/31/2006 | W/H TAX DIV MS | (14,727) | - | (14,727) | - | - | 768,879,160 | - | - | (14,727) |
| 1/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (26) | - | (26) | - | - | 768,879,135 | - | - | (26) |
| 2/1/2006 | W/H TAX DIV VZ | (15,313) | - | (15,313) | - | - | 768,863,822 | - | - | (15,313) |
| 2/1/2006 | W/H TAX DIV VZ | (13,322) | - | (13,322) | - | - | 768,850,499 | - | - | (13,322) |
| 2/13/2006 | W/H TAX DIV TXN | (2,405) | - | (2,405) | - | - | 768,848,095 | - | - | (2,405) |
| 2/15/2006 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 773,848,075 | - | - | - |
| 2/15/2006 | W/H TAX DIV MTT | (21,249) | - | (21,249) | - | - | 773,826,825 | - | - | (21,249) |
| 2/15/2006 | W/H TAX DIV AIG | (47,089) | - | (47,089) | - | - | 773,779,736 | - | - | (47,089) |
| 2/23/2006 | W/H TAX DIV GS | (5,682) | - | (5,682) | - | - | 773,774,054 | - | - | (5,682) |
| 2/24/2006 | CHECK WIRE | 4,999,980 | 4,999,980 | - | - | - | 778,774,034 | - | - | - |
| 2/24/2006 | W/H TAX DIV C | (123,376) | - | (123,376) | - | - | 778,650,658 | - | - | (123,376) |
| 2/28/2006 | W/H TAX DIV KO | (11,363) | - | (11,363) | - | - | 778,639,295 | - | - | (11,363) |
| 2/28/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 778,639,268 | - | - | (27) |
| 3/1/2006 | W/H TAX DIV INTC | (29,904) | - | (29,904) | - | - | 778,609,364 | - | - | (29,904) |
| 3/1/2006 | W/H TAX DIV WFC | (42,544) | - | (42,544) | - | - | 778,566,820 | - | - | (42,544) |
| 3/3/2006 | CHECK WIRE | 15,999,980 | 15,999,980 | - | - | - | 794,566,800 | - | - | - |
| 3/3/2006 | W/H TAX DIV BA | (12,272) | - | (12,272) | - | - | 794,554,528 | - | - | (12,272) |
| 3/7/2006 | W/H TAX DIV PFE | (88,132) | - | (88,132) | - | - | 794,466,396 | - | - | (88,132) |
| 3/7/2006 | W/H TAX DIV UPS | (20,727) | - | (20,727) | - | - | 794,445,669 | - | - | (20,727) |
| 3/9/2006 | W/H TAX DIV MSFT | (41,218) | - | (41,218) | - | - | 794,404,451 | - | - | (41,218) |
| 3/10/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 794,404,439 | - | - | (12) |
| 3/10/2006 | W/H TAX DIV HD | (15,583) | - | (15,583) | - | - | 794,388,856 | - | - | (15,583) |
| 3/10/2006 | W/H TAX DIV TGT | (4,545) | - | (4,545) | - | - | 794,384,311 | - | - | (4,545) |
| 3/10/2006 | W/H TAX DIV UTX | (11,000) | - | (11,000) | - | - | 794,373,311 | - | - | (11,000) |
| 3/10/2006 | W/H TAX DIV XOM | (98,663) | - | (98,663) | - | - | 794,274,648 | - | - | (98,663) |
| 3/10/2006 | W/H TAX DIV CVX | (50,391) | - | (50,391) | - | - | 794,224,257 | - | - | (50,391) |
| 3/13/2006 | W/H TAX DIV MMM | (16,727) | - | (16,727) | - | - | 794,207,530 | - | - | (16,727) |
| 3/14/2006 | W/H TAX DIV JNJ | (49,408) | - | (49,408) | - | - | 794,158,122 | - | - | (49,408) |
| 3/15/2006 | W/H TAX DIV TWX | (11,635) | - | (11,635) | - | - | 794,146,487 | - | - | (11,635) |
| 3/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 794,146,486 | - | - | (1) |
| 3/16/2006 | W/H TAX DIV SLB | (19,224) | - | (19,224) | - | - | 794,127,262 | - | - | (19,224) |
| 3/17/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15,681) | - | (15,681) | - | - | 794,111,581 | - | - | (15,681) |
| 3/22/2006 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 814,111,561 | - | - | - |
| 3/24/2006 | W/H TAX DIV BAC | (115,905) | - | (115,905) | - | - | 813,995,656 | - | - | (115,905) |
| 3/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | - | (24) | - | - | 813,995,632 | - | - | (24) |
| 3/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 813,995,630 | - | - | (2) |
| 3/31/2006 | W/H TAX DIV S | (3,939) | - | (3,939) | - | - | 813,991,691 | - | - | (3,939) |
| 3/31/2006 | W/H TAX DIV PEP | (22,629) | - | (22,629) | - | - | 813,969,062 | - | - | (22,629) |
| 4/3/2006 | W/H TAX DIV WMT | (22,477) | - | (22,477) | - | - | 813,946,585 | - | - | (22,477) |
| 4/3/2006 | W/H TAX DIV KO | (33,887) | - | (33,887) | - | - | 813,912,698 | - | - | (33,887) |
| 4/3/2006 | W/H TAX DIV GE | (44,046) | - | (44,046) | - | - | 813,868,652 | - | - | (44,046) |
| 4/5/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 813,868,649 | - | - | (3) |
| 4/5/2006 | W/H TAX DIV HPQ | (12,139) | - | (12,139) | - | - | 813,856,510 | - | - | (12,139) |
| 4/5/2006 | CHECK WIRE | 9,999,980 | 9,999,980 | - | - | - | 823,856,490 | - | - | - |
| 4/7/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 823,856,489 | - | - | (1) |
| 4/7/2006 | W/H TAX DIV MO | (7,041) | - | (7,041) | - | - | 823,849,448 | - | - | (7,041) |
| 4/10/2006 | W/H TAX DIV XOM | (88,788) | - | (88,788) | - | - | 823,760,660 | - | - | (88,788) |
| 4/10/2006 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 838,760,640 | - | - | - |
| 4/21/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 838,760,384 | - | - | (5) |
| 4/25/2006 | W/H TAX DIV SLB | (131,624) | - | (131,624) | - | - | 838,628,761 | - | - | (131,624) |
| 4/28/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (541) | - | (541) | - | - | 838,628,220 | - | - | (541) |
| 4/28/2006 | W/H TAX DIV MDT | (6,199) | - | (6,199) | - | - | 838,622,021 | - | - | (6,199) |
| 4/28/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | - | (8) | - | - | 838,622,013 | - | - | (8) |
| 4/28/2006 | W/H TAX DIV MS | (15,726) | - | (15,726) | - | - | 838,613,869 | - | - | (15,726) |
| 5/1/2006 | W/H TAX DIV | (69,936) | - | (69,936) | - | - | 838,544,474 | - | - | (69,936) |
| 5/1/2006 | W/H TAX DIV | (47,352) | - | (47,352) | - | - | 838,497,122 | - | - | (47,352) |
| 5/1/2006 | W/H TAX DIV VZ | (64,200) | - | (64,200) | - | - | 838,433,221 | - | - | (64,200) |
| 5/4/2006 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 853,433,201 | - | - | - |
| 5/5/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 853,433,197 | - | - | (5) |

MADC1159_00000005

Exhibit B

MADC1159_00000006

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 5/10/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | | (2) | | | 853,433,194 | | | (2) |
| 5/10/2006 | WH TAX DIV ADP | (8,155) | | (8,155) | | | 853,425,040 | | | (8,155) |
| 5/15/2006 | WH TAX DIV ABT | (24,341) | | (24,341) | | | 853,400,699 | | | (24,341) |
| 5/15/2006 | WH TAX DIV PG | (55,672) | | (55,672) | | | 853,345,027 | | | (55,672) |
| 5/19/2006 | CHECK WIRE | 49,999,980 | 49,999,980 | | | | 903,345,007 | | | |
| 5/22/2006 | WH TAX DIV CAT | (9,294) | | (9,294) | | | 903,335,713 | | | (9,294) |
| 5/22/2006 | WH TAX DIV TXN | (2,621) | | (2,621) | | | 903,333,092 | | | (2,621) |
| 5/24/2006 | WH TAX DIV MER | (12,614) | | (12,614) | | | 903,320,478 | | | (12,614) |
| 5/25/2006 | WH TAX DIV GS | (8,494) | | (8,494) | | | 903,311,984 | | | (8,494) |
| 5/26/2006 | WH TAX DIV C | (133,186) | | (133,186) | | | 903,178,799 | | | (133,186) |
| 5/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (30) | | (30) | | | 903,178,768 | | | (30) |
| 5/31/2006 | WH TAX DIV UPS | (23,007) | | (23,007) | | | 903,155,761 | | | (23,007) |
| 6/1/2006 | WH TAX DIV WFC | (49,849) | | (49,849) | | | 903,105,913 | | | (49,849) |
| 6/1/2006 | WH TAX DIV INTC | (32,795) | | (32,795) | | | 903,073,118 | | | (32,795) |
| 6/2/2006 | WH TAX DIV BA | (13,623) | | (13,623) | | | 903,059,495 | | | (13,623) |
| 6/5/2006 | WH TAX DIV WMT | (23,663) | | (23,663) | | | 903,035,832 | | | (23,663) |
| 6/6/2006 | WH TAX DIV PFE | (99,293) | | (99,293) | | | 902,936,539 | | | (99,293) |
| 6/6/2006 | WH TAX DIV BMY | (29,899) | | (29,899) | | | 902,906,640 | | | (29,899) |
| 6/8/2006 | WH TAX DIV MSFT | (44,955) | | (44,955) | | | 902,861,685 | | | (44,955) |
| 6/9/2006 | WH TAX DIV XOM | (110,206) | | (110,206) | | | 902,751,480 | | | (110,206) |
| 6/12/2006 | WH TAX DIV MMM | (18,567) | | (18,567) | | | 902,732,913 | | | (18,567) |
| 6/12/2006 | WH TAX DIV UTX | (11,707) | | (11,707) | | | 902,721,205 | | | (11,707) |
| 6/12/2006 | WH TAX DIV IBM | (26,358) | | (26,358) | | | 902,694,848 | | | (26,358) |
| 6/13/2006 | WH TAX DIV JNJ | (62,437) | | (62,437) | | | 902,629,411 | | | (62,437) |
| 6/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | | (24) | | | 902,629,387 | | | (24) |
| 6/15/2006 | WH TAX DIV TMX | (12,623) | | (12,623) | | | 902,616,764 | | | (12,623) |
| 6/22/2006 | WH TAX DIV HD | (18,163) | | (18,163) | | | 902,598,600 | | | (18,163) |
| 6/23/2006 | WH TAX DIV BAC | (131,180) | | (131,180) | | | 902,467,420 | | | (131,180) |
| 6/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (93) | | (93) | | | 902,467,327 | | | (93) |
| 6/30/2006 | WH TAX DIV S | (4,162) | | (4,162) | | | 902,463,165 | | | (4,162) |
| 6/30/2006 | WH TAX DIV PEP | (27,303) | | (27,303) | | | 902,435,862 | | | (27,303) |
| 7/3/2006 | WH TAX DIV KO | (24,822) | | (24,822) | | | 902,411,040 | | | (24,822) |
| 7/3/2006 | WH TAX DIV CVX | (65,590) | | (65,590) | | | 902,345,450 | | | (65,590) |
| 7/3/2006 | WH TAX DIV AIG | (21,947) | | (21,947) | | | 902,323,502 | | | (21,947) |
| 7/3/2006 | WH TAX DIV MRK | (46,014) | | (46,014) | | | 902,277,488 | | | (46,014) |
| 7/5/2006 | WH TAX DIV HPQ | (12,812) | | (12,812) | | | 902,264,676 | | | (12,812) |
| 7/5/2006 | WH TAX DIV SLB | (8,805) | | (8,805) | | | 902,255,871 | | | (8,805) |
| 7/10/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 922,255,851 | | | |
| 7/10/2006 | WH TAX DIV MO | (64,056) | | (64,056) | | | 922,191,794 | | | (64,056) |
| 7/14/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | | (9) | | | 922,191,785 | | | (9) |
| 7/21/2006 | WH TAX DIV WFC | (4) | | (4) | | | 922,191,781 | | | (4) |
| 7/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7,366) | | (7,366) | | | 922,184,415 | | | (7,366) |
| 7/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | | (24) | | | 922,184,389 | | | (24) |
| 8/7/2006 | CHECK WIRE | 24,999,980 | 24,999,980 | | | | 947,184,369 | | | |
| 8/7/2006 | CXL WH TAX DIV SLB | 8,805 | | 8,805 | | | 947,193,174 | | | 8,805 |
| 8/15/2006 | WH TAX DIV ABT | (11,404) | | (11,404) | | | 947,181,770 | | | (11,404) |
| 8/15/2006 | WH TAX DIV TXN | (46,154) | | (46,154) | | | 947,135,616 | | | (46,154) |
| 8/17/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | | (8) | | | 947,135,608 | | | (8) |
| 8/21/2006 | WH TAX DIV TXN | (2,105) | | (2,105) | | | 947,133,503 | | | (2,105) |
| 8/21/2006 | WH TAX DIV CAT | (4,775) | | (4,775) | | | 947,128,728 | | | (4,775) |
| 8/22/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 967,128,708 | | | |
| 8/23/2006 | WH TAX DIV MER | (10,060) | | (10,060) | | | 967,118,648 | | | (10,060) |
| 8/24/2006 | WH TAX DIV GS | (7,042) | | (7,042) | | | 967,111,607 | | | (7,042) |
| 8/25/2006 | WH TAX DIV C | (109,558) | | (109,558) | | | 967,002,048 | | | (109,558) |
| 9/1/2006 | WH TAX DIV BA | (10,865) | | (10,865) | | | 966,991,184 | | | (10,865) |
| 9/1/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | | (12) | | | 966,991,171 | | | (12) |
| 9/1/2006 | WH TAX DIV WFC | (42,814) | | (42,814) | | | 966,948,357 | | | (42,814) |
| 9/1/2006 | WH TAX DIV INTC | (26,330) | | (26,330) | | | 966,922,026 | | | (26,330) |
| 9/5/2006 | WH TAX DIV PFE | (79,316) | | (79,316) | | | 966,842,710 | | | (79,316) |
| 9/5/2006 | WH TAX DIV WMT | (18,872) | | (18,872) | | | 966,823,838 | | | (18,872) |
| 9/6/2006 | WH TAX DIV UPS | (18,349) | | (18,349) | | | 966,805,489 | | | (18,349) |
| 9/7/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 986,805,469 | | | |
| 9/11/2006 | WH TAX DIV UTX | (11,730) | | (11,730) | | | 986,793,740 | | | (11,730) |
| 9/11/2006 | WH TAX DIV CVX | (52,311) | | (52,311) | | | 986,741,429 | | | (52,311) |
| 9/11/2006 | WH TAX DIV XOM | (86,832) | | (86,832) | | | 986,654,597 | | | (86,832) |

Exhibit B

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/11/2006 | W/H TAX DIV IBM | (20,522) | | (20,522) | | | 986,634,075 | | (20,522) | (20,522) |
| 9/12/2006 | W/H TAX DIV MMM | (14,588) | | (14,588) | | | 986,619,267 | | (14,588) | (14,588) |
| 9/12/2006 | W/H TAX DIV DNJ | (49,796) | | (49,796) | | | 986,569,371 | | (49,796) | (49,796) |
| 9/14/2006 | W/H TAX DIV MSFT | (35,695) | | (35,695) | | | 986,533,775 | | (35,695) | (35,695) |
| 9/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | | (4) | | | 986,533,772 | | (4) | (4) |
| 9/15/2006 | W/H TAX DIV TWX | (10,748) | | (10,748) | | | 986,523,023 | | (10,748) | (10,748) |
| 9/19/2006 | W/H TAX DIV AIG | (19,254) | | (19,254) | | | 986,503,769 | | (19,254) | (19,254) |
| 9/21/2006 | W/H TAX DIV HD | (13,882) | | (13,882) | | | 986,489,887 | | (13,882) | (13,882) |
| 9/22/2006 | W/H TAX DIV BAC | (114,923) | | (114,923) | | | 986,374,964 | | (114,923) | (114,923) |
| 9/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (14) | | (14) | | | 986,374,950 | | (14) | (14) |
| 9/29/2006 | W/H TAX DIV PEP | (22,254) | | (22,254) | | | 986,352,696 | | (22,254) | (22,254) |
| 9/29/2006 | W/H TAX DIV S | (3,377) | | (3,377) | | | 986,349,319 | | (3,377) | (3,377) |
| 10/2/2006 | W/H TAX DIV MRK | (36,698) | | (36,698) | | | 986,312,621 | | (36,698) | (36,698) |
| 10/2/2006 | W/H TAX DIV KO | (28,690) | | (28,690) | | | 986,283,931 | | (28,690) | (28,690) |
| 10/4/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,006,283,911 | | | |
| 10/4/2006 | W/H TAX DIV HPQ | (9,979) | | (9,979) | | | 1,006,273,932 | | (9,979) | (9,979) |
| 10/10/2006 | W/H TAX DIV BAN | (81,098) | | (81,098) | | | 1,006,192,834 | | (81,098) | (81,098) |
| 10/17/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (25) | | (25) | | | 1,006,192,809 | | (25) | (25) |
| 10/25/2006 | W/H TAX DIV GE | (117,262) | | (117,262) | | | 1,006,075,547 | | (117,262) | (117,262) |
| 10/26/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | | (5) | | | 1,006,075,542 | | (5) | (5) |
| 10/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 1,006,075,542 | | (0) | (0) |
| 10/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | | (3) | | | 1,006,075,539 | | (3) | (3) |
| 10/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 1,006,075,539 | | (0) | (0) |
| 11/2/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,026,075,519 | | | |
| 11/8/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,046,075,499 | | | |
| 11/20/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | | (11) | | | 1,046,075,488 | | (11) | (11) |
| 11/20/2006 | W/H TAX DIV WMT | (3,913) | | (3,913) | | | 1,046,071,575 | | (3,913) | (3,913) |
| 11/22/2006 | W/H TAX DIV MER | (14,387) | | (14,387) | | | 1,046,057,188 | | (14,387) | (14,387) |
| 11/22/2006 | W/H TAX DIV C | (149,447) | | (149,447) | | | 1,045,907,741 | | (149,447) | (149,447) |
| 11/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | | (7) | | | 1,045,907,735 | | (7) | (7) |
| 11/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 1,045,907,734 | | (1) | (1) |
| 12/4/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,065,907,714 | | | |
| 12/20/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,085,907,694 | | | |
| 12/28/2006 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,105,907,674 | | | |
| 1/2/2007 | W/H TAX DIV MRK | (53,225) | | (53,225) | | | 1,105,854,449 | (53,225) | (53,225) | (53,225) |
| 1/2/2007 | W/H TAX DIV PEP | (32,468) | | (32,468) | | | 1,105,821,981 | (32,468) | (32,468) | (32,468) |
| 1/2/2007 | W/H TAX DIV T | (26,844) | | (26,844) | | | 1,105,795,136 | (26,844) | (26,844) | (26,844) |
| 1/3/2007 | W/H TAX DIV IBM | (28,155) | | (28,155) | | | 1,105,766,981 | (28,155) | (28,155) | (28,155) |
| 1/3/2007 | W/H TAX DIV TGT | (6,215) | | (6,215) | | | 1,105,760,766 | (6,215) | (6,215) | (6,215) |
| 1/3/2007 | W/H TAX DIV AIG | (27,778) | | (27,778) | | | 1,105,732,988 | (27,778) | (27,778) | (27,778) |
| 1/3/2007 | W/H TAX DIV PFE | (109,605) | | (109,605) | | | 1,105,623,382 | (109,605) | (109,605) | (109,605) |
| 1/3/2007 | W/H TAX DIV XX | (71,817) | | (71,817) | | | 1,105,551,565 | (71,817) | (71,817) | (71,817) |
| 1/3/2007 | W/H TAX DIV XOM | (118,423) | | (118,423) | | | 1,105,433,142 | (118,423) | (118,423) | (118,423) |
| 1/3/2007 | W/H TAX DIV MMM | (21,177) | | (21,177) | | | 1,105,411,965 | (21,177) | (21,177) | (21,177) |
| 1/3/2007 | W/H TAX DIV HPQ | (14,257) | | (14,257) | | | 1,105,397,708 | (14,257) | (14,257) | (14,257) |
| 1/3/2007 | W/H TAX DIV INTC | (35,856) | | (35,856) | | | 1,105,361,852 | (35,856) | (35,856) | (35,856) |
| 1/3/2007 | W/H TAX DIV WMT | (70,564) | | (70,564) | | | 1,105,291,288 | (70,564) | (70,564) | (70,564) |
| 1/3/2007 | W/H TAX DIV TWX | (14,550) | | (14,550) | | | 1,105,276,737 | (14,550) | (14,550) | (14,550) |
| 1/3/2007 | W/H TAX DIV EXC | (16,113) | | (16,113) | | | 1,105,260,624 | (16,113) | (16,113) | (16,113) |
| 1/3/2007 | W/H TAX DIV HD | (29,762) | | (29,762) | | | 1,105,230,862 | (29,762) | (29,762) | (29,762) |
| 1/3/2007 | W/H TAX DIV UTX | (4,810) | | (4,810) | | | 1,105,226,052 | (4,810) | (4,810) | (4,810) |
| 1/3/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 1,105,226,051 | (1) | (1) | (1) |
| 1/3/2007 | W/H TAX DIV KO | (41,066) | | (41,066) | | | 1,105,185,045 | (41,066) | (41,066) | (41,066) |
| 1/3/2007 | W/H TAX DIV MCD | (74,810) | | (74,810) | | | 1,105,110,235 | (74,810) | (74,810) | (74,810) |
| 1/3/2007 | W/H TAX DIV WFC | (58,504) | | (58,504) | | | 1,105,051,731 | (58,504) | (58,504) | (58,504) |
| 1/3/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (54) | | (54) | | | 1,105,051,677 | (54) | (54) | (54) |
| 1/3/2007 | W/H TAX DIV PNJ | (53,696) | | (53,696) | | | 1,104,998,981 | (53,696) | (53,696) | (53,696) |
| 1/3/2007 | W/H TAX DIV UTX | (69,055) | | (69,055) | | | 1,104,929,926 | (69,055) | (69,055) | (69,055) |
| 1/3/2007 | W/H TAX DIV BA | (16,775) | | (16,775) | | | 1,104,913,151 | (16,775) | (16,775) | (16,775) |
| 1/3/2007 | W/H TAX DIV VZ | (15,537) | | (15,537) | | | 1,104,896,614 | (15,537) | (15,537) | (15,537) |
| 1/3/2007 | W/H TAX DIV JPM | (64,841) | | (64,841) | | | 1,104,831,773 | (64,841) | (64,841) | (64,841) |
| 1/4/2007 | W/H TAX DIV MCD | (26,241) | | (26,241) | | | 1,104,805,532 | (26,241) | (26,241) | (26,241) |
| 1/10/2007 | W/H TAX DIV MO | (31,943) | | (31,943) | | | 1,104,773,588 | (31,943) | (31,943) | (31,943) |
| 1/12/2007 | W/H TAX DIV DIS | (42,200) | | (42,200) | | | 1,104,631,388 | (42,200) | (42,200) | (42,200) |
| 1/25/2007 | W/H TAX DIV GE | (108,674) | | (108,674) | | | 1,104,522,714 | (108,674) | (108,674) | (108,674) |

MADC1159_00000007

Exhibit B

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2 Year Cash Withdrawals | Column 11 6 Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/29/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (9) | - | (9) | - | - | 1,104,522,705 | - | (9) | (9) |
| 1/31/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (2) | - | (2) | - | - | 1,104,522,703 | - | (2) | (2) |
| 2/6/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (5) | - | (5) | - | - | 1,104,522,698 | - | (5) | (5) |
| 2/13/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (6) | - | (6) | - | - | 1,104,522,692 | - | (6) | (6) |
| 2/16/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (3) | - | (3) | - | - | 1,104,522,689 | - | (3) | (3) |
| 2/20/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (1) | - | (1) | - | - | 1,104,522,688 | - | (1) | (1) |
| 2/22/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (0) | - | (0) | - | - | 1,104,522,688 | - | (0) | (0) |
| 2/23/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (1) | - | (1) | - | - | 1,104,522,686 | - | (1) | (1) |
| 2/27/2007 | CHECK WIRE | 19,999,980 | 19,999,980 | - | - | - | 1,124,522,666 | - | - | - |
| 2/27/2007 | WH TAX DIV CMCSA | (4) | - | (4) | - | - | 1,124,522,662 | - | (4) | (4) |
| 2/28/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (7) | - | (7) | - | - | 1,124,522,655 | - | (7) | (7) |
| 3/1/2007 | WH TAX DIV UOP | (24,645) | - | (24,645) | - | - | 1,124,498,010 | - | (24,645) | (24,645) |
| 3/6/2007 | WH TAX DIV UPS | (16,335) | - | (16,335) | - | - | 1,124,481,675 | - | (16,335) | (16,335) |
| 3/9/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (16) | - | (16) | - | - | 1,124,481,659 | - | (16) | (16) |
| 3/12/2007 | WH TAX DIV TGT | (3,819) | - | (3,819) | - | - | 1,124,477,841 | - | (3,819) | (3,819) |
| 3/12/2007 | WH TAX DIV MMM | (20,226) | - | (20,226) | - | - | 1,124,457,615 | - | (20,226) | (20,226) |
| 3/12/2007 | WH TAX DIV TX | (5,617) | - | (5,617) | - | - | 1,124,451,998 | - | (5,617) | (5,617) |
| 3/12/2007 | WH TAX DIV CVX | (23,046) | - | (23,046) | - | - | 1,124,428,952 | - | (23,046) | (23,046) |
| 3/13/2007 | WH TAX DIV JNJ | (61,230) | - | (61,230) | - | - | 1,124,367,722 | - | (61,230) | (61,230) |
| 3/15/2007 | WH TAX DIV TWX | (12,167) | - | (12,167) | - | - | 1,124,355,555 | - | (12,167) | (12,167) |
| 3/15/2007 | WH TAX DIV WB | (58,992) | - | (58,992) | - | - | 1,124,296,564 | - | (58,992) | (58,992) |
| 3/16/2007 | WH TAX DIV UTX | (23,065) | - | (23,065) | - | - | 1,124,273,499 | - | (23,065) | (23,065) |
| 3/20/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (24) | - | (24) | - | - | 1,124,273,075 | - | (24) | (24) |
| 3/22/2007 | WH TAX DIV HD | (26,072) | - | (26,072) | - | - | 1,124,247,003 | - | (26,072) | (26,072) |
| 3/23/2007 | WH TAX DIV BAC | (138,630) | - | (138,630) | - | - | 1,124,108,373 | - | (138,630) | (138,630) |
| 3/26/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (13) | - | (13) | - | - | 1,124,108,360 | - | (13) | (13) |
| 3/30/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (7) | - | (7) | - | - | 1,124,108,354 | - | (7) | (7) |
| 3/30/2007 | WH TAX DIV PEP | (32,347) | - | (32,347) | - | - | 1,124,076,007 | - | (32,347) | (32,347) |
| 3/30/2007 | WH TAX DIV S | (4,741) | - | (4,741) | - | - | 1,124,071,266 | - | (4,741) | (4,741) |
| 4/2/2007 | CHECK WIRE | 19,999,980 | 19,999,980 | - | - | - | 1,144,071,246 | - | - | - |
| 4/2/2007 | WH TAX DIV WMT | (35,899) | - | (35,899) | - | - | 1,144,035,347 | - | (35,899) | (35,899) |
| 4/2/2007 | WH TAX DIV COP | (46,422) | - | (46,422) | - | - | 1,143,988,925 | - | (46,422) | (46,422) |
| 4/2/2007 | WH TAX DIV MRK | (55,434) | - | (55,434) | - | - | 1,143,933,491 | - | (55,434) | (55,434) |
| 4/4/2007 | WH TAX DIV HPQ | (14,715) | - | (14,715) | - | - | 1,143,918,776 | - | (14,715) | (14,715) |
| 4/10/2007 | WH TAX DIV MO | (120,002) | - | (120,002) | - | - | 1,143,798,774 | - | (120,002) | (120,002) |
| 4/19/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (30) | - | (30) | - | - | 1,143,798,744 | - | (30) | (30) |
| 4/25/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (1) | - | (1) | - | - | 1,143,798,744 | - | (1) | (1) |
| 4/25/2007 | WH TAX DIV GE | (160,752) | - | (160,752) | - | - | 1,143,637,992 | - | (160,752) | (160,752) |
| 5/4/2007 | WH TAX DIV CVS | (4,346) | - | (4,346) | - | - | 1,143,633,646 | - | (4,346) | (4,346) |
| 5/15/2007 | WH TAX DIV PG | (77,001) | - | (77,001) | - | - | 1,143,556,645 | - | (77,001) | (77,001) |
| 5/21/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (20) | - | (20) | - | - | 1,143,556,625 | - | (20) | (20) |
| 5/23/2007 | WH TAX DIV MAR | (20,383) | - | (20,383) | - | - | 1,143,536,242 | - | (20,383) | (20,383) |
| 5/24/2007 | WH TAX DIV GS | (5,965) | - | (5,965) | - | - | 1,143,530,277 | - | (5,965) | (5,965) |
| 5/25/2007 | WH TAX DIV C | (181,697) | - | (181,697) | - | - | 1,143,348,580 | - | (181,697) | (181,697) |
| 5/31/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (4) | - | (4) | - | - | 1,143,348,576 | - | (4) | (4) |
| 6/1/2007 | WH TAX DIV WFC | (65,225) | - | (65,225) | - | - | 1,143,283,351 | - | (65,225) | (65,225) |
| 6/1/2007 | WH TAX DIV JPM | (46,848) | - | (46,848) | - | - | 1,143,236,503 | - | (46,848) | (46,848) |
| 6/1/2007 | WH TAX DIV INTC | (45,133) | - | (45,133) | - | - | 1,143,191,370 | - | (45,133) | (45,133) |
| 6/1/2007 | WH TAX DIV BA | (18,815) | - | (18,815) | - | - | 1,143,172,555 | - | (18,815) | (18,815) |
| 6/4/2007 | WH TAX DIV WMT | (37,012) | - | (37,012) | - | - | 1,143,135,543 | - | (37,012) | (37,012) |
| 6/5/2007 | WH TAX DIV UPS | (29,895) | - | (29,895) | - | - | 1,143,105,648 | - | (29,895) | (29,895) |
| 6/5/2007 | WH TAX DIV PFE | (142,614) | - | (142,614) | - | - | 1,142,963,034 | - | (142,614) | (142,614) |
| 6/6/2007 | WH TAX DIV TYC | (13,788) | - | (13,788) | - | - | 1,142,949,246 | - | (13,788) | (13,788) |
| 6/11/2007 | WH TAX DIV UTX | (18,862) | - | (18,862) | - | - | 1,142,930,384 | - | (18,862) | (18,862) |
| 6/11/2007 | WH TAX DIV XOM | (137,376) | - | (137,376) | - | - | 1,142,793,008 | - | (137,376) | (137,376) |
| 6/11/2007 | WH TAX DIV CVX | (86,339) | - | (86,339) | - | - | 1,142,706,669 | - | (86,339) | (86,339) |
| 6/12/2007 | WH TAX DIV IBM | (41,412) | - | (41,412) | - | - | 1,142,665,257 | - | (41,412) | (41,412) |
| 6/12/2007 | WH TAX DIV JNJ | (82,419) | - | (82,419) | - | - | 1,142,582,838 | - | (82,419) | (82,419) |
| 6/14/2007 | WH TAX DIV MMM | (24,847) | - | (24,847) | - | - | 1,142,558,010 | - | (24,847) | (24,847) |
| 6/14/2007 | WH TAX DIV MSFT | (59,957) | - | (59,957) | - | - | 1,142,498,054 | - | (59,957) | (59,957) |
| 6/15/2007 | WH TAX DIV AIG | (90,050) | - | (90,050) | - | - | 1,142,408,054 | - | (90,050) | (90,050) |
| 6/15/2007 | FIDELITY SPARTAN US TREASURY MONEY MARKET | (9) | - | (9) | - | - | 1,142,408,150 | - | (9) | (9) |
| 6/15/2007 | WH TAX DIV WB | (72,472) | - | (72,472) | - | - | 1,142,395,678 | - | (72,472) | (72,472) |
| 6/15/2007 | WH TAX DIV TWX | (14,701) | - | (14,701) | - | - | 1,142,380,977 | - | (14,701) | (14,701) |
| 6/21/2007 | WH TAX DIV HD | (32,030) | - | (32,030) | - | - | 1,142,348,947 | - | (32,030) | (32,030) |

MADC1159_00000008

Exhibit B

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA PRO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/22/2007 | W/H TAX DIV PEAC | (173,932) | | (173,932) | | | 1,142,175,015 | | (173,932) | (173,932) |
| 6/29/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | | (19) | | | 1,142,174,995 | | (19) | (19) |
| 6/29/2007 | W/H TAX DIV FDP | (42,848) | | (42,848) | | | 1,142,132,147 | | (42,848) | (42,848) |
| 6/29/2007 | W/H TAX DIV S | (5,015) | | (5,015) | | | 1,142,127,132 | | (5,015) | (5,015) |
| 7/2/2007 | W/H TAX DIV MRK | (56,554) | | (56,554) | | | 1,142,070,578 | | (56,554) | (56,554) |
| 7/2/2007 | W/H TAX DIV KO | (46,972) | | (46,972) | | | 1,142,023,606 | | (46,972) | (46,972) |
| 7/3/2007 | W/H TAX DIV HPQ | (15,012) | | (15,012) | | | 1,142,008,594 | | (15,012) | (15,012) |
| 7/10/2007 | W/H TAX DIV MO | (99,600) | | (99,600) | | | 1,141,908,994 | | (99,600) | (99,600) |
| 7/17/2007 | CXL W/H TAX DIV TYC | 13,788 | | 13,788 | | | 1,141,922,782 | | | |
| 7/17/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | | (19) | | | 1,141,922,763 | | (19) | (19) |
| 8/2/2007 | CHECK WIRE | (15,000,000) | | (15,000,000) | | | 1,126,922,763 | | (15,000,000) | (15,000,000) |
| 8/2/2007 | W/H TAX DIV S | (11) | | (11) | | | 1,126,922,751 | | (11) | (11) |
| 8/6/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 1,126,922,750 | | (1) | (1) |
| 8/24/2007 | W/H TAX DIV C | (74,423) | | (74,423) | | | 1,126,848,326 | | (74,423) | (74,423) |
| 9/4/2007 | W/H TAX DIV WMT | (14,874) | | (14,874) | | | 1,126,833,452 | | (14,874) | (14,874) |
| 9/4/2007 | W/H TAX DIV WFC | (29,020) | | (29,020) | | | 1,126,804,432 | | (29,020) | (29,020) |
| 9/4/2007 | W/H TAX DIV HD | (18,430) | | (18,430) | | | 1,126,786,001 | | (18,430) | (18,430) |
| 9/5/2007 | W/H TAX DIV PFE | (57,313) | | (57,313) | | | 1,126,728,689 | | (57,313) | (57,313) |
| 9/6/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (25) | | (25) | | | 1,126,728,663 | | (25) | (25) |
| 9/6/2007 | CHECK WIRE | (43,000,000) | | (43,000,000) | | | 1,083,728,663 | | (43,000,000) | (43,000,000) |
| 9/7/2007 | W/H TAX DIV BA | (7,281) | | (7,281) | | | 1,083,721,382 | | (7,281) | (7,281) |
| 9/10/2007 | W/H TAX DIV TX | (9,153) | | (9,153) | | | 1,083,712,229 | | (9,153) | (9,153) |
| 9/10/2007 | W/H TAX DIV CVX | (34,689) | | (34,689) | | | 1,083,677,539 | | (34,689) | (34,689) |
| 9/10/2007 | W/H TAX DIV XOM | (55,519) | | (55,519) | | | 1,083,622,021 | | (55,519) | (55,519) |
| 9/10/2007 | W/H TAX DIV IBM | (15,602) | | (15,602) | | | 1,083,606,418 | | (15,602) | (15,602) |
| 9/13/2007 | W/H TAX DIV MSFT | (23,664) | | (23,664) | | | 1,083,582,755 | | (23,664) | (23,664) |
| 9/18/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | | (5) | | | 1,083,582,750 | | (5) | (5) |
| 9/18/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | | (3) | | | 1,083,582,746 | | (3) | (3) |
| 9/26/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | | (10) | | | 1,083,582,737 | | (10) | (10) |
| 9/28/2007 | CHECK WIRE | (12,366,000) | | (12,366,000) | | | 1,071,216,737 | | (12,366,000) | (12,366,000) |
| 9/28/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 1,071,216,735 | | (1) | (1) |
| 10/1/2007 | W/H TAX DIV INTC | (17,157) | | (17,157) | | | 1,071,199,578 | | (17,157) | (17,157) |
| 10/10/2007 | W/H TAX DIV MO | (39,650) | | (39,650) | | | 1,071,159,928 | | (39,650) | (39,650) |
| 10/25/2007 | W/H TAX DIV GE | (104,711) | | (104,711) | | | 1,071,055,217 | | (104,711) | (104,711) |
| 10/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (28) | | (28) | | | 1,071,055,189 | | (28) | (28) |
| 11/7/2007 | CHECK WIRE | 19,999,980 | 19,999,980 | | | | 1,091,055,169 | | | |
| 11/8/2007 | W/H TAX DIV UTX | (16) | | (16) | | | 1,091,055,153 | | (16) | (16) |
| 11/13/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (21) | | (21) | | | 1,091,055,132 | | (21) | (21) |
| 11/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | | (7) | | | 1,091,055,125 | | (7) | (7) |
| 11/21/2007 | W/H TAX DIV C | (47,134) | | (47,134) | | | 1,091,007,991 | | (47,134) | (47,134) |
| 11/21/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | | (2) | | | 1,091,007,989 | | (2) | (2) |
| 11/23/2007 | W/H TAX DIV MSFT | (5,555) | | (5,555) | | | 1,091,002,435 | | (5,555) | (5,555) |
| 11/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (14) | | (14) | | | 1,091,002,421 | | (14) | (14) |
| 12/3/2007 | W/H TAX DIV COP | (11,712) | | (11,712) | | | 1,090,990,709 | | (11,712) | (11,712) |
| 12/3/2007 | W/H TAX DIV MCD | (46,595) | | (46,595) | | | 1,090,944,114 | | (46,595) | (46,595) |
| 12/10/2007 | W/H TAX DIV EXC | (7,360) | | (7,360) | | | 1,090,936,754 | | (7,360) | (7,360) |
| 12/10/2007 | W/H TAX DIV XOM | (30,876) | | (30,876) | | | 1,090,905,878 | | (30,876) | (30,876) |
| 12/10/2007 | W/H TAX DIV UTX | (8,411) | | (8,411) | | | 1,090,896,467 | | (8,411) | (8,411) |
| 12/11/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (26) | | (26) | | | 1,090,896,441 | | (26) | (26) |
| 12/11/2007 | W/H TAX DIV PNJ | (60,278) | | (60,278) | | | 1,090,836,163 | | (60,278) | (60,278) |
| 12/12/2007 | W/H TAX DIV MMM | (17,992) | | (17,992) | | | 1,090,818,171 | | (17,992) | (17,992) |
| 12/13/2007 | W/H TAX DIV WFT | (23,130) | | (23,130) | | | 1,090,795,041 | | (23,130) | (23,130) |
| 12/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 1,090,795,040 | | (1) | (1) |
| 12/31/2007 | W/H TAX DIV WMT | (13) | | (13) | | | 1,090,795,027 | | (13) | (13) |
| 1/2/2008 | W/H TAX DIV WMT | (8,903) | | (8,903) | | | 1,090,786,125 | | (8,903) | (8,903) |
| 1/2/2008 | W/H TAX DIV HPQ | (3,486) | | (3,486) | | | 1,090,782,638 | | (3,486) | (3,486) |
| 1/2/2008 | W/H TAX DIV UPS | (11,039) | | (11,039) | | | 1,090,771,599 | | (11,039) | (11,039) |
| 1/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | | (2) | | | 1,090,771,597 | | (2) | (2) |
| 2/7/2008 | CHECK WIRE | 49,999,980 | 49,999,980 | | | | 1,140,771,577 | | | |
| 2/20/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | | (13) | | | 1,140,771,564 | | (13) | (13) |
| 2/22/2008 | W/H TAX DIV C | (52,571) | | (52,571) | | | 1,140,718,993 | | (52,571) | (52,571) |
| 2/28/2008 | W/H TAX DIV US | (4,259) | | (4,259) | | | 1,140,714,734 | | (4,259) | (4,259) |
| 3/3/2008 | W/H TAX DIV INTC | (24,437) | | (24,437) | | | 1,140,690,296 | | (24,437) | (24,437) |
| 3/3/2008 | W/H TAX DIV WFC | (34,895) | | (34,895) | | | 1,140,655,401 | | (34,895) | (34,895) |
| 3/3/2008 | W/H TAX DIV COP | (24,308) | | (24,308) | | | 1,140,631,093 | | (24,308) | (24,308) |

MADC1159_00000009

Exhibit B

MADC1159_00000010

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 30-Day Preferential Transfers | Column 10 2 Year Cash Withdrawals | Column 11 6 Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 3/4/2008 | W/H TAX DIV UPS | (15,059) | - | (15,059) | - | - | 1,140,616,034 | - | (15,059) | (15,059) |
| 3/4/2008 | W/H TAX DIV PFE | (70,095) | - | (70,095) | - | - | 1,140,545,939 | - | (70,095) | (70,095) |
| 3/5/2008 | W/H TAX DIV MER | (9,583) | - | (9,583) | - | - | 1,140,536,356 | - | (9,583) | (9,583) |
| 3/7/2008 | W/H TAX DIV BA | (9,735) | - | (9,735) | - | - | 1,140,526,621 | - | (9,735) | (9,735) |
| 3/10/2008 | W/H TAX DIV UTX | (10,709) | - | (10,709) | - | - | 1,140,515,912 | - | (10,709) | (10,709) |
| 3/10/2008 | W/H TAX DIV XOM | (63,888) | - | (63,888) | - | - | 1,140,452,023 | - | (63,888) | (63,888) |
| 3/10/2008 | W/H TAX DIV IBM | (18,254) | - | (18,254) | - | - | 1,140,433,770 | - | (18,254) | (18,254) |
| 3/10/2008 | W/H TAX DIV EXC | (10,648) | - | (10,648) | - | - | 1,140,423,122 | - | (10,648) | (10,648) |
| 3/10/2008 | W/H TAX DIV CVX | (40,584) | - | (40,584) | - | - | 1,140,382,537 | - | (40,584) | (40,584) |
| 3/11/2008 | W/H TAX DIV JNJ | (39,139) | - | (39,139) | - | - | 1,140,343,398 | - | (39,139) | (39,139) |
| 3/12/2008 | W/H TAX DIV MMM | (12,169) | - | (12,169) | - | - | 1,140,331,229 | - | (12,169) | (12,169) |
| 3/13/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (29,115) | - | (29,115) | - | - | 1,140,302,114 | - | (29,115) | (29,115) |
| 3/17/2008 | W/H TAX DIV WB | (42,836) | - | (42,836) | - | - | 1,140,259,278 | - | (42,836) | (42,836) |
| 3/17/2008 | W/H TAX DIV TWX | (7,416) | - | (7,416) | - | - | 1,140,251,863 | - | (7,416) | (7,416) |
| 3/17/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 1,140,251,851 | - | (12) | (12) |
| 3/17/2008 | W/H TAX DIV MCD | (14,831) | - | (14,831) | - | - | 1,140,237,020 | - | (14,831) | (14,831) |
| 3/19/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 1,140,237,019 | - | (1) | (1) |
| 3/20/2008 | CHECK WIRE | 119,999,980 | 119,999,980 | - | - | - | 1,260,236,999 | - | - | - |
| 3/24/2008 | W/H TAX DIV AIG | (17,037) | - | (17,037) | - | - | 1,260,219,962 | - | (17,037) | (17,037) |
| 3/27/2008 | W/H TAX DIV HD | (12,321) | - | (12,321) | - | - | 1,260,207,641 | - | (12,321) | (12,321) |
| 3/28/2008 | W/H TAX DIV BAC | (93,459) | - | (93,459) | - | - | 1,260,114,181 | - | (93,459) | (93,459) |
| 3/31/2008 | W/H TAX DIV MO | (19,395) | - | (19,395) | - | - | 1,260,094,787 | - | (19,395) | (19,395) |
| 4/1/2008 | W/H TAX DIV MRK | (27,746) | - | (27,746) | - | - | 1,260,067,041 | - | (27,746) | (27,746) |
| 4/1/2008 | W/H TAX DIV KO | (25,434) | - | (25,434) | - | - | 1,260,041,607 | - | (25,434) | (25,434) |
| 4/2/2008 | W/H TAX DIV HPQ | (6,815) | - | (6,815) | - | - | 1,260,034,793 | - | (6,815) | (6,815) |
| 4/9/2008 | W/H TAX DIV KFT | (13,964) | - | (13,964) | - | - | 1,260,020,828 | - | (13,964) | (13,964) |
| 4/18/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 1,260,020,826 | - | (3) | (3) |
| 4/28/2008 | W/H TAX DIV WMT | (18,064) | - | (18,064) | - | - | 1,260,002,762 | - | (18,064) | (18,064) |
| 4/18/2008 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 1,275,002,742 | - | - | - |
| 4/23/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 1,275,002,739 | - | (3) | (3) |
| 4/25/2008 | W/H TAX DIV GE | (102,799) | - | (102,799) | - | - | 1,274,899,940 | - | (102,799) | (102,799) |
| 4/25/2008 | W/H TAX DIV MDT | (4,487) | - | (4,487) | - | - | 1,274,895,453 | - | (4,487) | (4,487) |
| 4/30/2008 | W/H TAX DIV MS | (8,883) | - | (8,883) | - | - | 1,274,886,570 | - | (8,883) | (8,883) |
| 4/30/2008 | W/H TAX DIV JPM | (40,917) | - | (40,917) | - | - | 1,274,845,653 | - | (40,917) | (40,917) |
| 5/1/2008 | W/H TAX DIV VZ | (39,870) | - | (39,870) | - | - | 1,274,805,783 | - | (39,870) | (39,870) |
| 5/1/2008 | W/H TAX DIV T | (77,766) | - | (77,766) | - | - | 1,274,728,017 | - | (77,766) | (77,766) |
| 5/2/2008 | W/H TAX DIV S | (2,871) | - | (2,871) | - | - | 1,274,725,146 | - | (2,871) | (2,871) |
| 5/2/2008 | W/H TAX DIV BK | (8,614) | - | (8,614) | - | - | 1,274,716,532 | - | (8,614) | (8,614) |
| 5/9/2008 | W/H TAX DIV AXP | (6,461) | - | (6,461) | - | - | 1,274,710,071 | - | (6,461) | (6,461) |
| 5/15/2008 | W/H TAX DIV PG | (40,678) | - | (40,678) | - | - | 1,274,669,394 | - | (40,678) | (40,678) |
| 5/15/2008 | W/H TAX DIV ABT | (18,305) | - | (18,305) | - | - | 1,274,651,089 | - | (18,305) | (18,305) |
| 5/20/2008 | W/H TAX DIV CAT | (7,537) | - | (7,537) | - | - | 1,274,643,551 | - | (7,537) | (7,537) |
| 5/23/2008 | W/H TAX DIV C | (51,684) | - | (51,684) | - | - | 1,274,591,867 | - | (51,684) | (51,684) |
| 5/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (12) | - | (12) | - | - | 1,274,591,855 | - | (12) | (12) |
| 5/29/2008 | W/H TAX DIV GS | (4,187) | - | (4,187) | - | - | 1,274,587,667 | - | (4,187) | (4,187) |
| 6/2/2008 | W/H TAX DIV WMT | (34,075) | - | (34,075) | - | - | 1,274,553,592 | - | (34,075) | (34,075) |
| 6/2/2008 | W/H TAX DIV CCE | (26,381) | - | (26,381) | - | - | 1,274,527,212 | - | (26,381) | (26,381) |
| 6/2/2008 | W/H TAX DIV CQP | (14,991) | - | (14,991) | - | - | 1,274,512,221 | - | (14,991) | (14,991) |
| 6/2/2008 | W/H TAX DIV WFC | (60,656) | - | (60,656) | - | - | 1,274,451,565 | - | (60,656) | (60,656) |
| 6/3/2008 | W/H TAX DIV UPS | (27,315) | - | (27,315) | - | - | 1,274,424,250 | - | (27,315) | (27,315) |
| 6/3/2008 | W/H TAX DIV PFE | (130,671) | - | (130,671) | - | - | 1,274,293,579 | - | (130,671) | (130,671) |
| 6/6/2008 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 1,289,293,559 | - | - | - |
| 6/6/2008 | W/H TAX DIV BA | (17,658) | - | (17,658) | - | - | 1,289,275,901 | - | (17,658) | (17,658) |
| 6/10/2008 | W/H TAX DIV CVX | (82,497) | - | (82,497) | - | - | 1,289,193,404 | - | (82,497) | (82,497) |
| 6/10/2008 | W/H TAX DIV UTX | (19,424) | - | (19,424) | - | - | 1,289,173,980 | - | (19,424) | (19,424) |
| 6/10/2008 | W/H TAX DIV JNJ | (26,754) | - | (26,754) | - | - | 1,289,147,225 | - | (26,754) | (26,754) |
| 6/10/2008 | W/H TAX DIV EXC | (19,314) | - | (19,314) | - | - | 1,289,127,911 | - | (19,314) | (19,314) |
| 6/10/2008 | W/H TAX DIV XOM | (129,219) | - | (129,219) | - | - | 1,288,998,693 | - | (129,219) | (129,219) |
| 6/10/2008 | W/H TAX DIV IBM | (41,387) | - | (41,387) | - | - | 1,288,957,306 | - | (41,387) | (41,387) |
| 6/12/2008 | W/H TAX DIV MMM | (22,073) | - | (22,073) | - | - | 1,288,935,233 | - | (22,073) | (22,073) |
| 6/12/2008 | W/H TAX DIV MSFT | (52,809) | - | (52,809) | - | - | 1,288,882,424 | - | (52,809) | (52,809) |
| 6/24/2008 | CHECK WIRE | 19,999,980 | 19,999,980 | - | - | - | 1,308,882,404 | - | - | - |
| 6/27/2008 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 1,323,882,384 | - | - | - |
| 7/9/2008 | CHECK WIRE | 74,999,980 | 74,999,980 | - | - | - | 1,398,882,364 | - | - | - |
| 7/18/2008 | CHECK WIRE | 14,999,980 | 14,999,980 | - | - | - | 1,413,882,344 | - | - | - |

Exhibit B

BLMIS ACCOUNT NO. 1FR108 - UBS (LUXEMBOURG) SA FBO LUXALPHA SICAV

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 7/21/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (64) | - | (64) | - | - | 1,413,882,280 | - | (64) | (64) |
| 7/23/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 1,413,882,280 | - | (1) | (1) |
| 8/1/2008 | WH TAX DIV CINS | (4,501) | - | (4,501) | - | - | 1,413,877,778 | - | (4,501) | (4,501) |
| 8/8/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 1,413,877,775 | - | (4) | (4) |
| 8/13/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 1,413,877,774 | - | (0) | (0) |
| 8/20/2008 | WH TAX DIV CAT | (11,987) | - | (11,987) | - | - | 1,413,865,787 | - | (11,987) | (11,987) |
| 8/22/2008 | WH TAX DIV C | (76,979) | - | (76,979) | - | - | 1,413,788,808 | - | (76,979) | (76,979) |
| 8/28/2008 | WH TAX DIV GS | (5,708) | - | (5,708) | - | - | 1,413,783,099 | - | (5,708) | (5,708) |
| 9/11/2008 | CHECK WIRE | (130,000,000) | - | (130,000,000) | - | - | 1,283,783,099 | - | (130,000,000) | (130,000,000) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 1,283,783,088 | (11) | (11) | (11) |
| 10/2/2008 | WH TAX DIV MMM | (23,933) | - | (23,933) | - | - | 1,283,759,155 | (23,933) | (23,933) | (23,933) |
| 10/2/2008 | WH TAX DIV QCOM | (5,489) | - | (5,489) | - | - | 1,283,753,666 | (5,489) | (5,489) | (5,489) |
| 10/2/2008 | WH TAX DIV UPS | (29,617) | - | (29,617) | - | - | 1,283,724,050 | (29,617) | (29,617) | (29,617) |
| 10/2/2008 | WH TAX DIV JNJ | (84,444) | - | (84,444) | - | - | 1,283,639,606 | (84,444) | (84,444) | (84,444) |
| 10/2/2008 | WH TAX DIV HD | (8,148) | - | (8,148) | - | - | 1,283,631,458 | (8,148) | (8,148) | (8,148) |
| 10/2/2008 | WH TAX DIV BUD | (12,069) | - | (12,069) | - | - | 1,283,619,389 | (12,069) | (12,069) | (12,069) |
| 10/2/2008 | WH TAX DIV PEP | (43,129) | - | (43,129) | - | - | 1,283,576,260 | (43,129) | (43,129) | (43,129) |
| 10/2/2008 | WH TAX DIV PFE | (96,550) | - | (96,550) | - | - | 1,283,479,610 | (96,550) | (96,550) | (96,550) |
| 10/2/2008 | WH TAX DIV WMT | (35,525) | - | (35,525) | - | - | 1,283,444,085 | (35,525) | (35,525) | (35,525) |
| 10/2/2008 | WH TAX DIV INTC | (35,391) | - | (35,391) | - | - | 1,283,408,694 | (35,391) | (35,391) | (35,391) |
| 10/2/2008 | WH TAX DIV WFC | (42,975) | - | (42,975) | - | - | 1,283,365,719 | (42,975) | (42,975) | (42,975) |
| 10/2/2008 | WH TAX DIV TWX | (14,822) | - | (14,822) | - | - | 1,283,350,897 | (14,822) | (14,822) | (14,822) |
| 10/2/2008 | WH TAX DIV BAC | (186,243) | - | (186,243) | - | - | 1,283,164,654 | (186,243) | (186,243) | (186,243) |
| 10/2/2008 | WH TAX DIV CVX | (88,210) | - | (88,210) | - | - | 1,283,076,444 | (88,210) | (88,210) | (88,210) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 1,283,076,430 | (13) | (13) | (13) |
| 10/2/2008 | WH TAX DIV COP | (32,578) | - | (32,578) | - | - | 1,283,043,852 | (32,578) | (32,578) | (32,578) |
| 10/2/2008 | WH TAX DIV DVN | (21,061) | - | (21,061) | - | - | 1,283,022,792 | (21,061) | (21,061) | (21,061) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 1,283,022,791 | (1) | (1) | (1) |
| 10/2/2008 | WH TAX DIV EXC | (20,941) | - | (20,941) | - | - | 1,283,001,849 | (20,941) | (20,941) | (20,941) |
| 10/2/2008 | WH TAX DIV IBM | (30,580) | - | (30,580) | - | - | 1,282,971,270 | (30,580) | (30,580) | (30,580) |
| 10/2/2008 | WH TAX DIV MSFT | (57,788) | - | (57,788) | - | - | 1,282,913,562 | (57,788) | (57,788) | (57,788) |
| 10/2/2008 | WH TAX DIV XOM | (138,048) | - | (138,048) | - | - | 1,282,775,514 | (138,048) | (138,048) | (138,048) |
| 10/2/2008 | WH TAX DIV BA | (13,047) | - | (13,047) | - | - | 1,282,762,467 | (13,047) | (13,047) | (13,047) |
| 10/2/2008 | WH TAX DIV AIG | (38,592) | - | (38,592) | - | - | 1,282,723,874 | (38,592) | (38,592) | (38,592) |
| 10/2/2008 | WH TAX DIV MCD | (27,639) | - | (27,639) | - | - | 1,282,696,235 | (27,639) | (27,639) | (27,639) |
| 10/10/2008 | CHECK WIRE | (180,000,000) | - | (180,000,000) | - | - | 1,102,696,235 | (180,000,000) | (180,000,000) | (180,000,000) |
| 10/30/2008 | CHECK WIRE | (180,000,000) | - | (180,000,000) | - | - | 922,696,235 | (180,000,000) | (180,000,000) | (180,000,000) |
| 11/4/2008 | WH TAX DIV HPQ | (12,771) | - | (12,771) | - | - | 922,683,464 | (12,771) | (12,771) | (12,771) |
| 11/4/2008 | WH TAX DIV PM | (23,780) | - | (23,780) | - | - | 922,659,684 | (23,780) | (23,780) | (23,780) |
| 11/4/2008 | WH TAX DIV MO | (9,603) | - | (9,603) | - | - | 922,650,082 | (9,603) | (9,603) | (9,603) |
| 11/4/2008 | WH TAX DIV BAX | (9,109) | - | (9,109) | - | - | 922,640,972 | (9,109) | (9,109) | (9,109) |
| 11/4/2008 | WH TAX DIV COM | (16,606) | - | (16,606) | - | - | 922,624,366 | (16,606) | (16,606) | (16,606) |
| 11/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 922,624,365 | (1) | (1) | (1) |
| 11/4/2008 | WH TAX DIV MRK | (52,293) | - | (52,293) | - | - | 922,572,071 | (52,293) | (52,293) | (52,293) |
| 11/14/2008 | CHECK WIRE | (50,000,000) | - | (50,000,000) | - | - | 872,572,071 | (50,000,000) | (50,000,000) | (50,000,000) |
| 11/19/2008 | CHECK WIRE | (125,000,000) | - | (125,000,000) | - | - | 747,572,071 | (125,000,000) | (125,000,000) | (125,000,000) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 747,572,671 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 747,572,671 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 747,572,669 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 747,572,669 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 747,572,669 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 747,572,669 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 747,572,669 | (0) | (0) | (0) |
| | **Total:** | $ (766,477,098) | $ 1,514,049,766 | $ (766,477,098) | $ - | $ - | $ 747,572,669 | $ (536,210,431) | $ (743,334,785) | $ (766,477,698) |

MADC1159_00000011

Exhibit C

Exhibit C

MADC11159_00000012

BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 4/8/2003 | CHECK WIRE | 3,885,000 | 3,885,000 | - | - | - | 3,885,000 | - | - | - |
| 4/15/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | - | - | 3,884,999 | - | - | (1) |
| 5/1/2003 | CHECK WIRE | 1,000,000 | 1,000,000 | - | - | - | 4,884,999 | - | - | - |
| 5/9/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | - | - | 4,884,999 | - | - | (1) |
| 5/19/2003 | CHECK WIRE | 2,892,607 | 2,892,607 | - | - | - | 7,777,606 | - | - | - |
| 5/19/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | - | - | 7,777,604 | - | - | (1) |
| 6/5/2003 | CHECK WIRE | 2,589,000 | 2,589,000 | - | - | - | 10,366,604 | - | - | - |
| 6/5/2003 | W/H TAX DIV PFE | (445) | | (445) | - | - | 10,366,160 | - | - | (445) |
| 6/10/2003 | W/H TAX DIV XOM | (624) | | (624) | - | - | 10,365,536 | - | - | (624) |
| 6/10/2003 | W/H TAX DIV INJ | (262) | | (262) | - | - | 10,365,273 | - | - | (262) |
| 6/12/2003 | W/H TAX DIV MMM | (103) | | (103) | - | - | 10,365,171 | - | - | (103) |
| 6/12/2003 | W/H TAX DIV DD | (131) | | (131) | - | - | 10,365,040 | - | - | (131) |
| 6/20/2003 | W/H TAX DIV AIG | (45) | | (45) | - | - | 10,364,994 | - | - | (45) |
| 6/25/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | | (3) | - | - | 10,364,991 | - | - | (3) |
| 6/26/2003 | W/H TAX DIV HD | (52) | | (52) | - | - | 10,364,939 | - | - | (52) |
| 6/27/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | - | - | 10,364,939 | - | - | (0) |
| 6/27/2003 | CHECK WIRE | (1,200,000) | | (1,200,000) | - | - | 9,164,939 | - | - | (1,200,000) |
| 6/27/2003 | W/H TAX DIV BAC | (359) | | (359) | - | - | 9,164,580 | - | - | (359) |
| 6/30/2003 | W/H TAX DIV PEP | (100) | | (100) | - | - | 9,164,480 | - | - | (100) |
| 7/1/2003 | W/H TAX DIV KO | (199) | | (199) | - | - | 9,164,281 | - | - | (199) |
| 7/1/2003 | W/H TAX DIV ONE | (92) | | (92) | - | - | 9,164,189 | - | - | (92) |
| 7/7/2003 | W/H TAX DIV MHK | (303) | | (303) | - | - | 9,163,886 | - | - | (303) |
| 7/7/2003 | W/H TAX DIV WMT | (146) | | (146) | - | - | 9,163,740 | - | - | (146) |
| 7/8/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 14,163,740 | - | - | - |
| 7/8/2003 | W/H TAX DIV MO | (499) | | (499) | - | - | 14,163,240 | - | - | (499) |
| 7/9/2003 | W/H TAX DIV HPQ | (90) | | (90) | - | - | 14,163,151 | - | - | (90) |
| 7/10/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | - | - | 14,163,149 | - | - | (1) |
| 7/21/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | - | - | 14,163,149 | - | - | (1) |
| 7/31/2003 | W/H TAX DIV MWD | (156) | | (156) | - | - | 14,162,993 | - | - | (156) |
| 8/1/2003 | W/H TAX DIV VZ | (717) | | (717) | - | - | 14,162,277 | - | - | (717) |
| 8/1/2003 | W/H TAX DIV SBC | (841) | | (841) | - | - | 14,161,435 | - | - | (841) |
| 8/5/2003 | CHECK WIRE | 1,226,000 | 1,226,000 | - | - | - | 15,387,435 | - | - | - |
| 8/8/2003 | CHECK WIRE | 238,000 | 238,000 | - | - | - | 15,625,435 | - | - | - |
| 8/15/2003 | W/H TAX DIV PG | (385) | | (385) | - | - | 15,625,050 | - | - | (385) |
| 8/22/2003 | W/H TAX DIV PG | (184) | | (184) | - | - | 15,124,866 | - | - | (184) |
| 8/27/2003 | W/H TAX DIV MER | (99) | | (99) | - | - | 15,623,767 | - | - | (99) |
| 9/2/2003 | W/H TAX DIV INTC | (85) | | (85) | - | - | 15,623,682 | - | - | (85) |
| 9/2/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (508) | | (508) | - | - | 15,623,174 | - | - | (508) |
| 9/3/2003 | CHECK WIRE | 810,000 | 810,000 | - | - | - | 16,433,174 | - | - | - |
| 9/4/2003 | W/H TAX DIV PFE | (778) | | (778) | - | - | 16,432,396 | - | - | (778) |
| 9/5/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | | (15) | - | - | 16,432,381 | - | - | (15) |
| 9/9/2003 | W/H TAX DIV BUD | (124) | | (124) | - | - | 16,432,257 | - | - | (124) |
| 9/10/2003 | W/H TAX DIV IBM | (180) | | (180) | - | - | 16,432,077 | - | - | (180) |
| 9/10/2003 | W/H TAX DIV XOM | (1,114) | | (1,114) | - | - | 16,430,963 | - | - | (1,114) |
| 9/12/2003 | W/H TAX DIV DD | (237) | | (237) | - | - | 16,430,726 | - | - | (237) |
| 9/19/2003 | W/H TAX DIV AIG | (195) | | (195) | - | - | 16,430,531 | - | - | (195) |
| 9/26/2003 | W/H TAX DIV BAC | (1,348) | | (1,348) | - | - | 16,429,184 | - | - | (1,348) |
| 9/30/2003 | W/H TAX DIV PEP | (315) | | (315) | - | - | 16,428,869 | - | - | (315) |
| 10/1/2003 | W/H TAX DIV MRK | (970) | | (970) | - | - | 16,427,899 | - | - | (970) |
| 10/1/2003 | W/H TAX DIV KO | (638) | | (638) | - | - | 16,427,261 | - | - | (638) |
| 10/1/2003 | W/H TAX DIV VLAB | (68) | | (68) | - | - | 16,427,193 | - | - | (68) |
| 10/2/2003 | CHECK WIRE | 3,885,000 | 3,885,000 | - | - | - | 20,312,193 | - | - | - |
| 10/2/2003 | CHECK WIRE | 7,230,000 | 7,230,000 | - | - | - | 27,542,193 | - | - | - |
| 10/3/2003 | CHECK WIRE | 975,000 | 975,000 | - | - | - | 28,617,193 | - | - | - |
| 10/8/2003 | W/H TAX DIV HPQ | (285) | | (285) | - | - | 28,616,909 | - | - | (285) |
| 10/9/2003 | W/H TAX DIV MO | (1,591) | | (1,591) | - | - | 28,615,318 | - | - | (1,591) |
| 10/14/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | | (6) | - | - | 28,615,311 | - | - | (6) |
| 11/3/2003 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 33,615,311 | - | - | - |
| 11/5/2003 | CHECK WIRE | 18,000,000 | 18,000,000 | - | - | - | 51,615,311 | - | - | - |
| 11/7/2003 | W/H TAX DIV MSFT | (3,593) | | (3,593) | - | - | 51,611,719 | - | - | (3,593) |
| 11/14/2003 | W/H TAX DIV PG | (1,238) | | (1,238) | - | - | 51,610,481 | - | - | (1,238) |
| 12/1/2003 | CHECK WIRE | 3,550,000 | 3,550,000 | - | - | - | 55,160,481 | - | - | - |
| 11/25/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | | (6) | - | - | 55,160,475 | - | - | (6) |
| 11/26/2003 | W/H TAX DIV MER | (299) | | (299) | - | - | 55,160,175 | - | - | (299) |
| 11/26/2003 | W/H TAX DIV C | (3,751) | | (3,751) | - | - | 55,156,425 | - | - | (3,751) |

Exhibit C

BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 30-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/12/2003 | CHECK WIRE | 5,600,000 | 5,600,000 | | | | 60,756,425 | | | |
| 12/12/2003 | W/H TAX DIV NTC | (269) | | (269) | | | 60,756,156 | | | (269) |
| 12/1/2003 | W/H TAX DIV WFC | (1,531) | | (1,531) | | | 60,754,625 | | | (1,531) |
| 12/4/2003 | W/H TAX DIV PFE | (2,424) | | (2,424) | | | 60,752,201 | | | (2,424) |
| 12/9/2003 | W/H TAX DIV JNJ | (1,470) | | (1,470) | | | 60,750,731 | | | (1,470) |
| 12/10/2003 | CHECK WIRE | (1,030,000) | | (1,030,000) | | | 59,720,731 | | | (1,030,000) |
| 12/10/2003 | W/H TAX DIV XOM | (3,445) | | (3,445) | | | 59,717,287 | | | (3,445) |
| 12/10/2003 | W/H TAX DIV IBM | (572) | | (572) | | | 59,716,715 | | | (572) |
| 12/12/2003 | W/H TAX DIV MMM | (561) | | (561) | | | 59,716,154 | | | (561) |
| 12/16/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | | (6) | | | 59,716,148 | | | (6) |
| 12/31/2003 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | | (2) | | | 59,716,147 | | | (2) |
| 1/2/2004 | W/H TAX DIV ONE | (230) | | (230) | | | 59,715,916 | | | (230) |
| 1/2/2004 | W/H TAX DIV PEP | (233) | | (233) | | | 59,715,683 | | | (233) |
| 1/5/2004 | W/H TAX DIV WMT | (332) | | (332) | | | 59,715,351 | | | (332) |
| 1/6/2004 | W/H TAX DIV DIS | (371) | | (371) | | | 59,714,980 | | | (371) |
| 1/7/2004 | W/H TAX DIV HPQ | (209) | | (209) | | | 59,714,771 | | | (209) |
| 1/8/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 59,714,770 | | | (1) |
| 1/9/2004 | CHECK WIRE | 5,000,000 | 5,000,000 | | | | 64,714,770 | | | |
| 1/9/2004 | W/H TAX DIV MO | (1,201) | | (1,201) | | | 64,713,569 | | | (1,201) |
| 1/15/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 64,713,568 | | | (1) |
| 1/16/2004 | CHECK WIRE | 4,500,000 | 4,500,000 | | | | 69,213,568 | | | |
| 1/30/2004 | W/H TAX DIV MWD | (374) | | (374) | | | 69,213,193 | | | (374) |
| 2/2/2004 | W/H TAX DIV SBC | (1,443) | | (1,443) | | | 69,211,750 | | | (1,443) |
| 2/2/2004 | W/H TAX DIV VZ | (1,489) | | (1,489) | | | 69,210,261 | | | (1,489) |
| 2/3/2004 | CHECK WIRE | 3,610,000 | 3,610,000 | | | | 72,820,261 | | | |
| 2/13/2004 | CHECK WIRE | 22,410,000 | 22,410,000 | | | | 95,230,261 | | | |
| 2/17/2004 | CHECK WIRE | 2,000,000 | 2,000,000 | | | | 97,230,261 | | | |
| 2/17/2004 | W/H TAX DIV PG | (2,443) | | (2,443) | | | 97,227,818 | | | (2,443) |
| 2/26/2004 | W/H TAX DIV GS | (447) | | (447) | | | 97,227,371 | | | (447) |
| 2/27/2004 | W/H TAX DIV C | (8,303) | | (8,303) | | | 97,219,067 | | | (8,303) |
| 2/27/2004 | W/H TAX DIV MER | (630) | | (630) | | | 97,218,438 | | | (630) |
| 3/1/2004 | W/H TAX DIV WFC | (3,060) | | (3,060) | | | 97,215,378 | | | (3,060) |
| 3/1/2004 | W/H TAX DIV NTC | (1,041) | | (1,041) | | | 97,214,337 | | | (1,041) |
| 3/5/2004 | W/H TAX DIV BA | (548) | | (548) | | | 97,213,789 | | | (548) |
| 3/5/2004 | W/H TAX DIV G | (640) | | (640) | | | 97,213,149 | | | (640) |
| 3/5/2004 | W/H TAX DIV PFE | (5,189) | | (5,189) | | | 97,207,960 | | | (5,189) |
| 3/8/2004 | W/H TAX DIV MWD | (2,866) | | (2,866) | | | 97,205,094 | | | (2,866) |
| 3/9/2004 | W/H TAX DIV BUD | (709) | | (709) | | | 97,204,386 | | | (709) |
| 3/10/2004 | W/H TAX DIV XOM | (6,647) | | (6,647) | | | 97,197,739 | | | (6,647) |
| 3/10/2004 | W/H TAX DIV IBM | (1,088) | | (1,088) | | | 97,196,651 | | | (1,088) |
| 3/10/2004 | W/H TAX DIV UTX | (395) | | (395) | | | 97,196,256 | | | (395) |
| 3/12/2004 | W/H TAX DIV MER | (731) | | (731) | | | 97,195,526 | | | (731) |
| 3/15/2004 | W/H TAX DIV DD | (1,378) | | (1,378) | | | 97,194,148 | | | (1,378) |
| 4/6/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (39) | | (39) | | | 97,194,109 | | | (39) |
| 4/30/2004 | W/H TAX DIV JPM | (983) | | (983) | | | 97,193,126 | | | (983) |
| 4/30/2004 | W/H TAX DIV MWD | (1,281) | | (1,281) | | | 97,191,845 | | | (1,281) |
| 5/3/2004 | W/H TAX DIV C | (4,831) | | (4,831) | | | 97,187,014 | | | (4,831) |
| 5/3/2004 | W/H TAX DIV VZ | (4,931) | | (4,931) | | | 97,182,083 | | | (4,931) |
| 5/10/2004 | CHECK WIRE | 10,300,000 | 10,300,000 | | | | 107,482,083 | | | |
| 5/14/2004 | W/H TAX DIV PG | (3,772) | | (3,772) | | | 107,478,291 | | | (3,772) |
| 5/17/2004 | W/H TAX DIV IXN | (220) | | (220) | | | 107,478,071 | | | (220) |
| 5/26/2004 | W/H TAX DIV MER | (948) | | (948) | | | 107,477,123 | | | (948) |
| 5/27/2004 | W/H TAX DIV GS | (674) | | (674) | | | 107,476,450 | | | (674) |
| 5/28/2004 | W/H TAX DIV C | (12,285) | | (12,285) | | | 107,464,165 | | | (12,285) |
| 6/1/2004 | W/H TAX DIV NTC | (1,535) | | (1,535) | | | 107,462,630 | | | (1,535) |
| 6/1/2004 | W/H TAX DIV WFC | (4,607) | | (4,607) | | | 107,458,024 | | | (4,607) |
| 6/4/2004 | CHECK WIRE | 10,300,000 | 10,300,000 | | | | 117,758,024 | | | |
| 6/4/2004 | W/H TAX DIV G | (963) | | (963) | | | 117,757,061 | | | (963) |
| 6/4/2004 | W/H TAX DIV PFE | (7,673) | | (7,673) | | | 117,749,388 | | | (7,673) |
| 6/7/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | | (17) | | | 117,749,370 | | | (17) |
| 6/7/2004 | W/H TAX DIV WMT | (2,262) | | (2,262) | | | 117,747,108 | | | (2,262) |
| 6/8/2004 | W/H TAX DIV MER | (5,032) | | (5,032) | | | 117,742,077 | | | (5,032) |
| 6/9/2004 | W/H TAX DIV BUD | (1,067) | | (1,067) | | | 117,741,010 | | | (1,067) |
| 6/10/2004 | W/H TAX DIV XOM | (10,474) | | (10,474) | | | 117,730,535 | | | (10,474) |
| 6/10/2004 | W/H TAX DIV IBM | (1,843) | | (1,843) | | | 117,728,693 | | | (1,843) |

MADC1159_00000013

Exhibit C

MADC1159_00000014

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/10/2004 | WH TAX DIV UTX | (769) | - | (769) | - | - | 117,722,923 | - | - | (769) |
| 6/11/2004 | WH TAX DIV DD | (660) | - | (660) | - | - | 117,722,264 | - | - | (660) |
| 6/14/2004 | WH TAX DIV DD | (2,074) | - | (2,074) | - | - | 117,721,189 | - | - | (2,074) |
| 6/14/2004 | WH TAX DIV MMM | (1,187) | - | (1,187) | - | - | 117,724,002 | - | - | (1,187) |
| 6/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 117,724,000 | - | - | (2) |
| 6/25/2004 | WH TAX DIV HD | (1,418) | - | (1,418) | - | - | 117,722,582 | - | - | (1,418) |
| 6/30/2004 | WH TAX DIV PEP | (2,916) | - | (2,916) | - | - | 117,719,666 | - | - | (2,916) |
| 7/1/2004 | WH TAX DIV KO | (4,504) | - | (4,504) | - | - | 117,715,163 | - | - | (4,504) |
| 7/7/2004 | WH TAX DIV HPQ | (1,815) | - | (1,815) | - | - | 117,713,348 | - | - | (1,815) |
| 7/8/2004 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 127,713,348 | - | - | - |
| 7/9/2004 | WH TAX DIV MO | (10,251) | - | (10,251) | - | - | 127,703,097 | - | - | (10,251) |
| 7/30/2004 | WH TAX DIV GE | (1,066) | - | (1,066) | - | - | 127,701,431 | - | - | (1,066) |
| 8/18/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (43) | - | (43) | - | - | 127,701,388 | - | - | (43) |
| 8/23/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 127,701,387 | - | - | (0) |
| 9/7/2004 | WH TAX DIV WMT | (3,503) | - | (3,503) | - | - | 127,697,885 | - | - | (3,503) |
| 9/10/2004 | WH TAX DIV UTX | (1,179) | - | (1,179) | - | - | 127,696,706 | - | - | (1,179) |
| 9/13/2004 | WH TAX DIV MMM | (1,819) | - | (1,819) | - | - | 127,695,887 | - | - | (1,819) |
| 9/14/2004 | WH TAX DIV MSFT | (7,350) | - | (7,350) | - | - | 127,687,537 | - | - | (7,350) |
| 9/16/2004 | WH TAX DIV HD | (1,635) | - | (1,635) | - | - | 127,685,902 | - | - | (1,635) |
| 9/17/2004 | WH TAX DIV ARG | (1,673) | - | (1,673) | - | - | 127,684,229 | - | - | (1,673) |
| 9/24/2004 | WH TAX DIV BAC | (15,922) | - | (15,922) | - | - | 127,668,307 | - | - | (15,922) |
| 9/30/2004 | WH TAX DIV MER | (3,061) | - | (3,061) | - | - | 127,665,245 | - | - | (3,061) |
| 10/1/2004 | WH TAX DIV VIA.B | (902) | - | (902) | - | - | 127,664,043 | - | - | (902) |
| 10/1/2004 | WH TAX DIV MRK | (7,307) | - | (7,307) | - | - | 127,656,736 | - | - | (7,307) |
| 10/1/2004 | WH TAX DIV KO | (5,192) | - | (5,192) | - | - | 127,651,544 | - | - | (5,192) |
| 10/6/2004 | WH TAX DIV HPQ | (2,092) | - | (2,092) | - | - | 127,649,451 | - | - | (2,092) |
| 10/7/2004 | CHECK WIRE | - | - | - | - | - | 127,637,451 | - | - | - |
| 10/12/2004 | WH TAX DIV MO | (12,915) | - | (12,915) | - | - | 137,636,537 | - | - | (12,915) |
| 10/15/2004 | CHECK WIRE | 6,200,000 | 6,200,000 | - | - | - | 143,836,537 | - | - | - |
| 10/20/2004 | CHECK WIRE | 4,590,000 | 4,590,000 | - | - | - | 148,426,537 | - | - | - |
| 11/3/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (81) | - | (81) | - | - | 148,426,456 | - | - | (81) |
| 11/4/2004 | CHECK WIRE | 8,975,000 | 8,975,000 | - | - | - | 157,401,456 | - | - | - |
| 11/4/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 157,401,456 | - | - | (0) |
| 11/5/2004 | CHECK WIRE | 2,100,000 | 2,100,000 | - | - | - | 159,501,456 | - | - | - |
| 11/9/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 159,501,456 | - | - | (0) |
| 11/23/2004 | CHECK WIRE | 4,900,000 | 4,900,000 | - | - | - | 164,401,456 | - | - | - |
| 11/24/2004 | WH TAX DIV MER | (757) | - | (757) | - | - | 164,400,698 | - | - | (757) |
| 12/1/2004 | CHECK WIRE | 4,930,000 | 4,930,000 | - | - | - | 169,330,698 | - | - | - |
| 12/1/2004 | WH TAX DIV VNTC | (1,246) | - | (1,246) | - | - | 169,329,452 | - | - | (1,246) |
| 12/1/2004 | WH TAX DIV WFC | (3,923) | - | (3,923) | - | - | 169,325,529 | - | - | (3,923) |
| 12/3/2004 | WH TAX DIV BA | (1,260) | - | (1,260) | - | - | 169,324,269 | - | - | (1,260) |
| 12/3/2004 | WH TAX DIV MMM | (10,009) | - | (10,009) | - | - | 169,010,420 | - | - | (10,009) |
| 12/7/2004 | WH TAX DIV PFE | (2,535) | - | (2,535) | - | - | 169,311,685 | - | - | (2,535) |
| 12/10/2004 | WH TAX DIV JNJ | (2,394) | - | (2,394) | - | - | 169,309,291 | - | - | (2,394) |
| 12/10/2004 | WH TAX DIV IBM | (13,795) | - | (13,795) | - | - | 169,295,496 | - | - | (13,795) |
| 12/13/2004 | WH TAX DIV XOM | (41) | - | (41) | - | - | 169,295,455 | - | - | (41) |
| 12/14/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2,695) | - | (2,695) | - | - | 169,297,760 | - | - | (2,695) |
| 12/15/2004 | WH TAX DIV SBC | - | - | - | - | - | 174,292,760 | - | - | - |
| 12/16/2004 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 174,292,753 | - | - | - |
| 12/31/2004 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 174,291,224 | - | - | (1) |
| 1/3/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 174,291,224 | - | - | (7) |
| 1/11/2005 | WH TAX DIV WMT | (1,529) | - | (1,529) | - | - | 180,291,224 | - | - | (1,529) |
| 1/25/2005 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 186,291,224 | - | - | - |
| 2/1/2005 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 192,291,224 | - | - | - |
| 2/14/2005 | WH TAX DIV TXN | (509) | - | (509) | - | - | 192,290,714 | - | - | (509) |
| 2/16/2005 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 192,090,714 | - | - | - |
| 2/24/2005 | WH TAX DIV GS | (206) | - | (206) | - | - | 192,090,509 | - | - | (206) |
| 2/25/2005 | WH TAX DIV C | (26,891) | - | (26,891) | - | - | 197,203,618 | - | - | (26,891) |
| 2/28/2005 | WH TAX DIV MER | (1,716) | - | (1,716) | - | - | 197,201,902 | - | - | (1,716) |
| 3/1/2005 | WH TAX DIV WFC | (9,778) | - | (9,778) | - | - | 197,252,124 | - | - | (9,778) |
| 3/1/2005 | WH TAX DIV VNTC | (5,981) | - | (5,981) | - | - | 197,246,143 | - | - | (5,981) |
| 3/4/2005 | WH TAX DIV BA | (1,917) | - | (1,917) | - | - | 197,228,326 | - | - | (1,917) |
| 3/7/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2,412) | - | (2,412) | - | - | 197,241,814 | - | - | (2,412) |
| 3/7/2005 | WH TAX DIV C | (63) | - | (63) | - | - | 197,241,751 | - | - | (63) |
| 3/8/2005 | WH TAX DIV JNJ | (10,000) | - | (10,000) | - | - | 197,231,751 | - | - | (10,000) |

Exhibit C

MADC1159_00000015

## BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 3/8/2005 | W/H TAX DIV FFE | (16,909) | | (16,909) | | | 197,214,842 | | | (16,909) |
| 3/9/2005 | W/H TAX DIV HUD | (2,264) | | (2,264) | | | 197,212,578 | | | (2,264) |
| 3/10/2005 | W/H TAX DIV MMI | (3,574) | | (3,574) | | | 197,209,004 | | | (3,574) |
| 3/10/2005 | W/H TAX DIV XOM | (20,554) | | (20,554) | | | 197,188,450 | | | (20,554) |
| 3/10/2005 | W/H TAX DIV MSFT | (10,249) | | (10,249) | | | 197,178,201 | | | (10,249) |
| 3/10/2005 | W/H TAX DIV UTX | (2,831) | | (2,831) | | | 197,175,370 | | | (2,831) |
| 3/10/2005 | W/H TAX DIV DD | (1,128) | | (1,128) | | | 197,174,242 | | | (1,128) |
| 3/14/2005 | W/H TAX DIV MMM | (4,053) | | (4,053) | | | 197,170,190 | | | (4,053) |
| 3/18/2005 | W/H TAX DIV AIG | (3,887) | | (3,887) | | | 197,166,303 | | | (3,887) |
| 3/21/2005 | CHECK WIRE | 5,600,000 | 5,600,000 | | | | 202,763,303 | | | |
| 3/24/2005 | W/H TAX DIV HD | (2,573) | | (2,573) | | | 202,760,730 | | | (2,573) |
| 3/28/2005 | W/H TAX DIV PAC | (21,463) | | (21,463) | | | 202,739,267 | | | (21,463) |
| 3/31/2005 | W/H TAX DIV PEP | (4,686) | | (4,686) | | | 202,734,581 | | | (4,686) |
| 4/1/2005 | W/H TAX DIV KO | (6,323) | | (6,323) | | | 202,728,259 | | | (6,323) |
| 4/1/2005 | W/H TAX DIV MRK | (9,778) | | (9,778) | | | 202,718,480 | | | (9,778) |
| 4/1/2005 | W/H TAX DIV VIA.B | (1,426) | | (1,426) | | | 202,717,054 | | | (1,426) |
| 4/1/2005 | W/H TAX DIV HPQ | (1,413) | | (1,413) | | | 202,715,641 | | | (1,413) |
| 4/11/2005 | W/H TAX DIV MO | (14,042) | | (14,042) | | | 202,701,599 | | | (14,042) |
| 4/30/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (66) | | (66) | | | 202,701,533 | | | (66) |
| 4/20/2005 | CHECK WIRE | 4,600,000 | 4,600,000 | | | | 207,301,533 | | | |
| 4/25/2005 | W/H TAX DIV GE | (27,412) | | (27,412) | | | 207,274,121 | | | (27,412) |
| 5/2/2005 | CHECK WIRE | 3,000,000 | 3,000,000 | | | | 210,274,121 | | | |
| 5/23/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (44) | | (44) | | | 210,274,077 | | | (44) |
| 6/6/2005 | W/H TAX DIV WMT | (1,981) | | (1,981) | | | 210,272,095 | | | (1,981) |
| 6/10/2005 | W/H TAX DIV UTX | (942) | | (942) | | | 210,271,153 | | | (942) |
| 6/13/2005 | W/H TAX DIV MMM | (1,349) | | (1,349) | | | 210,269,803 | | | (1,349) |
| 6/17/2005 | W/H TAX DIV HPQ | (3,289) | | (3,289) | | | 210,266,515 | | | (3,289) |
| 6/20/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (37) | | (37) | | | 210,266,478 | | | (37) |
| 6/22/2005 | CHECK WIRE | 4,000,000 | 4,000,000 | | | | 214,266,478 | | | |
| 6/23/2005 | W/H TAX DIV HD | (2,203) | | (2,203) | | | 214,264,275 | | | (2,203) |
| 6/24/2005 | W/H TAX DIV BAC | (18,371) | | (18,371) | | | 214,245,904 | | | (18,371) |
| 6/30/2005 | W/H TAX DIV PEP | (4,482) | | (4,482) | | | 214,241,422 | | | (4,482) |
| 7/1/2005 | W/H TAX DIV MRK | (8,274) | | (8,274) | | | 214,233,149 | | | (8,274) |
| 7/1/2005 | W/H TAX DIV KO | (6,350) | | (6,350) | | | 214,226,798 | | | (6,350) |
| 7/1/2005 | W/H TAX DIV ALI | (2,229) | | (2,229) | | | 214,224,570 | | | (2,229) |
| 7/1/2005 | W/H TAX DIV VIA.B | (1,207) | | (1,207) | | | 214,223,363 | | | (1,207) |
| 7/5/2005 | W/H TAX DIV HPQ | (2,372) | | (2,372) | | | 214,220,992 | | | (2,372) |
| 7/8/2005 | W/H TAX DIV SLB | (1,334) | | (1,334) | | | 214,219,658 | | | (1,334) |
| 7/11/2005 | W/H TAX DIV MO | (15,232) | | (15,232) | | | 214,204,426 | | | (15,232) |
| 7/25/2005 | W/H TAX DIV GE | (23,486) | | (23,486) | | | 214,180,940 | | | (23,486) |
| 9/8/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (319) | | (319) | | | 214,180,621 | | | (319) |
| 9/12/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | | (5) | | | 214,180,615 | | | (5) |
| 9/30/2005 | W/H TAX DIV PEP | (3,107) | | (3,107) | | | 214,177,419 | | | (3,107) |
| 9/30/2005 | W/H TAX DIV S | (534) | | (534) | | | 214,176,885 | | | (534) |
| 10/3/2005 | W/H TAX DIV KO | (8,981) | | (8,981) | | | 214,167,904 | | | (8,981) |
| 10/9/2005 | W/H TAX DIV HPQ | (3,255) | | (3,255) | | | 214,164,649 | | | (3,255) |
| 10/10/2005 | W/H TAX DIV DD | (256) | | (256) | | | 214,164,392 | | | (256) |
| 10/12/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (109) | | (109) | | | 214,141,384 | | | (109) |
| 10/13/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | | (1) | | | 214,141,383 | | | (1) |
| 10/14/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 214,141,383 | | | (0) |
| 10/19/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 214,141,383 | | | (0) |
| 10/25/2005 | W/H TAX DIV GE | (24,083) | | (24,083) | | | 214,117,300 | | | (24,083) |
| 10/31/2005 | W/H TAX DIV MWD | (2,844) | | (2,844) | | | 214,114,456 | | | (2,844) |
| 11/1/2005 | CHECK WIRE | (6,000,000) | | (6,000,000) | | | 208,114,456 | | | (6,000,000) |
| 11/15/2005 | W/H TAX DIV ABT | (4,345) | | (4,345) | | | 208,110,111 | | | (4,345) |
| 11/15/2005 | W/H TAX DIV WFC | (14,365) | | (14,365) | | | 208,095,745 | | | (14,365) |
| 11/17/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (45) | | (45) | | | 208,095,700 | | | (45) |
| 11/21/2005 | W/H TAX DIV TXN | (738) | | (738) | | | 208,094,962 | | | (738) |
| 11/21/2005 | W/H TAX DIV GS | (1,644) | | (1,644) | | | 208,093,318 | | | (1,644) |
| 11/23/2005 | W/H TAX DIV C | (33,572) | | (33,572) | | | 208,059,746 | | | (33,572) |
| 11/23/2005 | W/H TAX DIV MER | (2,631) | | (2,631) | | | 208,057,115 | | | (2,631) |
| 11/30/2005 | CHECK WIRE | (3,000,000) | | (3,000,000) | | | 205,057,115 | | | (3,000,000) |
| 11/30/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | | (6) | | | 205,057,109 | | | (6) |
| 12/1/2005 | W/H TAX DIV UNTC | (7,194) | | (7,194) | | | 205,049,915 | | | (7,194) |
| 12/1/2005 | W/H TAX DIV WFC | (12,997) | | (12,997) | | | 205,036,918 | | | (12,997) |

Exhibit C

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/2/2005 | W/H TAX DIV BA | (2,960) | - | (2,960) | - | - | 205,033,958 | - | - | (2,960) |
| 12/6/2005 | W/H TAX DIV WFC | (20,912) | - | (20,912) | - | - | 205,013,046 | - | - | (20,912) |
| 12/8/2005 | W/H TAX DIV MSFT | (10,910) | - | (10,910) | - | - | 205,002,136 | - | - | (10,910) |
| 12/9/2005 | W/H TAX DIV XOM | (27,181) | - | (27,181) | - | - | 204,974,955 | - | - | (27,181) |
| 12/12/2005 | W/H TAX DIV IBM | (4,736) | - | (4,736) | - | - | 204,970,219 | - | - | (4,736) |
| 12/12/2005 | W/H TAX DIV CVX | (15,209) | - | (15,209) | - | - | 204,955,010 | - | - | (15,209) |
| 12/12/2005 | W/H TAX DIV MMM | (4,973) | - | (4,973) | - | - | 204,950,038 | - | - | (4,973) |
| 12/12/2005 | W/H TAX DIV UTX | (3,377) | - | (3,377) | - | - | 204,946,661 | - | - | (3,377) |
| 12/13/2005 | W/H TAX DIV JNJ | (14,712) | - | (14,712) | - | - | 204,931,949 | - | - | (14,712) |
| 12/15/2005 | W/H TAX DIV TWX | (3,464) | - | (3,464) | - | - | 204,928,485 | - | - | (3,464) |
| 12/15/2005 | W/H TAX DIV HD | (3,157) | - | (3,157) | - | - | 204,925,327 | - | - | (3,157) |
| 12/15/2005 | W/H TAX DIV SLB | (8,512) | - | (8,512) | - | - | 204,916,815 | - | - | (8,512) |
| 12/16/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 204,916,812 | - | - | (3) |
| 12/16/2005 | W/H TAX DIV AIG | (5,722) | - | (5,722) | - | - | 204,911,090 | - | - | (5,722) |
| 12/22/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 204,911,077 | - | - | (13) |
| 12/23/2005 | W/H TAX DIV BAC | (29,599) | - | (29,599) | - | - | 204,881,479 | - | - | (29,599) |
| 12/30/2005 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 204,881,470 | - | - | (9) |
| 12/30/2005 | W/H TAX DIV S | (1,085) | - | (1,085) | - | - | 204,880,385 | - | - | (1,085) |
| 1/3/2006 | W/H TAX DIV WMT | (3,647) | - | (3,647) | - | - | 204,876,738 | - | - | (3,647) |
| 1/3/2006 | W/H TAX DIV PEP | (6,499) | - | (6,499) | - | - | 204,870,240 | - | - | (6,499) |
| 1/3/2006 | W/H TAX DIV MRK | (12,497) | - | (12,497) | - | - | 204,857,742 | - | - | (12,497) |
| 1/3/2006 | W/H TAX DIV WMB | (1,366) | - | (1,366) | - | - | 204,856,377 | - | - | (1,366) |
| 1/4/2006 | W/H TAX DIV HPQ | (3,405) | - | (3,405) | - | - | 204,852,971 | - | - | (3,405) |
| 1/13/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 204,852,965 | - | - | (7) |
| 1/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (23) | - | (23) | - | - | 204,852,942 | - | - | (23) |
| 1/31/2006 | W/H TAX DIV MS | (4,043) | - | (4,043) | - | - | 204,848,899 | - | - | (4,043) |
| 2/1/2006 | W/H TAX DIV C | (4,202) | - | (4,202) | - | - | 204,844,697 | - | - | (4,202) |
| 2/1/2006 | W/H TAX DIV VZ | (3,656) | - | (3,656) | - | - | 204,841,041 | - | - | (3,656) |
| 2/13/2006 | W/H TAX DIV TXN | (660) | - | (660) | - | - | 204,840,381 | - | - | (660) |
| 2/15/2006 | W/H TAX DIV PG | (12,926) | - | (12,926) | - | - | 204,827,455 | - | - | (12,926) |
| 2/15/2006 | W/H TAX DIV ABT | (5,833) | - | (5,833) | - | - | 204,821,622 | - | - | (5,833) |
| 2/23/2006 | W/H TAX DIV QQQ | (1,560) | - | (1,560) | - | - | 204,820,062 | - | - | (1,560) |
| 2/24/2006 | W/H TAX DIV C | (33,867) | - | (33,867) | - | - | 204,786,195 | - | - | (33,867) |
| 2/28/2006 | W/H TAX DIV MER | (3,119) | - | (3,119) | - | - | 204,783,076 | - | - | (3,119) |
| 2/28/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 204,783,072 | - | - | (4) |
| 3/1/2006 | W/H TAX DIV INTC | (8,209) | - | (8,209) | - | - | 204,774,863 | - | - | (8,209) |
| 3/1/2006 | W/H TAX DIV TWX | (1,678) | - | (1,678) | - | - | 204,773,185 | - | - | (1,678) |
| 3/3/2006 | W/H TAX DIV BA | (3,369) | - | (3,369) | - | - | 204,769,816 | - | - | (3,369) |
| 3/7/2006 | W/H TAX DIV PFE | (24,193) | - | (24,193) | - | - | 204,745,623 | - | - | (24,193) |
| 3/7/2006 | W/H TAX DIV UPS | (5,690) | - | (5,690) | - | - | 204,739,934 | - | - | (5,690) |
| 3/8/2006 | CHECK WIRE | (16,000,000) | - | (16,000,000) | - | - | 188,739,934 | - | (16,000,000) | (16,000,000) |
| 3/9/2006 | W/H TAX DIV MMM | (3,315) | - | (3,315) | - | - | 188,736,619 | - | - | (3,315) |
| 3/10/2006 | W/H TAX DIV CVX | (13,833) | - | (13,833) | - | - | 188,722,785 | - | - | (13,833) |
| 3/10/2006 | W/H TAX DIV XOM | (27,083) | - | (27,083) | - | - | 188,695,702 | - | - | (27,083) |
| 3/10/2006 | W/H TAX DIV UTX | (3,019) | - | (3,019) | - | - | 188,692,683 | - | - | (3,019) |
| 3/10/2006 | W/H TAX DIV IBM | (4,291) | - | (4,291) | - | - | 188,688,392 | - | - | (4,291) |
| 3/10/2006 | W/H TAX DIV JPM | (1,248) | - | (1,248) | - | - | 188,687,145 | - | - | (1,248) |
| 3/10/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 188,687,142 | - | - | (3) |
| 3/13/2006 | W/H TAX DIV MMM | (4,592) | - | (4,592) | - | - | 188,682,550 | - | - | (4,592) |
| 3/15/2006 | W/H TAX DIV JNJ | (13,587) | - | (13,587) | - | - | 188,668,963 | - | - | (13,587) |
| 3/15/2006 | W/H TAX DIV TWX | (3,194) | - | (3,194) | - | - | 188,665,769 | - | - | (3,194) |
| 3/17/2006 | W/H TAX DIV AIG | (5,277) | - | (5,277) | - | - | 188,660,492 | - | - | (5,277) |
| 3/23/2006 | W/H TAX DIV HD | (4,305) | - | (4,305) | - | - | 188,656,187 | - | - | (4,305) |
| 3/24/2006 | W/H TAX DIV BAC | (31,816) | - | (31,816) | - | - | 188,624,371 | - | - | (31,816) |
| 3/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | - | (17) | - | - | 188,606,354 | - | - | (17) |
| 3/31/2006 | W/H TAX DIV WMT | (1,018) | - | (1,018) | - | - | 188,605,336 | - | - | (1,018) |
| 3/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 188,605,335 | - | - | (1) |
| 3/31/2006 | W/H TAX DIV PEP | (5,839) | - | (5,839) | - | - | 188,599,496 | - | - | (5,839) |
| 4/3/2006 | W/H TAX DIV KO | (8,755) | - | (8,755) | - | - | 188,590,740 | - | - | (8,755) |
| 4/3/2006 | W/H TAX DIV WMT | (5,810) | - | (5,810) | - | - | 188,584,930 | - | - | (5,810) |
| 4/3/2006 | W/H TAX DIV MRK | (11,379) | - | (11,379) | - | - | 188,573,551 | - | - | (11,379) |
| 4/3/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 188,573,549 | - | - | (2) |
| 4/5/2006 | W/H TAX DIV HPQ | (3,134) | - | (3,134) | - | - | 188,570,415 | - | - | (3,134) |
| 4/7/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 188,570,414 | - | - | (1) |
| 4/7/2006 | W/H TAX DIV SLB | (1,933) | - | (1,933) | - | - | 188,568,481 | - | - | (1,933) |

MADC1159_00000016

Exhibit C

MADC1159_00000017

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 4/10/2006 | WH TAX DIV MO | (22,958) | - | (22,958) | - | - | 188,545,524 | - | - | (22,958) |
| 4/21/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 188,545,520 | - | - | (4) |
| 4/28/2006 | WH TAX DIV MRK | (36,131) | - | (36,131) | - | - | 188,509,389 | - | - | (36,131) |
| 4/28/2006 | CXL WH TAX DIV SLB | 1,933 | - | 1,933 | - | - | 188,511,322 | - | - | 1,933 |
| 4/28/2006 | WH TAX DIV MDT | (1,494) | - | (1,494) | - | - | 188,509,828 | - | - | (1,494) |
| 4/28/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 188,509,821 | - | - | (6) |
| 4/28/2006 | WH TAX DIV MS | (3,791) | - | (3,791) | - | - | 188,506,030 | - | - | (3,791) |
| 5/1/2006 | WH TAX DIV MZ | (15,476) | - | (15,476) | - | - | 188,490,555 | - | - | (15,476) |
| 5/1/2006 | WH TAX DIV JPM | (11,341) | - | (11,341) | - | - | 188,479,213 | - | - | (11,341) |
| 5/1/2006 | WH TAX DIV T | (16,728) | - | (16,728) | - | - | 188,462,485 | - | - | (16,728) |
| 5/5/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (11) | - | (11) | - | - | 188,462,473 | - | - | (11) |
| 5/10/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 188,462,472 | - | - | (1) |
| 5/10/2006 | WH TAX DIV AXP | (1,066) | - | (1,066) | - | - | 188,461,406 | - | - | (1,066) |
| 5/15/2006 | WH TAX DIV ABT | (5,868) | - | (5,868) | - | - | 188,455,538 | - | - | (5,868) |
| 5/15/2006 | WH TAX DIV PG | (13,420) | - | (13,420) | - | - | 188,441,220 | - | - | (13,420) |
| 5/22/2006 | WH TAX DIV CAT | (2,240) | - | (2,240) | - | - | 188,438,980 | - | - | (2,240) |
| 5/23/2006 | WH TAX DIV TXN | (682) | - | (682) | - | - | 188,438,298 | - | - | (682) |
| 5/24/2006 | WH TAX DIV MER | (2,965) | - | (2,965) | - | - | 188,435,383 | - | - | (2,965) |
| 5/25/2006 | WH TAX DIV GS | (2,048) | - | (2,048) | - | - | 188,433,336 | - | - | (2,048) |
| 5/26/2006 | WH TAX DIV C | (32,105) | - | (32,105) | - | - | 188,401,231 | - | - | (32,105) |
| 5/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (34) | - | (34) | - | - | 188,401,197 | - | - | (34) |
| 5/31/2006 | WH TAX DIV UPS | (5,408) | - | (5,408) | - | - | 188,395,789 | - | - | (5,408) |
| 6/1/2006 | WH TAX DIV WFC | (11,717) | - | (11,717) | - | - | 188,384,073 | - | - | (11,717) |
| 6/1/2006 | WH TAX DIV INTC | (7,708) | - | (7,708) | - | - | 188,376,364 | - | - | (7,708) |
| 6/2/2006 | WH TAX DIV BA | (3,202) | - | (3,202) | - | - | 188,373,162 | - | - | (3,202) |
| 6/5/2006 | WH TAX DIV WMT | (5,562) | - | (5,562) | - | - | 188,367,601 | - | - | (5,562) |
| 6/6/2006 | WH TAX DIV HON | (7,207) | - | (7,207) | - | - | 188,360,393 | - | - | (7,207) |
| 6/6/2006 | WH TAX DIV PFE | (23,339) | - | (23,339) | - | - | 188,337,055 | - | - | (23,339) |
| 6/8/2006 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 198,337,055 | - | - | - |
| 6/8/2006 | WH TAX DIV MSFT | (10,566) | - | (10,566) | - | - | 198,326,489 | - | - | (10,566) |
| 6/9/2006 | WH TAX DIV XOM | (25,906) | - | (25,906) | - | - | 198,300,583 | - | - | (25,906) |
| 6/12/2006 | WH TAX DIV DIS | (6,190) | - | (6,190) | - | - | 198,294,393 | - | - | (6,190) |
| 6/12/2006 | WH TAX DIV MMM | (4,364) | - | (4,364) | - | - | 198,290,029 | - | - | (4,364) |
| 6/12/2006 | WH TAX DIV UTX | (1,728) | - | (1,728) | - | - | 198,288,300 | - | - | (1,728) |
| 6/13/2006 | WH TAX DIV INJ | (14,676) | - | (14,676) | - | - | 198,273,625 | - | - | (14,676) |
| 6/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | - | (24) | - | - | 198,273,601 | - | - | (24) |
| 6/22/2006 | WH TAX DIV KO | (2,566) | - | (2,566) | - | - | 198,271,035 | - | - | (2,566) |
| 6/22/2006 | WH TAX DIV HD | (4,269) | - | (4,269) | - | - | 198,266,766 | - | - | (4,269) |
| 6/23/2006 | WH TAX DIV BAC | (30,833) | - | (30,833) | - | - | 198,235,932 | - | - | (30,833) |
| 6/30/2006 | WH TAX DIV PEP | (6,409) | - | (6,409) | - | - | 198,229,124 | - | - | (6,409) |
| 6/30/2006 | WH TAX DIV AIG | (978) | - | (978) | - | - | 198,228,145 | - | - | (978) |
| 6/30/2006 | WH TAX DIV MRK | (50) | - | (50) | - | - | 198,228,095 | - | - | (50) |
| 7/3/2006 | WH TAX DIV CVX | (5,159) | - | (5,159) | - | - | 198,222,937 | - | - | (5,159) |
| 7/3/2006 | WH TAX DIV KO | (15,417) | - | (15,417) | - | - | 198,207,520 | - | - | (15,417) |
| 7/3/2006 | WH TAX DIV MRK | (5,834) | - | (5,834) | - | - | 198,201,685 | - | - | (5,834) |
| 7/3/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10,815) | - | (10,815) | - | - | 198,190,870 | - | - | (10,815) |
| 7/5/2006 | WH TAX DIV HPQ | (3,011) | - | (3,011) | - | - | 198,187,859 | - | - | (3,011) |
| 7/7/2006 | WH TAX DIV SLB | (2,073) | - | (2,073) | - | - | 198,185,786 | - | - | (2,073) |
| 7/10/2006 | WH TAX DIV MO | (15,056) | - | (15,056) | - | - | 198,170,730 | - | - | (15,056) |
| 7/14/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (39) | - | (39) | - | - | 198,170,691 | - | - | (39) |
| 7/21/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 198,170,686 | - | - | (5) |
| 7/31/2006 | WH TAX DIV VMS | (1,664) | - | (1,664) | - | - | 198,169,022 | - | - | (1,664) |
| 7/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (34) | - | (34) | - | - | 198,168,988 | - | - | (34) |
| 8/7/2006 | CXL WH TAX DIV SLB | 2,073 | - | 2,073 | - | - | 198,171,061 | - | - | 2,073 |
| 8/15/2006 | WH TAX DIV PG | (10,426) | - | (10,426) | - | - | 198,160,635 | - | - | (10,426) |
| 8/15/2006 | WH TAX DIV ABT | (2,576) | - | (2,576) | - | - | 198,158,059 | - | - | (2,576) |
| 8/18/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (22) | - | (22) | - | - | 198,158,037 | - | - | (22) |
| 8/21/2006 | WH TAX DIV TXN | (475) | - | (475) | - | - | 198,157,562 | - | - | (475) |
| 8/21/2006 | WH TAX DIV CAT | (1,079) | - | (1,079) | - | - | 198,156,483 | - | - | (1,079) |
| 8/23/2006 | WH TAX DIV MER | (2,273) | - | (2,273) | - | - | 198,154,211 | - | - | (2,273) |
| 8/24/2006 | WH TAX DIV C | (1,591) | - | (1,591) | - | - | 198,152,620 | - | - | (1,591) |
| 8/25/2006 | WH TAX DIV GS | (24,749) | - | (24,749) | - | - | 198,127,871 | - | - | (24,749) |
| 9/1/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (14) | - | (14) | - | - | 198,127,856 | - | - | (14) |
| 9/1/2006 | WH TAX DIV WFC | (9,672) | - | (9,672) | - | - | 198,118,185 | - | - | (9,672) |
| 9/1/2006 | WH TAX DIV BA | (2,454) | - | (2,454) | - | - | 198,115,730 | - | - | (2,454) |

Exhibit C

MADC1159_00000018

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/1/2006 | W/H TAX DIV INTC | (5,948) | - | (5,948) | - | - | 198,109,782 | - | - | (5,948) |
| 9/5/2006 | W/H TAX DIV WMT | (4,283) | - | (4,283) | - | - | 198,105,419 | - | - | (4,283) |
| 9/5/2006 | W/H TAX DIV PFE | (17,917) | - | (17,917) | - | - | 198,087,602 | - | - | (17,917) |
| 9/6/2006 | W/H TAX DIV UPS | (4,145) | - | (4,145) | - | - | 198,083,457 | - | - | (4,145) |
| 9/11/2006 | W/H TAX DIV IBM | (4,636) | - | (4,636) | - | - | 198,078,821 | - | - | (4,636) |
| 9/11/2006 | W/H TAX DIV CVX | (11,817) | - | (11,817) | - | - | 198,067,004 | - | - | (11,817) |
| 9/11/2006 | W/H TAX DIV UTX | (2,650) | - | (2,650) | - | - | 198,064,354 | - | - | (2,650) |
| 9/11/2006 | W/H TAX DIV XOM | (19,615) | - | (19,615) | - | - | 198,044,738 | - | - | (19,615) |
| 9/12/2006 | W/H TAX DIV MMM | (3,345) | - | (3,345) | - | - | 198,041,393 | - | - | (3,345) |
| 9/12/2006 | W/H TAX DIV INJ | (11,249) | - | (11,249) | - | - | 198,030,144 | - | - | (11,249) |
| 9/14/2006 | W/H TAX DIV MSFT | (8,064) | - | (8,064) | - | - | 198,022,081 | - | - | (8,064) |
| 9/15/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (10) | - | (10) | - | - | 198,022,071 | - | - | (10) |
| 9/15/2006 | W/H TAX DIV WX | (2,428) | - | (2,428) | - | - | 198,019,643 | - | - | (2,428) |
| 9/15/2006 | W/H TAX DIV ARG | (4,350) | - | (4,350) | - | - | 198,015,293 | - | - | (4,350) |
| 9/18/2006 | CHECK WIRE | (11,500,000) | - | (11,500,000) | - | - | 186,515,293 | - | - | (11,500,000) |
| 9/21/2006 | W/H TAX DIV HD | (3,136) | - | (3,136) | - | - | 186,512,157 | - | - | (3,136) |
| 9/21/2006 | W/H TAX DIV BAC | (25,961) | - | (25,961) | - | - | 186,486,196 | - | - | (25,961) |
| 9/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (21) | - | (21) | - | - | 186,486,175 | - | - | (21) |
| 9/29/2006 | W/H TAX DIV S | (763) | - | (763) | - | - | 186,485,412 | - | - | (763) |
| 9/29/2006 | W/H TAX DIV PEP | (5,027) | - | (5,027) | - | - | 186,480,385 | - | - | (5,027) |
| 10/2/2006 | W/H TAX DIV KO | (6,481) | - | (6,481) | - | - | 186,473,904 | - | - | (6,481) |
| 10/2/2006 | W/H TAX DIV MRK | (8,290) | - | (8,290) | - | - | 186,465,613 | - | - | (8,290) |
| 10/4/2006 | W/H TAX DIV HPQ | (2,254) | - | (2,254) | - | - | 186,463,359 | - | - | (2,254) |
| 10/10/2006 | W/H TAX DIV MO | (18,320) | - | (18,320) | - | - | 186,445,039 | - | - | (18,320) |
| 10/17/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (28) | - | (28) | - | - | 186,445,011 | - | - | (28) |
| 10/25/2006 | W/H TAX DIV GE | (26,489) | - | (26,489) | - | - | 186,418,522 | - | - | (26,489) |
| 10/26/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 186,418,516 | - | - | (6) |
| 10/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 186,418,515 | - | - | (1) |
| 10/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 186,418,511 | - | - | (5) |
| 10/31/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 186,418,510 | - | - | (0) |
| 11/7/2006 | CHECK WIRE | (38,500,000) | - | (38,500,000) | - | - | 147,918,510 | - | - | (38,500,000) |
| 11/20/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | - | (15) | - | - | 147,918,495 | - | - | (15) |
| 11/20/2006 | W/H TAX DIV TXN | (786) | - | (786) | - | - | 147,917,709 | - | - | (786) |
| 11/22/2006 | W/H TAX DIV C | (30,003) | - | (30,003) | - | - | 147,887,706 | - | - | (30,003) |
| 11/22/2006 | W/H TAX DIV MER | (2,888) | - | (2,888) | - | - | 147,884,818 | - | - | (2,888) |
| 11/27/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 147,884,812 | - | - | (6) |
| 11/30/2006 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 147,884,812 | - | - | (0) |
| 12/1/2006 | W/H TAX DIV MRK | (8,762) | - | (8,762) | - | - | 147,876,050 | - | (8,762) | (8,762) |
| 1/2/2007 | W/H TAX DIV PEP | (5,330) | - | (5,330) | - | - | 147,870,720 | - | (5,330) | (5,330) |
| 1/2/2007 | W/H TAX DIV WMT | (4,424) | - | (4,424) | - | - | 147,866,296 | - | (4,424) | (4,424) |
| 1/3/2007 | W/H TAX DIV ARG | (4,560) | - | (4,560) | - | - | 147,861,736 | - | (4,560) | (4,560) |
| 1/3/2007 | W/H TAX DIV INJ | (1,693) | - | (1,693) | - | - | 147,860,043 | - | (1,693) | (1,693) |
| 1/3/2007 | W/H TAX DIV KO | (6,731) | - | (6,731) | - | - | 147,853,312 | - | (6,731) | (6,731) |
| 1/3/2007 | W/H TAX DIV WB | (11,600) | - | (11,600) | - | - | 147,841,712 | - | (11,600) | (11,600) |
| 1/3/2007 | W/H TAX DIV CVX | (12,161) | - | (12,161) | - | - | 147,829,551 | - | (12,161) | (12,161) |
| 1/3/2007 | W/H TAX DIV WFC | (11,745) | - | (11,745) | - | - | 147,817,806 | - | (11,745) | (11,745) |
| 1/3/2007 | W/H TAX DIV PFE | (18,531) | - | (18,531) | - | - | 147,799,275 | - | (18,531) | (18,531) |
| 1/3/2007 | W/H TAX DIV TGT | (1,052) | - | (1,052) | - | - | 147,798,223 | - | (1,052) | (1,052) |
| 1/3/2007 | W/H TAX DIV UTX | (2,840) | - | (2,840) | - | - | 147,795,383 | - | (2,840) | (2,840) |
| 1/3/2007 | W/H TAX DIV IBM | (4,784) | - | (4,784) | - | - | 147,790,598 | - | (4,784) | (4,784) |
| 1/3/2007 | W/H TAX DIV MCD | (12,667) | - | (12,667) | - | - | 147,777,931 | - | (12,667) | (12,667) |
| 1/3/2007 | W/H TAX DIV HD | (4,886) | - | (4,886) | - | - | 147,773,045 | - | (4,886) | (4,886) |
| 1/3/2007 | W/H TAX DIV S | (790) | - | (790) | - | - | 147,772,256 | - | (790) | (790) |
| 1/3/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 147,772,254 | - | (2) | (2) |
| 1/3/2007 | W/H TAX DIV TWX | (2,631) | - | (2,631) | - | - | 147,769,623 | - | (2,631) | (2,631) |
| 1/3/2007 | W/H TAX DIV BAC | (2,389) | - | (2,389) | - | - | 147,767,234 | - | (2,389) | (2,389) |
| 1/3/2007 | W/H TAX DIV MMM | (27,076) | - | (27,076) | - | - | 147,740,158 | - | (27,076) | (27,076) |
| 1/3/2007 | W/H TAX DIV XOM | (20,070) | - | (20,070) | - | - | 147,720,088 | - | (20,070) | (20,070) |
| 1/3/2007 | W/H TAX DIV HPQ | (2,337) | - | (2,337) | - | - | 147,717,751 | - | (2,337) | (2,337) |
| 1/4/2007 | W/H TAX DIV UPS | (4,443) | - | (4,443) | - | - | 147,713,308 | - | (4,443) | (4,443) |

Exhibit C

MADC1159_00000019

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 11/02/2007 | W/H TAX DIV MO | (5,236) | - | (5,236) | - | - | 147,675,441 | - | (5,236) | (5,236) |
| 11/12/2007 | W/H TAX DIV DIS | (6,915) | - | (6,915) | - | - | 147,668,526 | - | (6,915) | (6,915) |
| 11/25/2007 | W/H TAX DIV CAT | (17,850) | - | (17,850) | - | - | 147,650,676 | - | (17,850) | (17,850) |
| 11/29/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 147,650,672 | - | (4) | (4) |
| 1/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 147,650,672 | - | (1) | (1) |
| 2/6/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (4) | - | (4) | - | - | 147,650,667 | - | (4) | (4) |
| 2/13/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (16) | - | (16) | - | - | 147,650,652 | - | (16) | (16) |
| 2/16/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | - | (7) | - | - | 147,650,645 | - | (7) | (7) |
| 2/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 147,650,639 | - | (6) | (6) |
| 2/22/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 147,650,637 | - | (2) | (2) |
| 2/23/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 147,650,636 | - | (1) | (1) |
| 2/28/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 147,650,633 | - | (3) | (3) |
| 3/1/2007 | W/H TAX DIV COP | (3,866) | - | (3,866) | - | - | 147,646,767 | - | (3,866) | (3,866) |
| 3/6/2007 | W/H TAX DIV UPS | (2,563) | - | (2,563) | - | - | 147,644,204 | - | (2,563) | (2,563) |
| 3/9/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | - | (6) | - | - | 147,644,198 | - | (6) | (6) |
| 3/12/2007 | W/H TAX DIV UTX | (882) | - | (882) | - | - | 147,643,316 | - | (882) | (882) |
| 3/12/2007 | W/H TAX DIV S | (699) | - | (699) | - | - | 147,642,617 | - | (699) | (699) |
| 3/12/2007 | W/H TAX DIV MMM | (3,174) | - | (3,174) | - | - | 147,639,543 | - | (3,174) | (3,174) |
| 3/13/2007 | W/H TAX DIV CVX | (3,617) | - | (3,617) | - | - | 147,635,927 | - | (3,617) | (3,617) |
| 3/15/2007 | W/H TAX DIV JNJ | (9,608) | - | (9,608) | - | - | 147,626,319 | - | (9,608) | (9,608) |
| 3/15/2007 | W/H TAX DIV WB | (9,257) | - | (9,257) | - | - | 147,617,062 | - | (9,257) | (9,257) |
| 3/16/2007 | W/H TAX DIV WX | (1,909) | - | (1,909) | - | - | 147,615,153 | - | (1,909) | (1,909) |
| 3/16/2007 | W/H TAX DIV AIG | (3,682) | - | (3,682) | - | - | 147,611,470 | - | (3,682) | (3,682) |
| 3/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (9) | - | (9) | - | - | 147,611,461 | - | (9) | (9) |
| 3/22/2007 | W/H TAX DIV HD | (4,091) | - | (4,091) | - | - | 147,607,370 | - | (4,091) | (4,091) |
| 3/23/2007 | W/H TAX DIV BAC | (21,753) | - | (21,753) | - | - | 147,585,617 | - | (21,753) | (21,753) |
| 3/28/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 157,585,617 | - | - | - |
| 3/28/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | - | (19) | - | - | 157,585,598 | - | (19) | (19) |
| 3/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 157,585,596 | - | (2) | (2) |
| 3/30/2007 | W/H TAX DIV S | (732) | - | (732) | - | - | 157,584,864 | - | (732) | (732) |
| 3/30/2007 | W/H TAX DIV PEP | (4,999) | - | (4,999) | - | - | 157,579,866 | - | (4,999) | (4,999) |
| 4/2/2007 | W/H TAX DIV MRK | (8,566) | - | (8,566) | - | - | 157,571,300 | - | (8,566) | (8,566) |
| 4/2/2007 | W/H TAX DIV KO | (7,176) | - | (7,176) | - | - | 157,564,123 | - | (7,176) | (7,176) |
| 4/4/2007 | W/H TAX DIV WMT | (5,546) | - | (5,546) | - | - | 157,558,577 | - | (5,546) | (5,546) |
| 4/10/2007 | W/H TAX DIV HPQ | (2,274) | - | (2,274) | - | - | 157,556,303 | - | (2,274) | (2,274) |
| 4/10/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | - | - | - | 167,556,303 | - | - | - |
| 4/16/2007 | W/H TAX DIV MO | (18,543) | - | (18,543) | - | - | 167,537,760 | - | (18,543) | (18,543) |
| 4/19/2007 | CHECK WIRE | 6,000,000 | 6,000,000 | - | - | - | 173,537,760 | - | - | - |
| 4/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (33) | - | (33) | - | - | 173,537,727 | - | (33) | (33) |
| 4/25/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 173,537,726 | - | (1) | (1) |
| 4/30/2007 | W/H TAX DIV GE | (25,225) | - | (25,225) | - | - | 173,512,501 | - | (25,225) | (25,225) |
| 5/4/2007 | CHECK WIRE | 5,000,000 | 5,000,000 | - | - | - | 178,512,501 | - | - | - |
| 5/9/2007 | W/H TAX DIV CVS | (741) | - | (741) | - | - | 178,511,760 | - | (741) | (741) |
| 5/15/2007 | CHECK WIRE | 16,000,000 | 16,000,000 | - | - | - | 194,511,760 | - | - | - |
| 5/16/2007 | W/H TAX DIV PG | (13,141) | - | (13,141) | - | - | 194,498,619 | - | (13,141) | (13,141) |
| 5/21/2007 | CHECK WIRE | 12,000,000 | 12,000,000 | - | - | - | 206,498,619 | - | - | - |
| 5/23/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (27) | - | (27) | - | - | 206,498,592 | - | (27) | (27) |
| 5/24/2007 | W/H TAX DIV MER | (3,479) | - | (3,479) | - | - | 206,495,113 | - | (3,479) | (3,479) |
| 5/25/2007 | W/H TAX DIV GS | (1,017) | - | (1,017) | - | - | 206,494,096 | - | (1,017) | (1,017) |
| 5/31/2007 | W/H TAX DIV C | (31,009) | - | (31,009) | - | - | 206,463,087 | - | (31,009) | (31,009) |
| 6/1/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | - | (5) | - | - | 206,463,082 | - | (5) | (5) |
| 6/1/2007 | W/H TAX DIV VNTC | (7,702) | - | (7,702) | - | - | 206,455,380 | - | (7,702) | (7,702) |
| 6/1/2007 | W/H TAX DIV WFC | (11,131) | - | (11,131) | - | - | 206,444,248 | - | (11,131) | (11,131) |
| 6/1/2007 | W/H TAX DIV BA | (3,211) | - | (3,211) | - | - | 206,441,037 | - | (3,211) | (3,211) |
| 6/1/2007 | W/H TAX DIV COP | (7,995) | - | (7,995) | - | - | 206,433,043 | - | (7,995) | (7,995) |
| 6/4/2007 | W/H TAX DIV WMT | (6,317) | - | (6,317) | - | - | 206,426,726 | - | (6,317) | (6,317) |
| 6/5/2007 | W/H TAX DIV UPS | (5,102) | - | (5,102) | - | - | 206,421,624 | - | (5,102) | (5,102) |
| 6/5/2007 | W/H TAX DIV PFE | (24,339) | - | (24,339) | - | - | 206,397,285 | - | (24,339) | (24,339) |
| 6/6/2007 | W/H TAX DIV TYC | (2,353) | - | (2,353) | - | - | 206,394,932 | - | (2,353) | (2,353) |
| 6/11/2007 | W/H TAX DIV CVX | (14,731) | - | (14,731) | - | - | 206,380,201 | - | (14,731) | (14,731) |
| 6/11/2007 | W/H TAX DIV WX | (3,219) | - | (3,219) | - | - | 206,376,982 | - | (3,219) | (3,219) |
| 6/11/2007 | W/H TAX DIV UPS | (23,445) | - | (23,445) | - | - | 206,353,537 | - | (23,445) | (23,445) |
| 6/11/2007 | W/H TAX DIV IBM | (7,088) | - | (7,088) | - | - | 206,346,449 | - | (7,088) | (7,088) |
| 6/11/2007 | W/H TAX DIV MMM | (4,241) | - | (4,241) | - | - | 206,342,229 | - | (4,241) | (4,241) |
| 6/12/2007 | W/H TAX DIV JNJ | (14,066) | - | (14,066) | - | - | 206,328,163 | - | (14,066) | (14,066) |

Exhibit C

MADC1159_00000020

BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 6/13/2007 | CHECK WIRE | 3,700,000 | 3,700,000 | | | | 210,028,163 | | | |
| 6/14/2007 | WH TAX DIV MSFT | (10,232) | | (10,232) | | | 210,018,931 | | (10,232) | (10,232) |
| 6/15/2007 | WH TAX DIV AIG | (5,102) | | (5,102) | | | 210,013,829 | | (5,102) | (5,102) |
| 6/15/2007 | WH TAX DIV WB | (12,368) | | (12,368) | | | 210,000,461 | | (12,368) | (12,368) |
| 6/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (8) | | (8) | | | 210,000,453 | | (8) | (8) |
| 6/15/2007 | WH TAX DIV TWX | (2,509) | | (2,509) | | | 209,997,944 | | (2,509) | (2,509) |
| 6/20/2007 | CHECK WIRE | 10,000,000 | 10,000,000 | | | | 219,997,944 | | | |
| 6/21/2007 | WH TAX DIV HD | (5,466) | | (5,466) | | | 219,992,478 | | (5,466) | (5,466) |
| 6/22/2007 | WH TAX DIV BAC | (29,684) | | (29,684) | | | 219,962,795 | | (29,684) | (29,684) |
| 6/29/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (16) | | (16) | | | 219,962,778 | | (16) | (16) |
| 6/29/2007 | WH TAX DIV S | (856) | | (856) | | | 219,961,922 | | (856) | (856) |
| 6/29/2007 | WH TAX DIV DEP | (312) | | (312) | | | 219,961,610 | | (312) | (312) |
| 7/2/2007 | WH TAX DIV KO | (8,016) | | (8,016) | | | 219,953,594 | | (8,016) | (8,016) |
| 7/2/2007 | WH TAX DIV MRK | (9,652) | | (9,652) | | | 219,943,942 | | (9,652) | (9,652) |
| 7/5/2007 | CHECK WIRE | 9,000,000 | 9,000,000 | | | | 228,936,942 | | | |
| 7/5/2007 | WH TAX DIV HPQ | (2,562) | | (2,562) | | | 228,934,380 | | (2,562) | (2,562) |
| 7/6/2007 | WH TAX DIV MO | (16,998) | | (16,998) | | | 228,917,383 | | (16,998) | (16,998) |
| 7/11/2007 | CHECK WIRE | 11,500,000 | 11,500,000 | | | | 240,417,383 | | | |
| 7/17/2007 | CXL WH TAX DIV TYC | 2,353 | | 2,353 | | | 240,419,736 | | | |
| 7/17/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (30) | | (30) | | | 240,419,706 | | (30) | (30) |
| 8/6/2007 | CHECK WIRE | 12,000,000 | 12,000,000 | | | | 252,419,706 | | | |
| 8/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (20) | | (20) | | | 252,419,686 | | (20) | (20) |
| 8/20/2007 | CHECK WIRE | (2,500,000) | | (2,500,000) | | | 249,919,686 | | (2,500,000) | (2,500,000) |
| 8/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (15) | | (15) | | | 249,919,670 | | (15) | (15) |
| 8/24/2007 | WH TAX DIV C | (16,262) | | (16,262) | | | 249,903,408 | | (16,262) | (16,262) |
| 9/4/2007 | WH TAX DIV WMT | (3,250) | | (3,250) | | | 249,900,158 | | (3,250) | (3,250) |
| 9/4/2007 | WH TAX DIV TGT | (4,027) | | (4,027) | | | 249,896,131 | | (4,027) | (4,027) |
| 9/4/2007 | WH TAX DIV WFC | (6,341) | | (6,341) | | | 249,889,790 | | (6,341) | (6,341) |
| 9/5/2007 | WH TAX DIV PFE | (12,523) | | (12,523) | | | 249,877,267 | | (12,523) | (12,523) |
| 9/7/2007 | WH TAX DIV HA | (1,591) | | (1,591) | | | 249,875,676 | | (1,591) | (1,591) |
| 9/10/2007 | WH TAX DIV IBM | (3,409) | | (3,409) | | | 249,872,267 | | (3,409) | (3,409) |
| 9/10/2007 | WH TAX DIV UTX | (2,000) | | (2,000) | | | 249,870,267 | | (2,000) | (2,000) |
| 9/10/2007 | WH TAX DIV XOM | (12,131) | | (12,131) | | | 249,858,136 | | (12,131) | (12,131) |
| 9/10/2007 | WH TAX DIV CVX | (7,580) | | (7,580) | | | 249,850,556 | | (7,580) | (7,580) |
| 9/13/2007 | WH TAX DIV MSFT | (5,171) | | (5,171) | | | 249,845,385 | | (5,171) | (5,171) |
| 9/14/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (24) | | (24) | | | 249,845,361 | | (24) | (24) |
| 9/18/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | | (3) | | | 249,845,358 | | (3) | (3) |
| 9/26/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (18) | | (18) | | | 249,845,340 | | (18) | (18) |
| 10/1/2007 | WH TAX DIV KO | (3,978) | | (3,978) | | | 249,841,362 | | (3,978) | (3,978) |
| 10/10/2007 | WH TAX DIV MO | (9,192) | | (9,192) | | | 249,832,170 | | (9,192) | (9,192) |
| 10/12/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (36) | | (36) | | | 249,832,134 | | (36) | (36) |
| 10/19/2007 | CHECK WIRE | (5,750,000) | | (5,750,000) | | | 244,082,134 | | (5,750,000) | (5,750,000) |
| 10/25/2007 | WH TAX DIV GE | (24,278) | | (24,278) | | | 244,057,856 | | (24,278) | (24,278) |
| 10/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | | (2) | | | 244,057,853 | | (2) | (2) |
| 11/6/2007 | CHECK WIRE | 15,000,000 | 15,000,000 | | | | 259,057,853 | | | |
| 11/7/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (17) | | (17) | | | 259,057,837 | | (17) | (17) |
| 11/13/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (19) | | (19) | | | 259,057,818 | | (19) | (19) |
| 11/15/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (6) | | (6) | | | 259,057,811 | | (6) | (6) |
| 11/19/2007 | CHECK WIRE | 15,000,000 | 15,000,000 | | | | 274,057,811 | | | |
| 11/20/2007 | CHECK WIRE | 5,000,000 | 5,000,000 | | | | 279,057,811 | | | |
| 11/21/2007 | WH TAX DIV MER | (1,277) | | (1,277) | | | 279,056,535 | | (1,277) | (1,277) |
| 11/21/2007 | WH TAX DIV UTX | (15) | | (15) | | | 279,056,520 | | (15) | (15) |
| 11/21/2007 | WH TAX DIV C | (10,835) | | (10,835) | | | 279,045,685 | | (10,835) | (10,835) |
| 11/30/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (7) | | (7) | | | 279,045,688 | | (7) | (7) |
| 12/3/2007 | WH TAX DIV MCD | (11,039) | | (11,039) | | | 279,034,649 | | (11,039) | (11,039) |
| 12/3/2007 | WH TAX DIV GDP | (2,692) | | (2,692) | | | 283,020,356 | | (2,692) | (2,692) |
| 12/3/2007 | WH TAX DIV GD | | | | | | | | | |
| 12/7/2007 | CHECK WIRE | 5,000,000 | 5,000,000 | | | | 284,030,456 | | | |
| 12/10/2007 | WH TAX DIV EXC | (1,744) | | (1,744) | | | 284,028,220 | | (1,744) | (1,744) |
| 12/10/2007 | WH TAX DIV UTX | (1,993) | | (1,993) | | | 284,028,658 | | (1,993) | (1,993) |
| 12/10/2007 | WH TAX DIV CVX | (7,552) | | (7,552) | | | 284,020,668 | | (7,552) | (7,552) |
| 12/11/2007 | WH TAX DIV C | (7) | | (7) | | | 284,020,661 | | (7) | (7) |
| 12/12/2007 | WH TAX DIV MMM | (14,284) | | (14,284) | | | 284,020,377 | | (14,284) | (14,284) |
| 12/12/2007 | WH TAX DIV MSFT | (4,264) | | (4,264) | | | 284,002,113 | | (4,264) | (4,264) |
| 12/13/2007 | WH TAX DIV MSFT | (5,480) | | (5,480) | | | 283,996,634 | | (5,480) | (5,480) |
| 12/19/2007 | CHECK WIRE | (7,000,000) | | (7,000,000) | | | 276,996,634 | | (7,000,000) | (7,000,000) |

Exhibit C

MADC1159_00000021

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 Date | Column 2 Transaction Description | Column 3 Transaction Amount Reported in Customer Statement | Column 4 Cash Deposits | Column 5 Cash Withdrawals | Column 6 Transfers of Principal In | Column 7 Transfers of Principal Out | Column 8 Balance of Principal | Column 9 90-Day Preferential Transfers | Column 10 2-Year Cash Withdrawals | Column 11 6-Year Cash Withdrawals |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/20/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 276,990,634 | | (0) | (0) |
| 12/31/2007 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | | (3) | | | 276,990,631 | | (3) | (3) |
| 1/2/2008 | WH TAX DIV WMT | (2,229) | | (2,229) | | | 276,988,401 | | (2,229) | (2,229) |
| 1/2/2008 | WH TAX DIV HPQ | (873) | | (873) | | | 276,993,529 | | (873) | (873) |
| 1/3/2008 | WH TAX DIV UPS | (2,615) | | (2,615) | | | 276,990,913 | | (2,615) | (2,615) |
| 1/8/2008 | CHECK WIRE | 10,800,000 | 10,800,000 | | | | 287,790,913 | | | |
| 1/17/2008 | CHECK WIRE | 12,000,000 | 12,000,000 | | | | 299,790,913 | | | |
| 1/22/2008 | CHECK WIRE | 10,000,000 | 10,000,000 | | | | 309,790,913 | | | |
| 1/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (25) | | (25) | | | 309,790,888 | | (25) | (25) |
| 2/5/2008 | CHECK WIRE | 11,000,000 | 11,000,000 | | | | 320,790,888 | | | |
| 2/13/2008 | CHECK WIRE | 9,000,000 | 9,000,000 | | | | 329,790,888 | | | |
| 2/21/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (20) | | (20) | | | 329,790,868 | | (20) | (20) |
| 2/21/2008 | CHECK WIRE | 15,000,000 | 15,000,000 | | | | 344,790,868 | | | |
| 2/22/2008 | WH TAX DIV C | (13,898) | | (13,898) | | | 344,776,969 | | (13,898) | (13,898) |
| 2/28/2008 | CHECK WIRE | 15,000,000 | 15,000,000 | | | | 359,776,969 | | | |
| 2/29/2008 | WH TAX DIV GS | (1,126) | | (1,126) | | | 359,775,843 | | (1,126) | (1,126) |
| 3/3/2008 | WH TAX DIV WFC | (9,225) | | (9,225) | | | 359,766,618 | | (9,225) | (9,225) |
| 3/3/2008 | WH TAX DIV INTC | (6,461) | | (6,461) | | | 359,760,158 | | (6,461) | (6,461) |
| 3/3/2008 | WH TAX DIV COP | (6,426) | | (6,426) | | | 359,753,731 | | (6,426) | (6,426) |
| 3/4/2008 | WH TAX DIV UPS | (3,981) | | (3,981) | | | 359,749,750 | | (3,981) | (3,981) |
| 3/4/2008 | WH TAX DIV PFE | (18,531) | | (18,531) | | | 359,731,219 | | (18,531) | (18,531) |
| 3/5/2008 | WH TAX DIV MER | (2,534) | | (2,534) | | | 359,728,685 | | (2,534) | (2,534) |
| 3/7/2008 | CHECK WIRE | 30,000,000 | 30,000,000 | | | | 389,728,685 | | | |
| 3/7/2008 | WH TAX DIV BA | (2,574) | | (2,574) | | | 389,726,112 | | (2,574) | (2,574) |
| 3/10/2008 | WH TAX DIV EXC | (2,815) | | (2,815) | | | 389,723,296 | | (2,815) | (2,815) |
| 3/10/2008 | WH TAX DIV UTX | (2,831) | | (2,831) | | | 389,720,465 | | (2,831) | (2,831) |
| 3/10/2008 | WH TAX DIV WMT | (4,826) | | (4,826) | | | 389,715,640 | | (4,826) | (4,826) |
| 3/10/2008 | WH TAX DIV XOM | (16,890) | | (16,890) | | | 389,698,749 | | (16,890) | (16,890) |
| 3/10/2008 | WH TAX DIV CVX | (10,729) | | (10,729) | | | 389,688,020 | | (10,729) | (10,729) |
| 3/11/2008 | WH TAX DIV JNJ | (10,347) | | (10,347) | | | 389,677,673 | | (10,347) | (10,347) |
| 3/12/2008 | WH TAX DIV MMM | (3,217) | | (3,217) | | | 389,674,455 | | (3,217) | (3,217) |
| 3/13/2008 | WH TAX DIV WMT | (7,697) | | (7,697) | | | 389,666,758 | | (7,697) | (7,697) |
| 3/17/2008 | WH TAX DIV WB | (11,325) | | (11,325) | | | 389,655,434 | | (11,325) | (11,325) |
| 3/17/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (23) | | (23) | | | 389,655,411 | | (23) | (23) |
| 3/17/2008 | WH TAX DIV MCD | (3,921) | | (3,921) | | | 389,651,490 | | (3,921) | (3,921) |
| 3/17/2008 | WH TAX DIV WFC | (1,960) | | (1,960) | | | 389,649,529 | | (1,960) | (1,960) |
| 3/20/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | | (0) | | | 389,649,529 | | (0) | (0) |
| 3/24/2008 | WH TAX DIV AIG | (4,504) | | (4,504) | | | 389,645,025 | | (4,504) | (4,504) |
| 3/27/2008 | WH TAX DIV HD | (3,257) | | (3,257) | | | 389,641,768 | | (3,257) | (3,257) |
| 3/28/2008 | WH TAX DIV BAC | (24,708) | | (24,708) | | | 389,617,059 | | (24,708) | (24,708) |
| 3/31/2008 | WH TAX DIV PEP | (5,127) | | (5,127) | | | 389,611,932 | | (5,127) | (5,127) |
| 4/1/2008 | WH TAX DIV MS | (6,724) | | (6,724) | | | 389,605,208 | | (6,724) | (6,724) |
| 4/1/2008 | WH TAX DIV MRK | (7,335) | | (7,335) | | | 389,597,873 | | (7,335) | (7,335) |
| 4/2/2008 | WH TAX DIV VZ | (1,802) | | (1,802) | | | 389,596,071 | | (1,802) | (1,802) |
| 4/4/2008 | WH TAX DIV KFT | (3,692) | | (3,692) | | | 389,592,379 | | (3,692) | (3,692) |
| 4/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | | (5) | | | 389,592,375 | | (5) | (5) |
| 4/4/2008 | WH TAX DIV AXP | (4,776) | | (4,776) | | | 389,587,599 | | (4,776) | (4,776) |
| 4/23/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (5) | | (5) | | | 389,587,594 | | (5) | (5) |
| 4/25/2008 | WH TAX DIV MDT | (1,306) | | (1,306) | | | 389,586,288 | | (1,306) | (1,306) |
| 4/25/2008 | WH TAX DIV GE | (27,177) | | (27,177) | | | 389,559,110 | | (27,177) | (27,177) |
| 4/30/2008 | WH TAX DIV PM | (1,914) | | (1,914) | | | 389,557,197 | | (1,914) | (1,914) |
| 4/30/2008 | WH TAX DIV MO | (2,587) | | (2,587) | | | 389,554,610 | | (2,587) | (2,587) |
| 5/1/2008 | WH TAX DIV VZ | (11,609) | | (11,609) | | | 389,543,001 | | (11,609) | (11,609) |
| 5/1/2008 | WH TAX DIV T | (22,643) | | (22,643) | | | 389,520,358 | | (22,643) | (22,643) |
| 5/2/2008 | WH TAX DIV CVS | (836) | | (836) | | | 389,509,521 | | (836) | (836) |
| 5/2/2008 | WH TAX DIV VK | (2,508) | | (2,508) | | | 389,507,013 | | (2,508) | (2,508) |
| 5/15/2008 | WH TAX DIV PG | (1,881) | | (1,881) | | | 389,505,132 | | (1,881) | (1,881) |
| 5/15/2008 | WH TAX DIV ABT | (11,844) | | (11,844) | | | 389,493,288 | | (11,844) | (11,844) |
| 5/20/2008 | WH TAX DIV CAT | (2,195) | | (2,195) | | | 389,485,763 | | (2,195) | (2,195) |
| 5/23/2008 | WH TAX DIV QS | (15,049) | | (15,049) | | | 389,470,714 | | (15,049) | (15,049) |
| 5/28/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (26) | | (26) | | | 389,470,689 | | (26) | (26) |
| 5/29/2008 | WH TAX DIV QS | (1,219) | | (1,219) | | | 389,469,469 | | (1,219) | (1,219) |
| 6/2/2008 | WH TAX DIV COP | (4,338) | | (4,338) | | | 389,465,131 | | (4,338) | (4,338) |
| 6/2/2008 | WH TAX DIV INTC | (7,681) | | (7,681) | | | 389,457,450 | | (7,681) | (7,681) |

Exhibit C

MADC1159_00000022

**BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET**

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 6/2/2008 | WH TAX DIV WMT | (9,861) | - | (9,861) | - | - | 389,447,589 | - | (9,861) | (9,861) |
| 6/2/2008 | WH TAX DIV PNU | (17,551) | - | (17,551) | - | - | 389,430,038 | - | (17,551) | (17,551) |
| 6/3/2008 | WH TAX DIV UPS | (7,905) | - | (7,905) | - | - | 389,422,133 | - | (7,905) | (7,905) |
| 6/3/2008 | WH TAX DIV PFE | (37,815) | - | (37,815) | - | - | 389,384,318 | - | (37,815) | (37,815) |
| 6/6/2008 | WH TAX DIV BA | (5,110) | - | (5,110) | - | - | 389,379,208 | - | (5,110) | (5,110) |
| 6/10/2008 | WH TAX DIV EXC | (5,589) | - | (5,589) | - | - | 389,373,619 | - | (5,589) | (5,589) |
| 6/10/2008 | WH TAX DIV PNJ | (7,742) | - | (7,742) | - | - | 389,365,877 | - | (7,742) | (7,742) |
| 6/10/2008 | WH TAX DIV XOM | (37,396) | - | (37,396) | - | - | 389,328,480 | - | (37,396) | (37,396) |
| 6/10/2008 | WH TAX DIV CVX | (23,874) | - | (23,874) | - | - | 389,304,606 | - | (23,874) | (23,874) |
| 6/10/2008 | WH TAX DIV IBM | (11,977) | - | (11,977) | - | - | 389,292,630 | - | (11,977) | (11,977) |
| 6/12/2008 | WH TAX DIV UTX | (5,621) | - | (5,621) | - | - | 389,287,009 | - | (5,621) | (5,621) |
| 6/12/2008 | WH TAX DIV MMM | (6,388) | - | (6,388) | - | - | 389,280,621 | - | (6,388) | (6,388) |
| 6/12/2008 | WH TAX DIV MSFT | (15,282) | - | (15,282) | - | - | 389,265,339 | - | (15,282) | (15,282) |
| 7/23/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (18) | - | (18) | - | - | 389,265,321 | - | (18) | (18) |
| 8/1/2008 | WH TAX DIV CVS | (1,213) | - | (1,213) | - | - | 389,264,108 | - | (1,213) | (1,213) |
| 8/8/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (3) | - | (3) | - | - | 389,264,104 | - | (3) | (3) |
| 8/13/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 389,264,104 | - | (0) | (0) |
| 8/20/2008 | WH TAX DIV CAT | (3,229) | - | (3,229) | - | - | 389,260,875 | - | (3,229) | (3,229) |
| 8/22/2008 | WH TAX DIV C | (20,736) | - | (20,736) | - | - | 389,240,139 | - | (20,736) | (20,736) |
| 8/27/2008 | CHECK WIRE | 7,000,000 | 7,000,000 | - | - | - | 396,240,139 | - | - | - |
| 8/28/2008 | WH TAX DIV GS | (1,538) | - | (1,538) | - | - | 396,238,601 | - | (1,538) | (1,538) |
| 9/24/2008 | CHECK WIRE | (155,000,000) | - | (155,000,000) | - | - | 241,238,601 | (155,000,000) | (155,000,000) | (155,000,000) |
| 10/2/2008 | WH TAX DIV HD | (2,165) | - | (2,165) | - | - | 241,236,437 | - | (2,165) | (2,165) |
| 10/2/2008 | WH TAX DIV MSFT | (15,478) | - | (15,478) | - | - | 241,220,959 | - | (15,478) | (15,478) |
| 10/2/2008 | WH TAX DIV MMM | (6,419) | - | (6,419) | - | - | 241,214,540 | - | (6,419) | (6,419) |
| 10/2/2008 | WH TAX DIV UTX | (5,649) | - | (5,649) | - | - | 241,208,891 | - | (5,649) | (5,649) |
| 10/2/2008 | WH TAX DIV EXC | (5,616) | - | (5,616) | - | - | 241,203,275 | - | (5,616) | (5,616) |
| 10/2/2008 | WH TAX DIV COP | (8,775) | - | (8,775) | - | - | 241,194,500 | - | (8,775) | (8,775) |
| 10/2/2008 | WH TAX DIV XOM | (37,026) | - | (37,026) | - | - | 241,157,473 | - | (37,026) | (37,026) |
| 10/2/2008 | WH TAX DIV INTC | (9,533) | - | (9,533) | - | - | 241,147,940 | - | (9,533) | (9,533) |
| 10/2/2008 | WH TAX DIV PEP | (26,668) | - | (26,668) | - | - | 241,121,273 | - | (26,668) | (26,668) |
| 10/2/2008 | WH TAX DIV WFC | (11,576) | - | (11,576) | - | - | 241,110,356 | - | (11,576) | (11,576) |
| 10/2/2008 | WH TAX DIV IBM | (8,237) | - | (8,237) | - | - | 241,102,119 | - | (8,237) | (8,237) |
| 10/2/2008 | WH TAX DIV TWX | (3,975) | - | (3,975) | - | - | 241,098,144 | - | (3,975) | (3,975) |
| 10/2/2008 | WH TAX DIV UPS | (7,943) | - | (7,943) | - | - | 241,090,201 | - | (7,943) | (7,943) |
| 10/2/2008 | WH TAX DIV KO | (1,458) | - | (1,458) | - | - | 241,088,743 | - | (1,458) | (1,458) |
| 10/2/2008 | WH TAX DIV QCOM | (11,594) | - | (11,594) | - | - | 241,077,149 | - | (11,594) | (11,594) |
| 10/2/2008 | WH TAX DIV PEP | (22,656) | - | (22,656) | - | - | 241,054,493 | - | (22,656) | (22,656) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (13) | - | (13) | - | - | 241,054,480 | - | (13) | (13) |
| 10/2/2008 | WH TAX DIV JNJ | (49,945) | - | (49,945) | - | - | 241,004,535 | - | (49,945) | (49,945) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 241,004,535 | - | (0) | (0) |
| 10/2/2008 | WH TAX DIV T | (10,349) | - | (10,349) | - | - | 240,994,186 | - | (10,349) | (10,349) |
| 10/2/2008 | WH TAX DIV BAC | (3,515) | - | (3,515) | - | - | 240,990,671 | - | (3,515) | (3,515) |
| 10/2/2008 | WH TAX DIV AIG | (3,251) | - | (3,251) | - | - | 240,987,420 | - | (3,251) | (3,251) |
| 10/2/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (2) | - | (2) | - | - | 240,987,418 | - | (2) | (2) |
| 10/2/2008 | WH TAX DIV CVX | (23,661) | - | (23,661) | - | - | 240,956,340 | - | (23,661) | (23,661) |
| 10/2/2008 | WH TAX DIV WMT | (9,528) | - | (9,528) | - | - | 240,946,812 | - | (9,528) | (9,528) |
| 10/6/2008 | CHECK WIRE | (10,000,000) | - | (10,000,000) | - | - | 230,946,812 | (10,000,000) | (10,000,000) | (10,000,000) |
| 10/27/2008 | CHECK WIRE | (30,000,000) | - | (30,000,000) | - | - | 200,946,812 | (30,000,000) | (30,000,000) | (30,000,000) |
| 11/4/2008 | WH TAX DIV KO | (4,293) | - | (4,293) | - | - | 200,942,518 | - | (4,293) | (4,293) |
| 11/4/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 200,942,518 | - | (1) | (1) |
| 11/4/2008 | WH TAX DIV MO | (2,587) | - | (2,587) | - | - | 200,939,931 | - | (2,587) | (2,587) |
| 11/4/2008 | WH TAX DIV HPQ | (3,426) | - | (3,426) | - | - | 200,936,505 | - | (3,426) | (3,426) |
| 11/4/2008 | WH TAX DIV MRK | (14,025) | - | (14,025) | - | - | 200,922,480 | - | (14,025) | (14,025) |
| 11/4/2008 | WH TAX DIV BAX | (2,443) | - | (2,443) | - | - | 200,920,037 | - | (2,443) | (2,443) |
| 11/14/2008 | WH TAX DIV PM | (6,378) | - | (6,378) | - | - | 200,913,659 | - | (6,378) | (6,378) |
| 11/14/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 200,913,658 | - | (1) | (1) |
| 11/14/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 200,913,658 | - | (0) | (0) |
| 11/14/2008 | CHECK WIRE | (65,000,000) | - | (65,000,000) | - | - | 135,913,658 | (65,000,000) | (65,000,000) | (65,000,000) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 135,913,657 | - | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 135,913,657 | - | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 135,913,656 | - | (0) | (0) |

Exhibit C

BLMIS ACCOUNT NO. 1FR096 - GROUPEMENT FINANCIER LTD 5-11 LAVINGTON STREET

| Column 1 | Column 2 | Column 3 | Column 4 | Column 5 | Column 6 | Column 7 | Column 8 | Column 9 | Column 10 | Column 11 |
|---|---|---|---|---|---|---|---|---|---|---|
| Date | Transaction Description | Transaction Amount Reported in Customer Statement | Cash Deposits | Cash Withdrawals | Transfers of Principal In | Transfers of Principal Out | Balance of Principal | 90-Day Preferential Transfers | 2-Year Cash Withdrawals | 6-Year Cash Withdrawals |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 135,913,656 | (0) | (0) | (0) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (1) | - | (1) | - | - | 135,913,654 | (1) | (1) | (1) |
| 12/3/2008 | FIDELITY SPARTAN U S TREASURY MONEY MARKET | (0) | - | (0) | - | - | 135,913,654 | (0) | (0) | (0) |
| | Total: | | $ 491,995,607 | $ (356,081,953) | $ - | $ - | 135,913,654 | $ (260,324,947) | $ (276,971,458) | $ (356,081,953) |

MADC1159_00000023